PERKINS COIE LLP
Shylah R. Alfonso, *pro hac vice pending*
SAlfonso@perkinscoie.com
Tiffany L. Lee, Bar No. 303007
TiffanyLee@perkinscoie.com
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.8000
Facsimile: 206.359.9000

Jon B. Jacobs, *pro hac vice pending*
JBJacobs@perkinscoie.com
700 13th Street, NW
Suite 800
Washington, D.C. 20005-3960
Telephone: 202.654.6200
Facsimile: 202.654.6211

Elliott J. Joh, Bar No. 264927
EJoh@perkinscoie.com
Lauren Trambley, Bar No. 340634
LTrambley@perkinscoie.com
PERKINS COIE LLP
505 Howard Street, Suite 1000
San Francisco, CA 94105-3204
Telephone: 415.344.7000
Facsimile: 415.344.7050

Attorneys for Defendant
LINKEDIN CORPORATION

## UNITED STATES DISTRICT COURT

### NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

| | |
|---|---|
| TODD CROWDER, KEVIN SCHULTE, and GARRICK VANCE, on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>v.<br><br>LINKEDIN CORPORATION,<br><br>                    Defendant. | Case No. 4:22-cv-00237-HSG<br><br>**DEFENDANT LINKEDIN CORP.'S NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**<br><br>Judge: Hon. Haywood S. Gilliam, Jr.<br>Date:   September 8, 2022<br>Time:   2:00 p.m.<br>Crtrm:  2 - 4th Floor |

**TABLE OF CONTENTS**

Page

I.    INTRODUCTION...................................................................................... 2

II.   FACTUAL BACKGROUND ................................................................... 4

      A.    LinkedIn Offers a Variety of Social Networking Services................... 4

      B.    LinkedIn is an Innovator..................................................................... 5

            1.    LinkedIn creates greater functionality through API partnerships. .............. 5

            2.    LinkedIn protects its members' control over their own data..................... 6

            3.    LinkedIn uses cloud computing resources to enhance its offerings............ 6

III.  THE COURT SHOULD DISMISS THE COMPLAINT FOR FAILURE TO STATE A CLAIM............................................................................. 7

      A.    Claims That Lack Sufficient Facts To Be Plausible On Their Face Must Be Dismissed................................................................................. 7

      B.    Plaintiffs Fail to Allege Facts Supporting a Viable Theory of Monopolization Under Section 2. ....................................................... 8

            1.    LinkedIn's success and innovations do not violate antitrust law................ 8

            2.    None of LinkedIn's specifically alleged conduct is exclusionary............. 10

                  a.    LinkedIn's API agreements are inclusionary, not exclusionary.... 10

                  b.    LinkedIn's alleged refusal to deal with its competitors is not exclusionary............................................................................. 11

                  c.    LinkedIn's use of the same cloud computing resources that are readily available to competitors is not exclusionary..................... 14

      C.    Plaintiffs' Attempted Monopolization Claim Under Section 2 Fails for the Same Reasons as Their Monopolization Claim........................... 17

      D.    Plaintiffs' Section 1 Claim Fails as a Matter of Law............................ 18

            1.    Plaintiffs have no direct evidence of the alleged agreement between LinkedIn and Facebook............................................................ 18

            2.    None of the alleged circumstantial evidence plausibly indicates an agreement........................................................................................ 19

                  a.    Facebook's product launch does not plausibly imply an antitrust conspiracy........................................................................ 20

                  b.    LinkedIn and Facebook's alleged data reciprocity negotiations do not plausibly imply a conspiracy.............................................. 22

                  c.    Facebook's alleged agreement with Google is irrelevant. ............ 23

            3.    Plaintiffs' market-division claim under Section 1 is time-barred.............. 24

CONCLUSION.............................................................................................. 24

LINKEDIN'S MOTION TO DISMISS COMPLAINT - CASE NO. 4:22-cv-00237-HSG

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*,
141 F.3d 947 (9th Cir. 1988)......................................................................10, 23

*Aerotec Int'l, Inc. v. Honeywell Int'l., Inc.*,
836 F.3d 1171 (9th Cir. 2016).....................................................................12, 13

*Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*,
592 F.3d 991 (9th Cir. 2010).........................................................................9, 16

*Am. Contractors Supply, LLC v. HD Supply Constr. Supply, Ltd.*,
2020 WL 10467232 (N.D. Ga. Feb. 26, 2020).....................................................11

*Apple, Inc. v. Psytar Corp.*,
586 F. Supp. 2d 1190 (N.D. Cal. 2008)................................................................8

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................................7

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
472 U.S. 585 (1985)........................................................................9, 12, 13, 14

*Associated Gen. Contractors of Cal., Inc. v. Carpenters*,
459 U.S. 519 (1983)............................................................................................7

*Atl. Richfield Co. v. USA Petroleum Co.*,
495 U.S. 328 (1990)..........................................................................................16

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
166 F. Supp. 3d 988 (N.D. Cal. 2015)................................................................24

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007).....................................................................................passim

*City of Oakland v. Oakland Raiders*,
20 F.4th 441 (9th Cir. 2021)..............................................................................16

*Complete Ent. Res. LLC v. Live Nation Ent., Inc.*,
2016 WL 3457177 (C.D. Cal. May 11, 2016).....................................................15

*Datel Holdings Ltd. v. Microsoft Corp.*,
712 F. Supp. 2d 974 (N.D. Cal. 2010)..................................................................6

*Evanston Police Pension Fund v. McKesson Corp.*,
411 F. Supp. 3d 580 (N.D. Cal. 2019)................................................................23

*Falstaff Brewing Co. v. Stroh Brewery Co.*,
   628 F. Supp. 822 (N.D. Cal. 1986) ................................................................18

*Feitelson v. Google Inc.*,
   80 F. Supp. 3d 1019 (N.D. Cal. 2015)...............................................................7

*FTC v. Qualcomm Inc.*,
   969 F.3d 974 (9th Cir. 2020) ........................................................ 9, 12, 13, 16

*General Commc'ns Eng'g, Inc. v. Motorola Commc'ns & Elecs., Inc.*,
   421 F. Supp. 274 (N.D. Cal. 1976) ...............................................................18

*Goldwasser v. Ameritech Corp.*,
   222 F.3d 390 (7th Cir. 2000) ...................................................................14, 16

*hiQ Labs, Inc. v. LinkedIn Corp.*,
   485 F. Supp. 3d 1137 (N.D. Cal. 2020).................................................3, 13, 14

*Hirsh v. Martindale-Hubbell, Inc.*,
   674 F.2d 1343 (9th Cir. 1982) .......................................................................15

*Howard Hess Dental Lab'ys Inc. v. Dentsply Int'l, Inc.*,
   602 F.3d 237 (3d Cir. 2010) ..........................................................................17

*Hunter v. Tarantino*,
   2010 WL 11579019 (C.D. Cal. July 15, 2010) ..............................................17

*In re Animation Workers Antitrust Litig.*,
   87 F. Supp. 3d 1195 (N.D. Cal. 2015)..............................................................7

*In re Elevator Antitrust Litig.*,
   502 F.3d 47 (2d Cir. 2007) ............................................................................23

*In re Gilead Scis. Secs. Litig.*,
   536 F.3d 1049 (9th Cir. 2008) .........................................................................7

*In re Packaged Seafood Antitrust Litig.*,
   2017 WL 35571 (S.D. Cal. Jan. 3, 2017)........................................................20

*John Doe 1 v. Abbott Lab'ys*,
   571 F.3d 930 (9th Cir. 2009)......................................................................8, 15

*Jones v. Micron Tech. Inc.*,
   400 F. Supp. 3d 897 (N.D. Cal. 2019)............................................................19

*Kendall v. Visa U.S.A., Inc.*,
   518 F.3d 1042 (9th Cir. 2008) ............................................................7, 19, 20

*Liveuniverse, Inc. v. Myspace, Inc.*,
   2007 WL 6865852 (C.D. Cal. June 4, 2007) ..................................................16

- iii -

*LiveUniverse, Inc. v. MySpace, Inc.*,
304 F. App'x 554 (9th Cir. 2008) ................................................................17

*MCI Commc'ns Corp v. AT&T*,
708 F.2d 1081 (7th Cir. 1983) .....................................................................12

*MedioStream, Inc. v. Microsoft Corp.*,
869 F. Supp. 2d 1095 (N.D. Cal. 2012)...................................................16, 24

*Monsanto Co. v. Trantham*,
156 F. Supp. 2d 855 (W.D. Tenn. 2001) ........................................................8

*Moore v. Mars Petcare US, Inc.*,
820 F. App'x 573 (9th Cir. 2020) ................................................................21

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
364 F.3d 1288 (11th Cir. 2004) ...................................................................12

*N. Star Gas Co. v. Pac. Gas & Electric Co.*,
2016 WL 5358590 (N.D. Cal. Sept. 26, 2016) (Gilliam, J.) ...........................7

*Name.Space, Inc. v. Internet Corp. for Assigned Names & Numbers*,
795 F.3d 1124 (9th Cir. 2015) .....................................................................20

*Novation Ventures, LLC v. J.G. Wentworth Co., LLC*,
2015 WL 12765467 (C.D. Cal. Sept. 21, 2015).............................................17

*Oliver v. SD-3C LLC*,
2016 WL 5950345 (N.D. Cal. Sept. 30, 2016)...............................................19

*Olympia Equipment Leasing Co. v. Western Union Telegraph Co.*,
797 F.2d 370 (7th Cir. 1986) .......................................................................11

*Opperman v. Path, Inc.*,
84 F. Supp. 3d 962 (N.D. Cal. 2015).............................................................6

*Pace Indus., Inc. v. Three Phoenix Co.*,
813 F.2d 234 (9th Cir. 1987) .......................................................................24

*Philadelphia Taxi Ass'n, Inc. v. Uber Techs., Inc.*,
886 F.3d 332 (3d Cir. 2018) ........................................................................16

*PNY Techs., Inc. v. SanDisk Corp.*,
2012 WL 1380271 (N.D. Cal. Apr. 20, 2012) ...............................................19

*Rebel Oil Co. v. Atl. Richfield Co.*,
51 F.3d 1421 (9th Cir. 1995).....................................................................8, 17

*Reveal Chat Holdco, LLC v. Facebook, Inc.*,
471 F. Supp. 3d 981 (N.D. Cal. 2020)......................................................13, 15

LINKEDIN'S MOTION TO DISMISS COMPLAINT - CASE NO. 4:22-cv-00237-HSG

*Samsung Elecs. Co. v. Panasonic Corp.*,
  2011 WL 9529403 (N.D. Cal. Aug. 25, 2011) ......................................................24

*Siva v. Am. Bd. of Radiology*,
  418 F. Supp. 3d 264 (N.D. Ill. 2019) ...................................................................12

*Spectrum Sports, Inc. v. McQuillan*,
  506 U.S. 447 (1993) ..............................................................................................17

*State of Ill., ex rel. Burris v. Panhandle Eastern Pipe Line Co.*,
  935 F.2d 1469 (7th Cir. 1991) ........................................................................11, 12

*U.S. v. Syufy Enters.*,
  903 F.2d 659 (9th Cir. 1990) ..................................................................................9

*Verizon Commc'ns Inc. v. Law Offices. of Curtis V. Trinko, LLP*,
  540 U.S. 398 (2004) ........................................................................................13, 16

**STATUTES**

15 U.S.C. § 1 ..................................................................................................passim

**RULES**

Fed. R. Civ. P. 12(b)(6) ............................................................................................7

**OTHER AUTHORITIES**

*API Terms of Use*, LINKEDIN, https://legal.linkedin.com/api-terms-of-use ..................10

*Privacy FAQs*, LINKEDIN, https://privacy.linkedin.com/faq ..........................................6

*Privacy Policy*, LINKEDIN, https://www.linkedin.com/legal/privacy-policy#key-
  terms-intro (Aug. 11, 2020) ....................................................................................6

*Privacy Settings*, LINKEDIN, https://privacy.linkedin.com/settings (last visited Apr.
  6, 2022) .....................................................................................................................6

*SNAP Partner Directory*, LINKEDIN, https://business.linkedin.com/sales-
  solutions/partners/find-a-partner#select-category (last visited Apr. 6, 2022) ..........6

## <u>NOTICE OF MOTION AND MOTION TO DISMISS</u>

TO PLAINTIFF AND THEIR ATTORNEYS OF RECORD:

NOTICE IS HEREBY GIVEN that on Thursday, September 8, 2022 at 2:00 p.m. or as soon thereafter as counsel may be heard, before the Honorable Haywood S. Gilliam, Jr., in Courtroom 2 of the United States Courthouse, located at 1301 Clay Street, Oakland, CA 94612, Defendant LinkedIn Corporation ("LinkedIn") will and hereby does move the Court to dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 8 and 12(b)(6) in its entirety with prejudice for failure to state a claim upon which relief can be granted.

This Motion is based on this Notice of Motion and Motion, the Memorandum of Points and Authorities contained herein, any reply papers that may be submitted and on the arguments of counsel at any hearing that may be held, and all of the pleadings, files and records in this proceeding.

DATED:  April 12, 2022             PERKINS COIE LLP

                                                    By:    _/s/ Elliott J. Joh_____
                                                            Elliott J. Joh

                                                    Attorney for Defendant
                                                    LINKEDIN CORPORATION

## MEMORANDUM OF POINTS AND AUTHORITIES

## STATEMENT OF ISSUES TO BE DECIDED

1.     Whether Plaintiffs fail to state a claim for monopolization under 15 U.S.C. § 2.

2.     Whether Plaintiffs fail to state a claim for attempted monopolization under 15 U.S.C. § 2.

3.     Whether Plaintiffs fail to state a claim for per se market-division under 15 U.S.C. § 1.

## I.     INTRODUCTION

Defendant LinkedIn Corporation ("LinkedIn") is a case study in how a successful company is created, grown, and operated through hard work, ingenuity and innovation. LinkedIn launched its social networking service in 2003 with a "no-frills website" and members numbering in the low thousands.  In the almost 20 years since, LinkedIn's investments and innovation have created a dynamic service that now allows hundreds of millions of professionals worldwide to connect online.  Plaintiffs Todd Crowder, Kevin Schulte, and Garrick Vance ("Plaintiffs") assert claims of monopolization and a market-division agreement with Facebook.  But the Complaint is replete with contradictory theories of harm, some of which have already been rejected in another case in this District based on these same facts. There is only one consistent and coherent story told by the Complaint, and it is neither exclusion nor collusion.  Rather, it is LinkedIn's success story as an innovator.

None of Plaintiffs' three monopolization theories alleges the kind of exclusionary behavior required to state a claim under Section 2 of the Sherman Act.  Nowhere do Plaintiffs identify a single company prevented from competing due to LinkedIn's conduct.  Instead, the Complaint describes LinkedIn's investments to optimize its services, which Plaintiffs themselves allege were beneficial to consumers.  The Court should reject each of these three theories.

*First*, Plaintiffs' allegations that LinkedIn aggregates and "sells" member data through its application programming interfaces ("APIs") to third-party business partners — a practice that Plaintiffs concede allows those partners to create additional functionality for LinkedIn's

1   services — fall far short of stating any kind of claim for excluding competition from the alleged

2   market for professional social networking.  If anything, LinkedIn's sharing of member data with

3   other businesses that are actual or potential competitors is the exact opposite of a Section 2

4   violation: it is inclusionary, not exclusionary.

5   　　　　*Second*, Plaintiffs' allegation that LinkedIn's efforts to protect its members' control over

6   their own data against automated "scraping" by suspicious third party bots amounts to

7   exclusionary conduct ignores Supreme Court precedent holding that companies do not have a

8   duty to deal to help rivals.  It also ignores Judge Chen's holding in a 2020 case that a complaint

9   challenging these same efforts did not state a Section 2 claim.  *hiQ Labs, Inc. v. LinkedIn Corp.*,

10  485 F. Supp. 3d 1137 (N.D. Cal. 2020).  Moreover, this theory flatly contradicts Plaintiffs' first

11  theory.  On the one hand, Plaintiffs allege that LinkedIn's "sale" of member data to third parties

12  is anticompetitive; on the other, they allege that LinkedIn's refusal to share such data is

13  exclusionary.  Both theories cannot be correct, and, in fact, neither is.

14  　　　　*Third*, Plaintiffs' allegations that LinkedIn uses Microsoft's high-quality cloud

15  computing services to boost its operating efficiency and enhance its services fail to support any

16  theory of exclusion.  Plaintiffs concede that anyone can use such services not only from

17  Microsoft, but also from Google and Amazon.  Nor do Plaintiffs allege any LinkedIn

18  competitors were excluded as a result.  Nothing about this or any other conduct alleged by

19  Plaintiffs is anticompetitive.  In fact, it is Plaintiffs' requested relief here — to hamstring

20  LinkedIn from improving its services by preventing it, and it alone, from using a tool available

21  to everyone else — that would harm competition and consumers.

22  　　　　Finally, Plaintiffs' claim that LinkedIn violated Section 1 by agreeing not to compete

23  with Facebook is not supported by any facts plausibly suggesting that the two companies agreed

24  to anything.  Plaintiffs' theory here is that Facebook agreed not to enter the alleged market in

25  exchange for ***nothing*** on LinkedIn's part.  There are no facts suggesting that LinkedIn agreed in

26  any way not to compete with Facebook.  Without any quid pro quo, Plaintiffs' alleged

27  agreement is implausible.  A Section 1 agreement cannot be inferred from the bare allegation

28  that Facebook never launched a competing service; that would upend antitrust law because

-3-

1    antitrust plaintiffs could then file lawsuits whenever companies do not expand into new

2    markets.  Plaintiffs even admit they do not have the facts they need to plausibly allege an

3    agreement, repeatedly invoking the need for discovery.  But the Supreme Court's opinion in

4    *Twombly* prohibits such a fishing expedition.  Finally, even if this Section 1 claim had been

5    adequately pled, it is barred by the four-year statute of limitations because the alleged

6    agreement occurred no later than 2016.

7         At bottom, the Complaint is long on technical details and jargon, but it lacks the

8    necessary facts that would support any legal claim under the antitrust laws.  Because Plaintiffs'

9    untenable legal theories cannot be fixed, the Complaint should be dismissed with prejudice.

10   **II.    FACTUAL BACKGROUND**

11        **A.    LinkedIn Offers a Variety of Social Networking Services.**

12        LinkedIn provides an online platform that allows users (called "members") to connect

13   with other professionals.  Compl. ¶ 51.  Membership to LinkedIn is free, as are the core social

14   networking services members use to connect with others.  *Id.* ¶¶ 54, 245.  LinkedIn offers

15   services to individual members as well as to enterprise and professional organizations.  *Id.* ¶

16   386.

17        In 2005, LinkedIn started offering paid job postings and a subscription service allowing

18   members enhanced access to LinkedIn's network of professionals.  *Id.* ¶¶ 109-10.  That service

19   allowed members to perform more sophisticated searches to look for others with particular

20   experience, attributes or employment history.  *Id.* ¶ 110.  It allowed access to an enhanced

21   communications feature called InMail, which permitted members to directly communicate with

22   others on the network.  *Id.* ¶¶ 111, 113.  And it gave recruiters a more effective way to find

23   suitable job candidates or experts.  *Id.* ¶ 112.  These premium services have since evolved into

24   several types of subscription service plans — including a Career Plan, a Business Plan, a Sales

25   Navigator product, and a Recruiter Lite product — each with their own menu of features

26   directed at different types of members and uses, with prices "ranging from $29.99[] to $99.95"

27   per month.  *Id.* ¶¶ 407-12.  The named Plaintiffs subscribed to just one of these products,

28   LinkedIn Premium Career.  *Id.* ¶¶ 42-44.  Plaintiffs assert that LinkedIn operates in an alleged

Professional Social Networking Market.[1]  *Id.* ¶ 373.  According to Plaintiffs, companies like Xing, AngelList, Viadeo, and Lets Lunch — each with their own set of features and substantial userbases — compete with LinkedIn in this space.  *Id.* ¶¶ 437-40.  LinkedIn has also acknowledged in public filings that it "face[s] significant competition in all aspects of [its] business" in a "rapidly evolving" space.  *Id.* ¶ 384 (citing LinkedIn's 2015 10-K).

**B.      LinkedIn is an Innovator.**

LinkedIn was an innovator from its founding in 2002; it was the first social network focused on professional connections.  Compl. ¶ 96 *et. seq*.  Far from a "sprint to dominance," *id.* ¶¶ 95-96, the Complaint describes thirteen years of LinkedIn's hard work and perseverance, overcoming challenges along the way, before achieving an alleged dominant market position.  *Id.* ¶ 490 ("since at least 2015").  From 2002 to today, LinkedIn has been innovating and finding ways to enhance its services.  For example, LinkedIn was one of the first companies to assemble a data science team.  *Id.* ¶ 244.  By 2015, it began developing cutting edge machine learning tools that could algorithmically serve content to its members to increase their engagement with the platform.  *Id.* ¶ 13.  And as explained in the following sections, the very conduct challenged by Plaintiffs has increased the value of LinkedIn's products to its members.

**1.      LinkedIn creates greater functionality through API partnerships.**

Like other online platforms, LinkedIn partners with third-party developers to create software applications that can interact with its members.  *Id.* ¶ 196.  To create such functionality, LinkedIn provides developers with access to certain data relating to its members via application programming interfaces ("APIs").  *Id.* ¶¶ 188-89.  LinkedIn's website identifies

---

[1] For purposes of this Motion, LinkedIn does not challenge Plaintiffs' definition of the relevant market with respect to either product (the "Professional Social Networking Market") or geography (the United States), despite its disagreement that such definitions are appropriate.

1   many of the company's developer partners.[2]  It also states that members are allowed to opt out

2   of providing any of their information to such developers.[3]

3           **2.      LinkedIn protects its members' control over their own data.**

4           The success of LinkedIn's platform depends heavily on members being able to decide

5   the extent to which their data is collected, stored, viewed, and used, and by whom.  LinkedIn

6   employs software to protect its members' choices and prevent third parties from taking and

7   using that data without member consent.  Compl. ¶¶ 288-99.  According to the Complaint, such

8   measures have included: (1) "FUSE," which detects high volume requests and denies service to

9   such requests; (2) "Quicksand," which identifies bots; (3) "Sentinel," which blocks requests

10  from suspicious sources; and (4) "Org Block," which contains a list of unauthorized IP

11  addresses.  *Id.* ¶¶ 293-97.

12          **3.      LinkedIn uses cloud computing resources to enhance its offerings.**

13          Microsoft acquired LinkedIn in 2016, and LinkedIn announced plans for using

14  Microsoft's Azure cloud computing resources in 2019 to enhance its services.  *Id.* ¶ 300.  Azure

15  constitutes only 20% of the global cloud computing infrastructure and is available to and used

16  by other customers as well.  *See id.* ¶ 309, 313.  Amazon and Google also provide comparable

17  cloud computing services.  *See id.* ¶ 302.

18

19  _____

20  [2] *See, e.g., SNAP Partner Directory*, LINKEDIN, https://business.linkedin.com/sales-
    solutions/partners/find-a-partner#select-category (last visited Apr. 6, 2022) (listing API partners).

21  Courts may take judicial notice of statements on webpages that are "publicly available, standard
    documents that are capable of ready and accurate determination" and "relevant to [the plaintiff's]

22  claims."  *Opperman v. Path, Inc.*, 84 F. Supp. 3d 962, 976 (N.D. Cal. 2015) (taking judicial
    notice of Apple's Software Licensing Agreements and Privacy Policy); *Datel Holdings Ltd. v.*

23  *Microsoft Corp.*, 712 F. Supp. 2d 974, 983 (N.D. Cal. 2010) (taking judicial notice of Xbox's
    warranty).

24  [3] *Privacy Policy*, LINKEDIN, https://www.linkedin.com/legal/privacy-policy#key-terms-intro
    (Aug. 11, 2020) ("You can ask us to erase or delete all or some of your personal data. . . . You

25  can ask us to stop using all or some of your personal data . . . or to limit our use of it."); *Privacy*
    *Settings*, LINKEDIN, https://privacy.linkedin.com/settings (last visited Apr. 6, 2022) ("See which

26  apps and services of others you have allowed to access some of your data; you can stop access at

27  any time."); *Privacy FAQs*, LINKEDIN, https://privacy.linkedin.com/faq ("You can review the
    settings in each category [Account, Privacy, Advertising, and Communications] to better

28  understand how LinkedIn uses your personal data and how you can control it.").

1

## III.   THE COURT SHOULD DISMISS THE COMPLAINT FOR FAILURE TO STATE

2

A CLAIM.

3

### A.   Claims That Lack Sufficient Facts To Be Plausible On Their Face Must Be

4

Dismissed.

5

A court should dismiss a complaint under Rule 12(b)(6) if it lacks sufficient facts to

6

"state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

7

(quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This "facial plausibility"

8

standard requires the plaintiff to allege facts that "raise a right to relief above the speculative

9

level." *Twombly*, 550 U.S. at 555.  The Court need not accept as true "allegations that are

10

merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re*

11

*Animation Workers Antitrust Litig.*, 87 F. Supp. 3d 1195, 1206 (N.D. Cal. 2015) (quoting *In re*

12

*Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008)).  "[E]ven where facts are

13

accepted as true, a plaintiff may plead [him]self out of court if he plead[s] facts which establish

14

that he cannot prevail on his claim.'" *N. Star Gas Co. v. Pac. Gas & Electric Co.*, 2016 WL

15

5358590, at *7 (N.D. Cal. Sept. 26, 2016) (Gilliam, J.) (internal citation and quotation omitted).

16

The "Supreme Court has noted precisely in the context of private antitrust litigation, 'it

17

is one thing to be cautious before dismissing an antitrust complaint in advance of discovery, but

18

quite another to forget that proceeding to antitrust discovery can be expensive.'" *Feitelson v.*

19

*Google Inc.*, 80 F. Supp. 3d 1019, 1025 (N.D. Cal. 2015) (quoting *Twombly*, 550 U.S. at 558-

20

59)).  Similarly, the Ninth Circuit has stressed the importance of the *Twombly* pleading

21

standard, "because discovery in antitrust cases frequently causes substantial expenditures and

22

gives the plaintiff the opportunity to extort large settlements even where he does not have much

23

of a case." *Kendall v. Visa U.S.A., Inc.,* 518 F.3d 1042, 1047 (9th Cir. 2008).  "As such, 'a

24

district court must retain the power to insist upon some specificity in pleading before allowing a

25

potentially massive factual controversy to proceed.'" *Feitelson*, 80 F. Supp. 3d  at 1025–26

26

(quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528 n.17

27

(1983)).

28

1      **B.**     **Plaintiffs Fail to Allege Facts Supporting a Viable Theory of Monopolization**

2            **Under Section 2.**

3      To state a claim under Section 2, Plaintiffs must allege facts plausibly indicating (1)

4 possession of monopoly power in the relevant market; (2) "the willful acquisition or

5 maintenance of that power as distinguished from growth or development as a consequence of a

6 superior product, business acumen, or historic accident;" and (3) causal antitrust injury. *John*

7 *Doe 1 v. Abbott Lab'ys*, 571 F.3d 930, 933 n.3, 934 (9th Cir. 2009); *Rebel Oil Co. v. Atl.*

8 *Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir. 1995). Plaintiffs cannot state a Section 2 claim

9 under any of their proffered theories; at their core, the claims describe procompetitive

10 investments and innovation, and none of them identify exclusionary conduct violative of the

11 antitrust laws. Their claims should be dismissed with prejudice.

12      **1.**     **LinkedIn's success and innovations do not violate antitrust law.**

13      The Complaint repeatedly points to LinkedIn's desire to take advantage of alleged

14 network effects, its success in doing so, and the investments it has made to improve its services

15 and compete more effectively. *E.g.*, Compl. ¶¶ 2, 6, 8, 13, 136, 224, 244. None of this violates

16 antitrust law.

17      LinkedIn's position as the alleged "leader in the professional social networking market,"

18 Compl. ¶ 2, is not itself sufficient to state either a monopolization or attempted monopolization

19 claim under Section 2. *See John Doe 1*, 571 F.3d at 934 ("[M]ere possession of monopoly

20 power and the practice of charging monopoly prices does not run afoul of § 2."); *Apple, Inc. v.*

21 *Psytar Corp.*, 586 F. Supp. 2d 1190, 1198 (N.D. Cal. 2008) ("[A] company does not violate the

22 Sherman Act by virtue of the natural monopoly it holds over its own product."). "Quick growth

23 through market demand [also] does not constitute a willful acquisition of monopoly

24 power." *Monsanto Co. v. Trantham*, 156 F. Supp. 2d 855, 863 (W.D. Tenn. 2001). Any claim

25 that LinkedIn unlawfully acquired monopoly power as a result of its early growth and the

26 network effects in this alleged "winner-take-all market" therefore does not state a claim. Compl.

27 ¶ 8 (alleging that "LinkedIn's exponential growth was the result of powerful network effects

28

1   stemming from user growth, the inelastic ubiquity of job hunting and professional connection,

2   and LinkedIn's role as a source of professional identity"); *id.* ¶ 98 ("winner-take-all" market).

3         The antitrust laws also do not prohibit, and in fact encourage, the kinds of substantial

4   investments made by LinkedIn in innovating and developing its service. *See Allied Orthopedic*

5   *Appliances Inc. v. Tyco Health Care Grp. LP,* 592 F.3d 991, 998 (9th Cir. 2010) ("A

6   monopolist, no less than any other competitor, is permitted and indeed encouraged to compete

7   aggressively on the merits, and any success it may achieve solely through the process of

8   invention and innovation is necessarily tolerated by the antitrust laws.") (internal citation and

9   quotation omitted).  LinkedIn's development of "cutting edge machine learning and artificial

10  intelligence infrastructure that could algorithmically serve content to users [to] dr[i]ve

11  engagement — and monetize user data for profit" is therefore not a violation of Section 2, even

12  if it enhances an alleged "Data, Machine Learning, and Inference Barrier to Entry."  Compl. ¶

13  13; *see also id.* ¶ 136 ("In fact, LinkedIn invented many of the tools widely used to create real-

14  time data streams, to aggregate and standardize data, and to feed and update machine-learning

15  algorithms.").

16        LinkedIn is also not prohibited from "assert[ing] its economic muscle with vigor,

17  imagination, devotion, and ingenuity" and "act[ing] with sharp elbows—as businesses often

18  do." *FTC v. Qualcomm Inc.*, 969 F.3d 974, 1005 (9th Cir. 2020) ("Anticompetitive behavior is

19  illegal under federal antitrust law.  Hypercompetitive behavior is not.") (internal citation and

20  quotation omitted); *U.S. v. Syufy Enters.,* 903 F.2d 659, 669 (9th Cir. 1990) ("[A]n efficient,

21  vigorous, aggressive competitor is not the villain antitrust laws are aimed at eliminating.").

22        LinkedIn may also "tak[e] advantage of scale economies . . . [t]hese benefits are a

23  consequence of size and not an exercise of monopoly power." *Aspen Skiing Co. v. Aspen*

24  *Highlands Skiing Corp.*, 472 U.S. 585, 597 (1985).  Plaintiffs' allegations regarding the

25  advantages LinkedIn enjoys due to its popularity therefore do not form the basis of a viable

26  Section 2 claim. *E.g.,* Compl. ¶¶ 227, 251.

27

28

## 2.    None of LinkedIn's specifically alleged conduct is exclusionary.

None of the three alleged ways that LinkedIn supposedly violated Section 2 constitutes exclusionary conduct.  First, LinkedIn's alleged sale of data to third parties, even if to "undisclosed" API partners, is not exclusionary because selling data does not deny anything to anyone.  Second, LinkedIn's use of technical measures to prevent data scraping does not amount to an antitrust violation because LinkedIn has no duty to deal with rivals.  Third, LinkedIn's use of cloud computing resources to improve its services does not prevent any of its competitors from doing the same and is decidedly procompetitive.

### a.    LinkedIn's API agreements are inclusionary, not exclusionary.

Plaintiffs' allegation that LinkedIn sells data to its API partners and that doing so somehow excludes competitors does not state a claim under Section 2.  Compl. ¶¶ 261-87.  A cursory review of LinkedIn's website reveals that access to its APIs is generally free and that its online API terms are publicly accessible.[4]  Yet even if Plaintiffs' allegations were correct, the claim does not make sense.  *See Adaptive Power Sols., LLC v. Hughes Missile Sys. Co.*, 141 F.3d 947, 952 (9th Cir. 1988) ("Antitrust claims must make economic sense.").  Plaintiffs allege on the one hand that LinkedIn has gathered a large amount of data that acts as a barrier to entry in the market, but allege on the other that LinkedIn "maintain[s] its monopoly over professional social networking" by selling that data to third parties.  Compl. ¶¶ 137, 286.  Not only do Plaintiffs fail to plead any facts supporting that conclusion, the conclusion itself —that lowering the barriers to entry by making data available to potential competitors harms competition —is nonsensical.

Plaintiffs repeatedly claim that LinkedIn's alleged sale of data does not enhance the value of its premium subscription products and that it amounts to charging LinkedIn's members for a "negative-valued" product.[5]  Compl. ¶¶ 40, 266-67, 465.  Elsewhere, however, Plaintiffs

---

[4] LinkedIn's website shows that LinkedIn's APIs are actually provided to developers at no charge.  *See* Section 8.2, *API Terms of Use*, LINKEDIN, https://legal.linkedin.com/api-terms-of-use ("The APIs are currently provided for free, but LinkedIn reserves the right to charge for the APIs in the future.").

[5] Members are able to opt out of providing their data to third-party developers.  *See supra* note 3.

LINKEDIN'S MOTION TO DISMISS COMPLAINT - CASE NO. 4:22-cv-00237-HSG

1    allege the exact opposite, that LinkedIn's members do benefit from its API agreements because

2    developers with access to its APIs build applications "based on professional reputation and

3    relationships" so they can "present deeper insights to [their] users". *Id.* ¶¶ 196-97 (internal

4    quotation marks omitted).  This contradiction further illustrates the implausibility of Plaintiffs'

5    claim.

6            Nor does Plaintiffs' conclusory allegation that the alleged API agreements have "no

7    apparent procompetitive effects" mean that they violate the antitrust laws.  Compl. ¶ 286.  "[A]

8    monopolist's duties are negative—to refrain from anticompetitive conduct—rather than

9    affirmative—to promote competition."  *State of Ill., ex rel. Burris v. Panhandle Eastern Pipe*

10   *Line Co.*, 935 F.2d 1469, 1484 (7th Cir. 1991); *see also Olympia Equipment Leasing Co. v.*

11   *Western Union Telegraph Co.*, 797 F.2d 370, 375-76 (7th Cir. 1986) ("There is a difference

12   between positive and negative duties, and the antitrust laws, like other legal doctrines sounding

13   in tort, have generally been understood to impose only the latter."); *Am. Contractors Supply,*

14   *LLC v. HD Supply Constr. Supply, Ltd.*, 2020 WL 10467232, at *6 (N.D. Ga. Feb. 26, 2020)

15   ("[T]he Sherman Act does not require a company with monopoly power to alter its way of

16   doing business in order to promote competition.").  At bottom, Plaintiffs allege that LinkedIn

17   has lawfully gathered information, uses that information to deliver services to its members, and

18   provides access to that information to third parties.  That is not an exclusionary business

19   practice in violation of Section 2.

20           **b.      LinkedIn's alleged refusal to deal with its competitors is not**

21                   **exclusionary.**

22           Plaintiffs' second theory of anticompetitive conduct is an about-face from their first.

23   After alleging that LinkedIn's *provision* of its member data to third parties is anticompetitive,

24   Plaintiffs next claim that the *restriction* of access to such data is also exclusionary.

25   Specifically, Plaintiffs allege that LinkedIn's use of technology to protect members' control

26   over their own data — against the threat of "high volume requests," "computer program[s]

27   designed to consume LinkedIn data," and otherwise "suspicious" third parties — is

28   anticompetitive.  Compl. ¶¶ 294-96.  Plaintiffs claim that LinkedIn members desire to make the

1    data at issue "public," *id.* ¶ 288, but do not allege that any member wants their data to be

2    "scraped" by "bots, " "sold on the dark web" and used elsewhere for unknown purposes by

3    third parties without their consent.  Indeed, under their first theory, Plaintiffs assert members do

4    ***not*** want their data used by unknown entities.  *Id.* ¶¶ 267, 274.  Moreover, LinkedIn's anti-

5    scraping technology does not undermine its members' desire to have their LinkedIn profiles

6    discoverable by others; the Complaint concedes that such data is still discoverable on

7    LinkedIn's site and to anyone through a search engine.  *Id.* ¶¶ 289, 298.

8           Aside from the contradiction posed by these two theories of anticompetitive conduct,

9    Plaintiffs' claim based on LinkedIn's refusal to "acquiesce to every demand placed upon them

10   by competitors" fails because LinkedIn has no obligation to deal with others, including rivals.

11   *Burris*, 935 F.2d at 1484; *see also Aerotec Int'l, Inc. v. Honeywell Int'l., Inc.*, 836 F.3d 1171,

12   1184 (9th Cir. 2016) ("Competitors are not required to engage in a lovefest[.]"); *Morris*

13   *Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1296 (11th Cir. 2004) ("Section 2 of the

14   Sherman Act does not require [defendant] to *give* its product freely to its competitors."); *MCI*

15   *Commc'ns Corp v. AT&T*, 708 F.2d 1081, 1149 (7th Cir. 1983) (concluding that defendant's

16   refusal to voluntarily assume "the extraordinary obligation to fill in the gaps in its competitor's

17   network" did not support a finding that it was trying to maintain its monopoly by

18   anticompetitive means); *Siva v. Am. Bd. of Radiology*, 418 F. Supp. 3d 264, 278 (N.D. Ill. 2019)

19   ("Plaintiff must allege that the monopolist's refusal to deal is irrational but for an

20   anticompetitive purpose, and there is nothing irrational about declining to cooperate with a

21   would-be rival to help it compete.").

22          "The one, limited exception to this general rule that there is no antitrust duty to deal" is

23   if LinkedIn had "(1) [] unilaterally terminat[ed] a voluntary and profitable course of dealing; (2)

24   the only conceivable rationale or purpose is to sacrifice short-term benefits in order to obtain

25   higher profits in the long run from the exclusion of competition; and (3) the refusal to deal

26   involves products that [LinkedIn] already sells in the existing market to other similarly situated

27   customers."  *Qualcomm*, 969 F.3d at 993-94 (citing *Aspen Skiing*, 472 U.S. 585).  None of these

28   three elements are pled in the Complaint.

LINKEDIN'S MOTION TO DISMISS COMPLAINT - CASE NO. 4:22-cv-00237-HSG

1    First, allowing third parties to "scrape" member data without member consent — for

2  free — is hardly a voluntary or profitable course of dealing.  Rather, it is in LinkedIn's short

3  term and long-term interests to preclude such third party abuse and protect members' control

4  over their own data.  *hiQ Labs, Inc.*, 485 F. Supp. 3d at 1151  (rejecting as "speculative" the

5  claim that LinkedIn had any short-term interest in permitting the scraping of public data about

6  its members).

7    Second, exclusion is not the only conceivable reason for preventing scraping.  The

8  Complaint concedes that LinkedIn uses these various software programs to protect its members'

9  control over their own data.  Compl. ¶¶ 294-96.

10    Third, Plaintiffs do not identify any specific competitor or potential entrant that was

11  denied data that LinkedIn made available to other similarly situated entities.  In *Aspen Skiing,*

12  the defendant refused to sell lift tickets to a smaller competing ski resort that it did offer to sell

13  to others.  Here, because LinkedIn employs its anti-scraping technology in a neutral manner, the

14  *Aspen Skiing* exception is inapplicable.  *Qualcomm,* 969 F.3d at 995 (holding that *Aspen Skiing*

15  exception does not apply where Qualcomm applies its licensing policy neutrally against all

16  competing modem chip manufacturers, and does not single out any specific competitor); *see*

17  *also Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1001-02 (N.D. Cal.

18  2020) (finding that the *Aspen Skiing* exception did not apply to Section 2 claim when Facebook

19  stopped providing access via APIs to its social data).

20    The Court should also reject Plaintiffs' contention that LinkedIn's refusal to allow

21  unfettered use of its members' data somehow prevents its rivals from creating a competing

22  service.  Plaintiffs do not allege that LinkedIn's members are ever restricted from sharing their

23  data with a competing network.  In fact, they concede that Facebook has "amassed a large trove

24  of data from its users, including information about their work histories."  Compl. ¶ 318.  For

25  that reason, Plaintiffs have no theory that the alleged restrictions have denied access to what

26  antitrust law describes as an "essential facility."  *See Aerotec*, 836 F.3d at 1185 ("*Trinko*

27  teaches that 'where access exists, the [essential facilities] doctrine serves no purpose.'")

28  (quoting *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 411

-13-

LINKEDIN'S MOTION TO DISMISS COMPLAINT - CASE NO. 4:22-cv-00237-HSG

1    (2004)).  LinkedIn is not required to spare its competitors the same time, resources, and effort

2    that LinkedIn expended to collect and compile its members' data.  *Cf. Goldwasser v. Ameritech*

3    *Corp.*, 222 F.3d 390, 399 (7th Cir. 2000) ("Anyone who wanted to compete with [a monopolist]

4    would have had the burden of duplicating its physical infrastructure . . . but this is the normal

5    way in which competitive markets work.  It obviously takes much longer to enter a market that

6    requires huge sunk cost investments before business is possible, but . . . it can be done.").

7         The court in *hiQ Labs* dismissed an identical Section 2 claim, one brought by a scraper

8    alleging exclusion based on LinkedIn's use of measures that prevented it from accessing

9    "public" data about LinkedIn members.  *hiQ Labs, Inc.,* 485 F. Supp. 3d at 1149 ("hiQ has

10   failed to adequately allege anticompetitive conduct.").  As Judge Chen noted in that case, "[t]he

11   Court does not doubt that LinkedIn is a useful source for publicly available data given its focus

12   on professional social networking and its prominence in the professional social networking

13   space; however, that does not mean that useful publicly available information cannot be gleaned

14   from other sources such as Google and Facebook or other industry directories and sources." *Id.*

15   at 1148-49.  He dismissed the plaintiff's theories based on LinkedIn's right to decide for itself

16   with whom to deal under the antitrust laws and the lack of factual allegations supporting the

17   *Aspen Skiing* exception or "essential facilities" doctrine.  *Id.* at 1150-54.  This Court should do

18   the same.

            **c.    LinkedIn's use of the same cloud computing resources that are**
19
            **readily available to competitors is not exclusionary.**
20

21        Plaintiffs' final theory of exclusion is that LinkedIn's use of Microsoft Azure cloud

22   computing resources, which are available to other third parties, "massively strengthens the

23   [barriers to entry,] sealing out potential rivals from competing with LinkedIn in the professional

24   social networking market."  Compl. ¶ 301.  Again, nothing that Plaintiffs allege is exclusionary.

25        At the outset, it is important to note what Plaintiffs are ***not*** alleging in this theory.

26

27

28

LINKEDIN'S MOTION TO DISMISS COMPLAINT - CASE NO. 4:22-cv-00237-HSG

Plaintiffs are not alleging that Microsoft's acquisition of LinkedIn in 2016 was itself anticompetitive.[6] Nor could they, because such claims would be barred by the four-year statute of limitations. *See Reveal Chat Holdco,* 471 F. Supp. 3d at 994-95 (rejecting continuing violation doctrine and finding Section 2 claim based on acquisitions preceding complaint by more than four years to be time-barred); *Complete Ent. Res. LLC v. Live Nation Ent., Inc.*, 2016 WL 3457177, at *1 (C.D. Cal. May 11, 2016) ("It cannot be the case that if a merger leads to monopoly power then anything anticompetitive that the newfound monopolist does is a 'continuing violation' that began with the merger, allowing the merger to be challenged indefinitely under section 2 of the Sherman Act.").

Plaintiffs are also not alleging that LinkedIn has prevented any competitor from using either Microsoft Azure or other cloud computing services. In fact, Plaintiffs concede that LinkedIn's use of Azure is non-exclusive; Microsoft sells its services to other customers as well. Compl. ¶ 313. Moreover, Azure represents only 20% of the cloud computing infrastructure worldwide. *Id.* ¶ 309. The other providers of comparable cloud computing resources — Google and Amazon — are allegedly the very competitors that are somehow deterred from entering the market due to LinkedIn's use of Azure. *Id.* ¶¶ 302, 304.

Instead, the focus of Plaintiffs' anticompetitive allegations is LinkedIn's use of sophisticated computing technology to build and improve its offerings to its members. *See id.* ¶ 305 (noting that LinkedIn's use of Azure has allowed it to "accelerate video post-delivery, improve machine translation . . . and keep inappropriate content off [LinkedIn's] site"). This does not state an antitrust claim. A "major goal of the antitrust law" is to promote practices that "increase the efficacy of a firm's product." *Hirsh v. Martindale-Hubbell, Inc.,* 674 F.2d 1343, 1348 (9th Cir. 1982). Even a monopolist is not prohibited from improving its products and services. *See John Doe 1*, 571 F.3d at 933 n.3 (noting that Section 2 does not prohibit "growth or development as a consequence of a superior product"). LinkedIn "ha[s] no duty to constrict

---

[6] In fact, the Complaint concedes that the many predicted synergies and efficiencies from that transaction did, in fact, occur from LinkedIn being able to utilize Microsoft's servers instead of relying solely on its own. Compl. ¶¶ 26, 123.

1   product development so as to facilitate sales of rival products or to help competitors survive or

2   expand.'" *Liveuniverse, Inc. v. Myspace, Inc.*, 2007 WL 6865852, at *14 (C.D. Cal. June 4,

3   2007) (internal citation and quotation omitted); *see also Allied Orthopedic Appliances,* 592 F.3d

4   at 998-99 ("[A] design change that improves a product by providing a new benefit to consumers

5   does not violate [the antitrust laws] absent some associated anticompetitive conduct.");

6   *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1107 (N.D. Cal. 2012) ("As a

7   general rule, courts are properly very skeptical about claims that competition has been harmed

8   by a dominant firm's product design changes.").

9         Nor is it anticompetitive if LinkedIn obtains Azure's services at a discount, Compl. ¶¶

10  313-15, because the "ability to operate at a lower cost is not anticompetitive." *See Philadelphia*

11  *Taxi Ass'n, Inc. v. Uber Techs., Inc.*, 886 F.3d 332, 340 (3d Cir. 2018) ("Running a business

12  with greater economic efficiency is to be encouraged, because that often translates to enhanced

13  competition among market players, better products, and lower prices for consumers.");

14  *Goldwasser*, 222 F.3d at 398 ("Monopolists are just as entitled as other firms to choose efficient

15  methods of doing business[.]").

16        In sum, Plaintiffs have failed to allege any conduct that plausibly excludes competition

17  in the relevant market and have not stated a monopolization claim under Section 2.[7]

18

19

20

21  [7] Plaintiffs' claim of higher prices paid for premium services also fails to plead cognizable

22  antitrust injury, which is "injury of the type the antitrust laws were intended to prevent and that
    flows from that which makes the defendant's acts unlawful." *Atl. Richfield Co. v. USA Petroleum*

23  *Co.,* 495 U.S. 328, 334 (1990). The challenged conduct enhanced those services and paying
    higher prices for higher quality does not constitute antitrust injury. *See Qualcomm,* 969 F.3d at

24  990 ("The opportunity to charge monopoly prices—at least for a short period—is what attracts
    'business acumen' in the first place; it induces risk taking that produces innovation and economic

25  growth.") (quoting *Trinko*, 540 U.S. at 407). Moreover, Plaintiffs' claimed harm is too indirect.
    *See City of Oakland v. Oakland Raiders,* 20 F.4th 441, 458 (9th Cir. 2021). They do not identify

26  a single potential entrant deterred by the challenged conduct. Even assuming entry would have
    occurred, there are no allegations suggesting new competitors would have offered any of the

27  premium products comparable to those for which LinkedIn charges a subscription fee: LinkedIn's

28  Premium Career, Business, Sales Navigator, and Recruiter Lite. Compl. ¶¶ 406-11.

1

2

### C.    Plaintiffs' Attempted Monopolization Claim Under Section 2 Fails for the Same Reasons as Their Monopolization Claim.

3    An attempted monopolization claim requires Plaintiffs to allege: "(1) specific intent to

4    control prices or destroy competition; (2) predatory or anticompetitive conduct directed at

5    accomplishing that purpose; (3) a dangerous probability of achieving monopoly power; and (4)

6    causal antitrust injury." *Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1433 (9th Cir.

7    1995).  Plaintiffs' attempted monopolization claim fails because it relies on the same alleged

8    conduct above, which is not anticompetitive, and Plaintiffs fail to allege specific intent.

9    First, because Plaintiffs' attempted monopolization claim is predicated on the same

10   alleged anticompetitive conduct as their monopolization claim, *see* Compl. ¶ 499, their

11   attempted monopolization claim necessarily also fails.  *See LiveUniverse, Inc. v. MySpace, Inc.*,

12   304 F. App'x 554, 557 (9th Cir. 2008) ("[Plaintiff] failed to allege anticompetitive conduct [in

13   its monopolization claim].  Because attempted monopolization requires pleading these same

14   elements, [plaintiff's] claim necessarily fails."); *Novation Ventures, LLC v. J.G. Wentworth Co.,*

15   *LLC*, 2015 WL 12765467, at *7 (C.D. Cal. Sept. 21, 2015) ("Plaintiff's attempted

16   monopolization claim still fails where it does not properly allege anticompetitive conduct.").

17   Second, Plaintiffs' attempted monopolization claim should be dismissed because it does

18   not allege that LinkedIn possessed a "specific intent to control prices or destroy competition."

19   *Rebel Oil Co.*, 51 F.3d at 1433; *see also Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 459

20   (1993) (finding that an attempted monopolization claim requires, among other things, facts

21   showing "a specific intent to monopolize").  "[I]t is insufficient to simply allege a defendant's

22   unfair or predatory tactics to prove the defendant's intent to monopolize." *Hunter v. Tarantino*,

23   2010 WL 11579019, at *8 (C.D. Cal. July 15, 2010) (dismissing attempted monopolization

24   claim).  The Complaint is devoid of allegations that LinkedIn intended to control prices or

25   destroy competition, aside from the conclusory assertion that LinkedIn acted "to eliminate

26   competitive threats before they became too formidable." Compl. ¶ 499.  The Court should not

27   infer specific intent from that allegation because it "rest[s] not on facts but on conclusory

28   statements strung together with antitrust jargon." *Howard Hess Dental Lab'ys Inc. v. Dentsply*

1   *Int'l, Inc.*, 602 F.3d 237, 258 (3d Cir. 2010) ("It is an axiom of antitrust law . . . that merely

2   saying so does not make it so for pleading-sufficiency purposes.").

3           Instead, the Complaint concedes that LinkedIn's alleged API agreements, its use of anti-

4   scraping measures, and its use of cloud computing resources were for the purpose of expanding

5   its business, protecting members' choices about their own data, and achieving economies of

6   scale.  Compl. ¶¶ 260, 463.  This alleged purpose — a "mere intent to beat the opposition" —

7   fails to allege monopolistic intent.  *See Falstaff Brewing Co. v. Stroh Brewery Co.*, 628 F. Supp.

8   822, 829 (N.D. Cal. 1986) ("Even direct evidence of intent to vanquish a rival or exclude

9   competition is insufficient to establish specific intent to monopolize by some illegal means.

10  More than mere intent to beat the opposition is required to establish specific intent to

11  monopolize.") (citations omitted); *General Commc'ns Eng'g, Inc. v. Motorola Commc'ns &*

12  *Elecs., Inc.*, 421 F. Supp. 274, 286 (N.D. Cal. 1976) ("[T]he mere intention to exclude

13  competition is not sufficient to show a specific intent to monopolize. . . . [Otherwise,] the very

14  competitive behavior that the antitrust laws were intended to protect, would instead be

15  prohibited.").[8]

16          **D.      Plaintiffs' Section 1 Claim Fails as a Matter of Law.**

17          Plaintiffs' Section 1 claim based on an alleged market-division agreement between

18  LinkedIn and Facebook is not supported by direct or indirect evidence, is implausible, and is

19  time-barred.  Accordingly, the claim must be dismissed with prejudice.

20                  **1.      Plaintiffs have no direct evidence of the alleged agreement between**

21                          **LinkedIn and Facebook.**

22          Plaintiffs' Section 1 claim has many parallels to the alleged conspiracy in *Bell Atlantic*

23  *Corp. v. Twombly*.  *See* 550 U.S. at 551 (dismissing Section 1 claim alleging "agreements by

24  the [defendants] to refrain from competing against one another").  As in *Twombly*, Plaintiffs'

25  allegations fall far short in "nudg[ing] their claims across the line from conceivable to plausible,

26  [and] their complaint must [therefore] be dismissed."  *Id.* at 570.

27  _____

28  [8] Plaintiffs also fail to plead causal antitrust injury in their attempt to monopolize claim for the
    same reasons stated in note 7, *supra*.

1    In order to state a Section 1 claim, plaintiffs must allege "evidentiary facts" of an

2  agreement among two or more persons or business entities. *PNY Techs., Inc. v. SanDisk Corp.*,

3  2012 WL 1380271, at *13 (N.D. Cal. Apr. 20, 2012).  Such facts include "a 'specific time,

4  place, or person involved in the alleged conspiracies' to give a defendant seeking to respond to

5  allegations of a conspiracy an idea of where to begin." *Id.* (quoting *Kendall*, 518 F.3d at 1047).

6  "'[A] conclusory allegation of agreement at some unidentified point does not supply facts

7  adequate to show illegality' for purposes of Section 1." *Id.*  Mere allegations of parallel

8  conduct are insufficient.  A plaintiff must allege facts "tending to exclude the possibility of

9  independent action." *Twombly,* 550 U.S. at 554.

10    "Factual allegations concerning an agreement to restrain trade can take two forms: direct

11  or circumstantial.  Direct evidence of factual allegations are 'explicit and require no inferences

12  to establish the existence of a conspiracy.'" *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897,

13  915 (N.D. Cal. 2019) (quoting *Oliver v. SD-3C LLC*, 2016 WL 5950345, at *4 (N.D. Cal. Sept.

14  30, 2016)).  But Plaintiffs do not allege any direct evidence of the alleged agreement between

15  LinkedIn and Facebook.  And, as discussed below, the circumstantial evidence is both

16  implausible and lacking any particulars.  Plaintiffs do not allege who was involved in making

17  the alleged agreement or when or where it took place.  Compl. ¶ 362 (speculating the agreement

18  occurred sometime "between 2013 and 2016").  In fact, they concede they need discovery to

19  find any evidence of "any express agreements" or "any tacit agreement" between the two

20  companies. *Id.* ¶ 363.  Mere speculations and fishing expeditions, such as this one, are not

21  permitted under *Twombly*. *See PNY*, 2012 WL 1380271, at *14 n.14 ("Unfortunately,

22  [plaintiff] cannot save its Section 1 claim based on the expectation that through discovery it

23  might find a factual basis for its conspiracy claim.").

24       **2.    None of the alleged circumstantial evidence plausibly indicates an**

25             **agreement.**

26    Plaintiffs instead rely on circumstantial evidence "to infer that an impermissible

27  agreement to restrain trade exists." *Jones*, 400 F. Supp. 3d at 915.  Specifically, Plaintiffs

28  allege that a market-division agreement between LinkedIn and Facebook is the "most plausible

1   inference" from their allegations that: (1) Facebook's professional product, called

2   Facebook@Work and then Workplace, had fewer features than LinkedIn's platform when

3   launched in 2016; (2) LinkedIn and Facebook had been negotiating on a separate data exchange

4   issue during the same time period; and (3) two years later, Facebook entered into an allegedly

5   similar non-compete agreement with Google in a completely different market.  Compl. ¶¶ 357,

6   509-18.

7           None of Plaintiffs' alleged circumstantial evidence is sufficient because "[e]ach

8   allegation is equally susceptible to non-conspiratorial interpretation."  *In re Packaged Seafood*

9   *Antitrust Litig.*, 2017 WL 35571, at *12 (S.D. Cal. Jan. 3, 2017); *see also Kendall*, 518 F.3d at

10  1049 (holding that "[a]llegations of facts that could just as easily suggest rational, legal business

11  behavior by the defendants as they could suggest an illegal conspiracy are insufficient to plead a

12  violation of the antitrust laws").  As *Twombly* advises, Plaintiffs are required to plead facts

13  indicating something "more than the natural, unilateral reaction of each [company] intent on

14  keeping its [] dominance" in circumstances in which "resisting competition is routine market

15  conduct."  550 U.S. at 566 ("[T]here is no reason to infer that the companies had agreed among

16  themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel

17  decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1

18  violation against almost any group of competing businesses would be a sure thing.").  Plaintiffs

19  fail to meet that burden, and their Section 1 claim must accordingly be dismissed.

20                    a.       **Facebook's product launch does not plausibly imply an**

21                             **antitrust conspiracy.**

22          Plaintiffs cannot plausibly infer a market-division agreement from their allegations

23  about Facebook's decision to introduce a "professional" product that did not compete directly

24  with LinkedIn.  These allegations "just as easily suggest rational, legal business behavior,"

25  which means that an anticompetitive agreement cannot be inferred.  *Name.Space, Inc. v.*

26  *Internet Corp. for Assigned Names & Numbers*, 795 F.3d 1124, 1130 (9th Cir. 2015)

27  (dismissing plaintiff's allegations that an anticompetitive agreement existed since the

28

-20-

1  company's alleged conduct, though contrary to its business model, was not "illogical or

2  suspicious").

3         There are myriad reasons why Facebook may have chosen not to compete in the alleged

4  market, and Plaintiffs themselves supply one such alleged reason in their Complaint:  the high

5  barriers to entry that would deter any entity — even Facebook — from competing.  *See* Compl.

6  ¶¶ 2, 97-98 (alleging that the market has a "near-insurmountable, and growing barrier to

7  entry").  The fact that Facebook declined to make the investment to overcome these barriers to

8  entry and compete with LinkedIn in this alleged market — far from suggesting conspiracy —

9  makes economic sense.  *See Moore v. Mars Petcare US, Inc.*, 820 F. App'x 573, 576 (9th Cir.

10  2020) (allegations of significant barriers to entry provided alternative explanation to

11  agreement).  As the Supreme Court observed in *Twombly*, "firms do not expand without limit

12  and none of them enters every market that an outside observer might regard as profitable, or

13  even a small portion of such markets."  550 U.S. at 569.  In that case, a class of local telephone

14  subscribers alleged that local exchange carriers ("ILECs") agreed not to compete with each

15  other, pointing to the fact (as Plaintiffs do here) that the ILECs had declined to enter each

16  other's markets "in any significant way."  *Id.* at 567.  The Supreme Court held that was

17  insufficient to support a Section 1 claim, in part because the complaint itself gave "reasons to

18  believe that the ILECs would see their best interests in keeping to their old turf."  *Id.* at 568.

19  Although ILECs had passed up business opportunities to compete against each other, plaintiffs

20  in that case did not allege that those opportunities would have been "potentially any more

21  lucrative than other opportunities being pursued by the ILECs during the same time period."  *Id.*

22  The same is true here.  Plaintiffs in this case do not allege that Facebook's entry into the alleged

23  Professional Social Networking Market would have been more lucrative than the many other

24  opportunities it decided to undertake over the past ten years.  Compl. ¶¶ 351-52 (listing several

25  other markets Facebook entered "over the past decade").[9]

26

27  [9] Furthermore, any inference that Facebook agreed not to compete with LinkedIn entirely is
    undercut by Plaintiffs' allegation that Facebook did launch a product for job postings over the last

28  several years, Compl. ¶ 354, which clearly overlaps with LinkedIn's products, *id.* ¶ 109.

LINKEDIN'S MOTION TO DISMISS COMPLAINT - CASE NO. 4:22-cv-00237-HSG

b.    **LinkedIn and Facebook's alleged data reciprocity negotiations do not plausibly imply a conspiracy.**

Plaintiffs allege that LinkedIn and Facebook were negotiating about data reciprocity and access to Facebook's APIs at this same time, but all of the alleged facts are limited to Facebook's internal discussions and deliberations.  There are no facts indicating that Facebook agreed with LinkedIn about anything or that the two were even negotiating.  Nor are there any alleged facts about LinkedIn considering any agreement with Facebook.

According to Plaintiffs, in the fall of 2013, Facebook noticed that LinkedIn was accessing data about Facebook's users.  Compl. ¶ 332.  This activity did not violate Facebook's API policies, but certain executives at Facebook allegedly thought it was contrary to an earlier request to LinkedIn not to access Facebook's APIs until the two companies reached any data reciprocity agreement.  *Id.* ¶¶ 332, 339.  Facebook viewed LinkedIn's app as potentially competitive because Facebook intended to move into the "reputation" category.  *Id.* ¶ 335. Facebook executives debated various terms of a potential data agreement with LinkedIn, including requiring that status updates posted on LinkedIn be shared on Facebook.  *Id.* ¶ 339. More than a year later, Facebook removed developer access to its APIs with the exception of those with which it had entered agreements.  *Id.* ¶ 343.

From these barebones allegations, Plaintiffs assert that "the companies reached an agreement—whether express or tacit—between 2013 and 2016 that the companies would refrain from directly competing with each other in conjunction with some sort of exchange or bargain regarding user data."  *Id.* ¶ 362.  That is exactly the sort of vague, conclusory allegation that *Twombly* warns against.  550 U.S. at 557 ("[A] conclusory allegation of agreement at some unidentified point does not supply facts adequate to show illegality.").  Plaintiffs admit they need discovery to determine "the extent of the companies' data sharing" and "the existence and contents of any express agreements between the companies."  Compl. ¶ 363.

Even if there was a data reciprocity agreement, of course, that does not mean that LinkedIn and Facebook also agreed not to compete.  There is no alleged link – not in time, nor place, nor participants, nor substance – between the purported data reciprocity discussions and

-22-

1   a wholly separate, alleged agreement to divide markets.  The internal Facebook emails cited by

2   Plaintiffs only suggest Facebook was looking for LinkedIn's agreement to share certain

3   member status updates with Facebook.  *Id.* ¶ 339.  That is worlds away from anything

4   approaching an agreement not to compete in an entire market segment.

5          Finally, the terms of the alleged agreement itself are implausible.  Plaintiffs allege that

6   the quid pro quo of the agreement was that Facebook agreed not to enter the alleged

7   Professional Social Networking Market in exchange for ***nothing*** on LinkedIn's part.  *Id.* ¶ 517

8   (conceding that the "LinkedIn quo to Facebook's quid cannot be known specifically without

9   discovery").  According to Plaintiffs, LinkedIn still had access to Facebook's APIs after the

10  alleged agreement was struck.  *Id.* ¶ 32 ("From April 2015 until the present, LinkedIn suffered

11  no public problems or deprecation after Facebook privatized its APIs . . . .").  Plaintiffs

12  speculate that LinkedIn agreed to "refrain[] from making incursions into Facebook's general

13  social networking business" as part of the deal, *id.* ¶ 357 , but there are no facts alleged to

14  suggest that LinkedIn ever considered doing so in the first place.

15         "Antitrust claims must make economic sense," and Plaintiffs' claim that Facebook

16  agreed to avoid competing with LinkedIn in exchange for nothing on LinkedIn's part does not.

17  *Adaptive Power Sols., LLC*, 141 F.3d at 952.

18                  **c.      Facebook's alleged agreement with Google is irrelevant.**

19         Plaintiffs' allegations regarding a purportedly similar agreement between Facebook and

20  Google in wholly separate markets related to online advertising, Compl. ¶¶ 365-70, do not save

21  Plaintiffs' claim.  Courts routinely reject the allegation that "if it happened there, it could have

22  happened here." *In re Elevator Antitrust Litig.*, 502 F.3d 47, 52 (2d Cir. 2007).  Furthermore,

23  whether Facebook may have entered into anticompetitive agreements with other entities under

24  different circumstances has no bearing on the likelihood of LinkedIn entering into such an

25  agreement.  *See Evanston Police Pension Fund v. McKesson Corp.*, 411 F. Supp. 3d 580, 595-

26  96 (N.D. Cal. 2019) (rejecting argument that evidence of an antitrust conspiracy can be imputed

27  to a non-participating defendant).  And there is no evidence that LinkedIn did.

28

-23-

LINKEDIN'S MOTION TO DISMISS COMPLAINT - CASE NO. 4:22-cv-00237-HSG

1

####     3.     Plaintiffs' market-division claim under Section 1 is time-barred.

2       If Plaintiffs' conclusory allegations of agreement were not already fatal to their Section

3  1 claim, it should also be dismissed as time-barred under any reasonable reading of the

4  Complaint.  Although difficult to discern, Plaintiffs roughly allege that this agreement

5  purportedly occurred "between 2013 and 2016."  Compl. ¶ 362.  The operative four-year statute

6  of limitations therefore expired by 2020 at the latest.  *See Bay Area Surgical Mgmt. LLC v.*

7  *Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 999 (N.D. Cal. 2015) (finding that Section 1 claim

8  accrued at the time that alleged conspiracy was formed and expired 4 years later).

9       No tolling or exception to the statute of limitations can save Plaintiffs' Section 1 claim.

10  For example, Plaintiffs do not allege "new or independent actions taken after [2016] that caused

11  Plaintiffs any new or accumulating injury" and would thus "restart the statute of limitations."

12  *Id.* (citing *Pace Indus., Inc. v. Three Phoenix Co.*, 813 F.2d 234, 237 (9th Cir. 1987) ("[E]ven

13  when a plaintiff alleges a continuing violation, an overt act by the defendant is required to

14  restart the statute of limitations and the statute runs from the last overt act.")).  The only alleged

15  "act" undertaken by either member of the alleged conspiracy after 2016 is Mark Zuckerberg's

16  public statement in 2018 that Facebook did not consider LinkedIn to be a competitor.  *See*

17  Compl. ¶ 358.  This statement, in addition to failing to plausibly suggest an antitrust conspiracy

18  between the companies, does not suffice as an "overt act" that restarts the statute of limitations,

19  because it is "merely a reaffirmation of a[n alleged] previous decision."  *Samsung Elecs. Co. v.*

20  *Panasonic Corp.*, 2011 WL 9529403, at *4 (N.D. Cal. Aug. 25, 2011); *see also MedioStream*,

21  869 F. Supp. 2d at 1105 ("[T]he mere fulfillment of the terms of a 'permanent' agreement

22  executed outside the limitations period does not support an antitrust claim.").

23       Thus, for this additional reason, Plaintiffs' Section 1 claim should be dismissed with

24  prejudice.

25                                   <u>**CONCLUSION**</u>

26       For all the foregoing reasons, each of Plaintiffs' claims should be dismissed with

27  prejudice.  "Dismissal without leave to amend is proper if it is clear that the complaint could not

28  be saved by amendment."  *Kendall*, 518 F.3d at 1051.  Given the legal theories upon which the

1    Complaint is based, it is apparent that no amendment could transform Plaintiffs' allegations into

2    cognizable claims under the Sherman Act.  Accordingly, the Court should dismiss the

3    Complaint without leave to amend.

4

5    DATED:  April 12, 2022                    PERKINS COIE LLP

6
                                               By:   _/s/ Elliott J. Joh_____
7                                                   Elliott J. Joh
                                               Elliott J. Joh, Bar No. 264927
8                                              EJoh@perkinscoie.com
                                               Lauren Trambley, Bar No. 340634
9                                              LTrambley@perkinscoie.com
                                               505 Howard Street, Suite 1000
10                                             San Francisco, CA 94105-3204
                                               Telephone: 415.344.7000
11                                             Facsimile: 415.344.7050

12
                                               Shylah R. Alfonso, *pro hac vice pending*
13                                             SAlfonso@perkinscoie.com
                                               Tiffany Lee, Bar No. 303007
14                                             TiffanyLee@perkinscoie.com
                                               1201 Third Avenue, Suite 4900
15                                             Seattle, WA 98101-3099
                                               Telephone: 206.359.8000
16                                             Facsimile: 206.359.9000

17
                                               Jon B. Jacobs, *pro hac vice forthcoming*
18                                             JBJacobs@perkinscoie.com
                                               700 13th Street, NW
19                                             Suite 800
                                               Washington, D.C. 20005-3960
20                                             Telephone: 202.654.6200
                                               Facsimile: 202.654.6211
21
                                               Attorneys for Defendant
22                                             LINKEDIN CORPORATION

23

24

25

26

27

28

LINKEDIN'S MOTION TO DISMISS COMPLAINT - CASE NO. 4:22-cv-00237-HSG