UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD CROWDER, et al.,<br><br>　　　　Plaintiffs,<br><br>　v.<br><br>LINKEDIN CORPORATION,<br><br>　　　　Defendant. | Case No. 22-cv-00237-HSG<br><br>**ORDER GRANTING MOTION TO DISMISS AND MOTION TO STAY DISCOVERY**<br><br>Re: Dkt. Nos. 27, 51 |

Before the Court are Defendant's motion to dismiss and motion to stay discovery. Dkt. Nos. 27, 51. The Court held a hearing on the motion to dismiss. Dkt. No. 42. The Court finds the motion to stay discovery appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). The Court **GRANTS** the motions.

**I.  BACKGROUND**

This is an antitrust proposed class action against LinkedIn, an online social network that focuses on professional connections. *See* Dkt. No. 1 ("Compl.") ¶¶ 1, 51. Plaintiffs subscribe to LinkedIn Premium Career, which provides paying users with additional features. *Id.* ¶¶ 42–44, 47. Plaintiffs assert that LinkedIn has a monopoly in the professional social networking market, allowing it to overcharge Premium subscribers. *Id.* ¶¶ 40, 373, 381–432.

Plaintiffs allege that LinkedIn's monopoly is protected by a powerful barrier to market entry comprising LinkedIn's "data centralization and aggregation, its machine learning and AI infrastructure, and the inferred data it produce[s]." *Id.* ¶¶ 2, 208–11. This allegedly prevents would-be rivals from entering the market, because "[w]ithout these three components, a new entrant could not viably compete with LinkedIn." *Id.* ¶ 210.

1   Defendant allegedly strengthens this barrier and maintains its monopoly through four

2   categories of anticompetitive conduct. *Id.* ¶ 260. First, Defendant sells private user data through

3   application programming interfaces ("API") to exclusive third parties called "partners." *Id.*

4   ¶¶ 22–24, 261–87. Second, Defendant uses "technological countermeasures" to limit access to

5   public user information. *Id.* ¶¶ 25, 288–99. Third, Defendant integrated its user data with

6   Microsoft's Azure cloud computing system. *Id.* ¶¶ 26–27, 300–16. Fourth, Defendant agreed

7   with Facebook to divide markets to ensure Facebook would not develop a competing product. *Id.*

8   ¶¶ 28–37, 317–72.

9   Plaintiffs bring claims under Sections 1 and 2 of the Sherman Act for monopolization,

10  attempted monopolization, and market division. 15 U.S.C. §§ 1, 2; Compl. ¶¶ 487–523.

**II.  MOTION TO DISMISS**

**A.  Legal Standard**

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of

fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

If the court concludes that a 12(b)(6) motion should be granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation omitted).

**B. Discussion**

**i. Section 1 Liability for Market Division**

Section 1 of the Sherman Act prohibits "[e]very contract, combination . . . or conspiracy, in restraint of trade . . . ." 15 U.S.C. § 1. To establish Section 1 liability, a plaintiff must prove (1) the existence of an agreement, and (2) that the agreement was an "unreasonable" restraint of trade. *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1178 (9th Cir. 2016).

Plaintiffs' Section 1 claim is based on an alleged agreement between LinkedIn and Facebook to ensure Facebook did not enter the professional social networking market. Compl. ¶ 317. Specifically, Plaintiffs allege that Facebook unexpectedly pivoted from developing a product called Facebook at Work—described by Forbes as "pos[ing] a threat to LinkedIn"—and released a product that stayed "out of LinkedIn's lane." *Id.* ¶¶ 318–27, 348. According to Plaintiffs, competition "stopped in its tracks" after Facebook grew concerned about LinkedIn accessing Facebook's user data, and the two companies began negotiating a data access agreement. *Id.* ¶¶ 328–63. Given that Facebook was imminently positioned to enter the market, has otherwise "aggressively entered almost every conceivable Internet application market," and has reportedly entered into other market division agreements, Plaintiffs assert that a non-compete agreement between the two companies is the "most plausible inference." *Id.* ¶¶ 351, 355–57.

Defendant argues that (1) the Section 1 claim is time-barred and (2) the alleged circumstantial evidence does not plausibly establish a market division agreement between Facebook and LinkedIn. *See* Dkt. No. 27 at 18–24.

### a. Statute of Limitations

"A district court may dismiss a claim if the running of the statute is apparent on the face of the complaint." *Cervantes v. Countrywide Home Loans, Inc.*, 656 F.3d 1034, 1045 (9th Cir. 2011) (quotation omitted). Antitrust claims are governed by a four-year statute of limitations. *See Samsung Elecs. Co. v. Panasonic Corp.*, 747 F.3d 1199, 1202 (9th Cir. 2014) (citing 15 U.S.C. § 15b). However, there is an exception for "continuing violations." *Id.* To plead a continuing violation, a plaintiff must allege "an overt act during the limitations period that meets two criteria: 1) it must be a new and independent act that is not merely a reaffirmation of a previous act; and 2) it must inflict new and accumulating injury on the plaintiff." *Id.* (quotation omitted).

The Court finds that Plaintiffs' claim based on the agreement between Facebook and LinkedIn is time-barred. The agreement allegedly happened "between 2013 and 2016," necessarily more than four years before the complaint was filed. Compl. ¶ 37. Plaintiffs argue that there was a continuing violation because the agreement persisted into the limitations period and caused consumers to be overcharged. *See* Dkt. No. 38 ("Opp.") at 25. But courts have found similar allegations insufficient. *Reveal Chat Holdco LLC v. Facebook, Inc.*, No. 20-CV-00363-BLF, 2021 WL 1615349, at *6 (N.D. Cal. Apr. 26, 2021) (finding the "continued existence" of data sharing agreements did "not constitute new and independent acts"); *Garrison v. Oracle Corp.*, 159 F. Supp. 3d 1044, 1071 (N.D. Cal. 2016) (plaintiffs failed to allege overt acts beyond the initial agreement); *Ryan v. Microsoft Corp.*, 147 F. Supp. 3d 868, 884–85 (N.D. Cal. 2015) ("Maintaining and reaffirming prior agreements do not suffice to show an overt act."); *MedioStream, Inc. v. Microsoft Corp.*, 869 F. Supp. 2d 1095, 1105 (N.D. Cal. 2012) (noting "mere fulfillment of the terms of a 'permanent' agreement executed outside the limitations period" is insufficient).

Though "active enforcement" of an agreement may constitute an overt act, "passive receipt of profits" does not. *Eichman v. Fotomat Corp.*, 880 F.2d 149, 160 (9th Cir. 1989); *see also Samsung Elecs. Co.*, 747 F.3d at 1204 ("We have repeatedly held that acts taken to enforce a contract were overt acts that restarted the statute of limitations."). Plaintiffs' cited cases concern price fixing and "pay for delay" conspiracies and do not stand for the proposition that each

4

payment of a monopoly price, on its own, gives rise to a continuing violation. *See In re Glumetza Antitrust Litig.*, --- F. Supp. 3d ---, 2020 WL 1066934, at *6 (N.D. Cal. 2020); *Oliver v. SD-3C LLC*, 751 F.3d 1081, 1086 (9th Cir. 2014). As one of those cases acknowledges, the mere charging of monopoly prices is not unlawful. *In re Glumetza Antitrust Litig.*, 2020 WL 1066934, at *5. Plaintiffs' interpretation would unduly expand the continuing violations exception in the antitrust context.

Because Plaintiffs have not pled a continuing violation, the Court **DISMISSES** the Section 1 claim with leave to amend. To overcome the statute of limitations, Plaintiffs must allege an "overt act" that occurred on or after January 13, 2018. Because the Court finds the Section 1 claim as pled time-barred, it does not reach Defendant's remaining argument.

### ii. Section II Liability for Monopolization

Under Section 2 of the Sherman Act, it is unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. To establish Section 2 liability, a plaintiff must show: (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury. *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020).

#### a. Anticompetitive Conduct

Defendant argues that Plaintiffs have not adequately alleged that LinkedIn engaged in "willful acquisition or maintenance" of monopoly power, also known as the "anticompetitive conduct" element.[1]

Anticompetitive conduct is "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) (quotation omitted). Put another way, anticompetitive conduct is "behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). "[B]ehavior that might otherwise not be of

---

[1] Defendant does not dispute in this motion that the monopoly power and relevant market elements are adequately pled. See Dkt. No. 39 at 1 n.2.

concern to the antitrust laws—or that might even be viewed as procompetitive—can take on exclusionary connotations when practiced by a monopolist." *Image Tech. Servs., Inc.*, 125 F.3d at 1217 (quotation omitted).

Plaintiffs assert that they have adequately alleged a "course of conduct" or "monopoly broth" theory. Opp. at 5–6. Under this theory, a plaintiff "can state a Section 2 claim by alleging a series of practices that are anticompetitive, even if some of the activities would be lawful if viewed in isolation." *Free FreeHand Corp. v. Adobe Sys. Inc.*, 852 F. Supp. 2d 1171, 1180 (N.D. Cal. 2012). Courts must consider the "overall combined effect" of the conduct. *City of Anaheim v. S. Cal. Edison Co.*, 955 F.2d 1373, 1376 (9th Cir.1992). At the same time, if all plaintiffs allege are "a number of perfectly legal acts, it becomes much more difficult to find overall wrongdoing," and "a finding of some slight wrongdoing in certain areas need not by itself add up to a violation." *Id.* Accordingly, the Court will evaluate each category of alleged anticompetitive conduct while considering them in the aggregate.

### 1. API Agreements

The first category of alleged anticompetitive conduct is entering "agreements with hand-selected 'partners' to purchase user data through LinkedIn's APIs." Opp. at 6; Compl. ¶¶ 22–24, 261-87. The complaint describes APIs as interfaces that allow developers to request and receive information from LinkedIn, and as a way "for developers to build apps that could interact with LinkedIn's network of professionals." Compl. ¶¶ 188–96. Plaintiffs allege that in 2015, LinkedIn stopped offering general access to its APIs and began requiring that developers apply and register to become API "partners." *Id.* ¶¶ 199–207. Since then, LinkedIn allegedly sells data to these selected, unidentified "partners." *Id.* ¶¶ 261–65. Plaintiffs assert that these data sale agreements provide no value to Premium subscribers, who cannot opt out, and that the exposure of this data is a "massive security vulnerability." *Id.* ¶¶ 23, 266–87.

Although Plaintiffs' complaint is long on facts about the security and privacy risks of API access, it does not plausibly allege a theory for why the practice of sharing data through APIs with partners is *anticompetitive*. Putting aside whether the practice of selling data is desirable, it is unclear how increasing access to data fortifies a barrier to market entry that includes, as one of its

6

primary components, a "critical mass of user data." *See id.* ¶¶ 212–28. As Defendant points out, Plaintiffs themselves endorse the argument that the restriction of data increases the barrier. *See, e.g.*, Opp. at 12 (arguing that restricting access to public data prevents potential competitors from "gaining a data foothold").[2] Plaintiffs' arguments in opposition to the motion shed no light on the question. Plaintiffs seem to simultaneously imply that Defendant should not be providing API access at all because of the security risks, and that restricting access to selected partners "prevent[s] rivals or potential entrants from obtaining LinkedIn user data." *See* Opp. at 7.

    Plaintiffs also have not plausibly alleged that the *way* Defendant provides access to its APIs is anticompetitive. To the extent Plaintiffs argue that "hand-selecting" undisclosed partners—as opposed to allowing general API access—is exclusionary, it is well established that there is no "duty to deal" with one's rivals except under narrowly limited circumstances. *See Qualcomm Inc.*, 969 F.3d at 993. "The Sherman Act aims to preserve the right of freedom to trade, and it does not infringe upon a company's right freely to exercise [its] own independent discretion as to parties with whom [it] will deal." *Dreamstime.com, LLC v. Google LLC*, 54 F.4th 1130, 1141 (9th Cir. 2022) (quotations omitted). Plaintiffs make no effort to establish that the API agreements fall into the narrow exception to this rule. *See Aerotec Int'l, Inc.*, 836 F.3d at 1184 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585 (1985)). Nor do the API agreements constitute "exclusive dealing," because they do not involve "an agreement between a seller and a buyer where the buyer agrees to purchase only the seller's product and refrains from doing business with the seller's competition." *See Simon & Simon, PC v. Align Tech., Inc.*, 533 F. Supp. 3d 904, 915 (N.D. Cal. 2021).[3]

---

[2] Plaintiffs address this apparent contradiction by explaining that the API allegations are about *private* data, while its allegations about restricting data apply to *public* data. *See* Opp. at 11–12. Regardless, Plaintiffs have not plausibly explained why the sale of *any* data would be anticompetitive.

[3] Fundamentally, it is unclear to the Court what theory Plaintiffs are actually advancing. At the motion hearing, Plaintiffs unequivocally stated that their claims are not predicated on either a duty to deal or exclusive dealing theory, even after arguing in opposition that their allegations "specifically and plausibly plead that LinkedIn's API agreements are exclusive dealing agreements." *Compare* Opp. at 7 *with* Hearing Transcript, Dkt. No. 48, at 9:22–25, 10:21–22, 12:1–3. Regardless, as alleged, Plaintiffs have not adequately pled either theory. And Plaintiffs "cannot get anywhere by reframing" the API allegations as "the execution of an unlawful scheme

Plaintiffs also argue that the specific terms of the API agreements are anticompetitive. Opp. at 8–9. But there are *no* allegations in the complaint to support this theory: the complaint does not address or describe the API terms of use at all.[4] *See Broam v. Bogan*, 320 F.3d 1023, 1026 n.2 (9th Cir. 2003) (noting that courts "*may not* look beyond the complaint to a plaintiff's moving papers" in deciding a Rule 12(b)(6) motion to dismiss, and that facts raised for the first time in opposition should be considered only in deciding whether to grant leave to amend).

Because Plaintiffs will have a chance to amend, the Court notes for the sake of efficiency that, at least as currently described in the opposition, the API terms of use do not constitute "exclusive dealing" or other anticompetitive conduct. The terms appear to prohibit API users from getting *LinkedIn* data from third parties or through particular methods, such as scraping and crawling. *See* Opp. at 9. Plaintiffs do not allege that the terms prevent developers from dealing with competitors altogether. They also do not explain why what appears to be "a focused prohibition" on the means of access to LinkedIn's own data rises to the level of market interference that would violate Section 2. *See New York v. Facebook*, 549 F. Supp. 3d 6, 31–34 (D.D.C. 2021) (rejecting a "conditional dealing" theory based on an API access policy because it was a "far cry" from a policy requiring that developers only build apps for Facebook).

In sum, Plaintiffs have not plausibly alleged that Defendant's API agreements constitute anticompetitive conduct, whether because Defendant offers access to data in the first place, restricts access to select "partners," or imposes the terms of use Plaintiffs describe.

---

of monopoly maintenance." *See New York v. Facebook*, 549 F. Supp. 3d 6, 28 (D.D.C. 2021) (addressing API access policies under a duty to deal theory); *see also Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 1000–01 (N.D. Cal. 2020) (finding that the decision to withdraw API access was not anticompetitive absent a duty to deal and rejecting plaintiffs' argument that the court cannot "dismember the API withdrawal from the alleged scheme").

[4] Although both parties allude to judicial notice of the API terms of use, *see* Opp. at 7 n.2; Dkt. No. 39 at 3, neither party made a proper request for judicial notice. For that reason, to the extent the parties intended to do so, the request is **DENIED**. The Court notes that no portions of the terms of use appear in the complaint, and it is unclear whether Plaintiffs themselves believe the terms apply to API partners. *See* Opp. at 7. In the future, if the parties wish to request judicial notice or argue that a document is incorporated by reference, they should submit a properly supported request. Further, even if the Court were to take judicial notice of the API terms of use, it would not change the Court's analysis on this motion to dismiss.

8

### 2. Data Access Countermeasures

The second category of alleged anticompetitive conduct is Defendant's use of "technological countermeasures" that are "deployed to limit access to data that users affirmatively seek to make public." *See* Compl. ¶ 299. The complaint cites four types of technology: (1) FUSE, which detects high volume requests and prevents automated access to data; (2) Quicksand, which detects whether a requester is a computer program; (3) Sentinel, which blocks requests from sources deemed "suspicious," and (4) Org Block, which includes a manual list of IP addresses LinkedIn believes belong to competitors. *Id.* ¶¶ 294–97. Meanwhile, LinkedIn "whitelists" certain companies, such as Google, to allow them to obtain user information. *Id.* ¶ 298.

Once again, Plaintiffs do not plausibly plead why these technological countermeasures, sometimes called "anti-scraping" measures, are anticompetitive. Given that Plaintiffs concede that Defendant was under no obligation to share its data at all, it is unclear where the antitrust violation could lie. *See* Opp. at 13–14; *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1150–55 (N.D. Cal. 2020) (analyzing various antitrust theories and dismissing claims based on LinkedIn blocking a competitor from accessing public data on its website).

Plaintiffs argue that LinkedIn's restriction of access to public data undermines user choice. *See* Opp. at 3, 12. The Court can find no authority for the proposition that a "negation of . . . users' preferences" is inherently anticompetitive. *See id.* at 12. Businesses are not beholden to adopt decisions that align with customer preference. Plaintiffs rely on *United States v. Microsoft Corp.*, 253 F.3d 34, 65 (D.C. Cir. 2001), but that case does not stand for the proposition that there is a viable antitrust theory based solely on consumer preference. There, Microsoft had designed an operating system that "would have unpleasant consequences for users" who tried to use an internet browser other than Internet Explorer, including "overriding the user's choice" of a rival browser. *Id.* So there, the relevance of user preference was that Microsoft was actively preventing consumers from using a competing product they wanted to use. There is no such allegation here.

To the extent that user choice is relevant, the complaint stops short of actually alleging that users dislike the anti-scraping measures.[5] Plaintiffs allege that users want to have a "public-facing professional resume and identity" and "derive value from their LinkedIn profile appearing in search results." Compl. ¶¶ 25, 289. Plaintiffs thus posit that users *want* their data to be made public. *Id.* ¶ 25. However, the complaint seems to assume that "public" equates to access by any means. The complaint does not state that the countermeasures prevent resumes and identities from appearing "publicly" on LinkedIn, in search results, or to colleagues and employers. Nor does the complaint state that users want their data to be available via the particular methods that the countermeasures target: high volume requests, computer programs, and sources deemed suspicious. *See id.* ¶¶ 294–96.

If the implication is that limiting access to data is irrational but for an anticompetitive purpose, the "theory of short-term sacrifice is far from obvious or even intuitive." *See hiQ Labs, Inc.*, 485 F. Supp. 3d at 1151; *see also In re Google Digital Advert. Antitrust Litig.*, --- F. Supp. 3d ---, 2022 WL 4226932, at *22–24 (S.D.N.Y.) (dismissing claims based on encryption of user IDs because the complaint did not explain why the conduct was irrational "as opposed to an immediately profitable business strategy that also presented the perception or reality of enhanced consumer privacy").

In sum, Plaintiffs have not plausibly alleged that the technological countermeasures constitute anticompetitive conduct.

### 3. Product Integration

The third category of alleged anticompetitive conduct is LinkedIn's transition to Microsoft's Azure cloud server in 2019. Compl. ¶ 300. Plaintiffs allege that the integration of Azure's AI technology and GPU hardware "significantly" and "potentially irretrievably" fortifies the barrier to market entry. *Id.* ¶ 304. Defendant's integration with the Azure cloud, according to Plaintiffs, gives LinkedIn access to approximately 20% of the total public cloud infrastructure. *Id.*

---

[5] The Court notes that whether a business choice undermines user preference might go to whether conduct constitutes "irrational short-term behavior" under a duty to deal theory. *See hiQ Labs, Inc.*, 485 F. Supp. 3d at 1151 ("Absent what would otherwise be irrational short-term behavior . . . there is no antitrust claim for refusal to deal.")

¶ 309. And because Microsoft acquired LinkedIn in 2016, LinkedIn's use of Azure "comes with a significant cost advantage" unavailable to other companies. *Id.* ¶¶ 313–14.

"As a general rule, courts are properly very skeptical about claims that competition has been harmed by a dominant firm's product design changes." *MedioStream, Inc.*, 869 F. Supp. 2d at 1107 (quotation omitted). Although changes in product design are not immune from antitrust scrutiny, one that improves a product does not violate the antitrust laws "absent some associated anticompetitive conduct." *Allied Orthopedic Appliances Inc. v. Tyco Health Care Grp. LP*, 592 F.3d 991, 998–99 (9th Cir. 2010). The Ninth Circuit has warned that "[t]here is no room in this analysis for balancing the benefits or worth of a product improvement against its anticompetitive effects. If a monopolist's design change is an improvement, it is necessarily tolerated by the antitrust laws, unless the monopolist abuses or leverages its monopoly power in some other way when introducing the product." *Id.* at 1000 (quotations and citation omitted).

Plaintiffs' allegations about Azure integration do not plausibly establish anticompetitive conduct. First, Plaintiffs fail to allege that using Azure did not improve LinkedIn's services or provide a benefit to users. *See MedioStream*, 869 F. Supp. at 1107. To the contrary, the complaint identifies potential improvements stemming from the integration: the "agility, capacity and elasticity" of Azure allows LinkedIn to "accelerate video post-delivery," "improve machine translation in the Feed," and "keep inappropriate content off [its] site." *Id.* ¶ 305. Plaintiffs allege only that the integration was "neither necessary nor inevitable" because Defendant is "capable of designing and operating its own software and hardware infrastructure . . . ." Compl. ¶ 316. That is not sufficient. Many product development choices are not necessary or inevitable. Without allegations that integration was not an improvement to LinkedIn's services or that there was an abuse of monopoly power "in some other way" associated with the introduction of the integration, this conduct is not plausibly anticompetitive.

Defendants again rely heavily on the *Microsoft* case, involving integration of a web browser with an operating system. 253 F.3d at 65–66. As explained, there the anticompetitive conduct was not the integration itself—it was that the product was designed to inhibit the use of rival browsers. Plaintiffs directly concede that the integration itself is not anticompetitive and

11

should be viewed as part of the overall alleged scheme. *See* Opp. at 18. But as other courts have noted, Plaintiffs cannot avoid the requirement that they plausibly plead anticompetitive conduct by repeatedly asserting that a defendant's actions were part of a broader scheme. *See New York*, 549 F. Supp. 3d at 28; *Reveal Chat Holdco, LLC*, 471 F. Supp. 3d at 1001.

### 4. Market-Division Agreement with Facebook

The fourth and final category of alleged anticompetitive conduct is a market division agreement with Facebook described above. As explained, claims based on this conduct are time-barred.

### 5. Aggregate Effect

Although the Court must consider the alleged conduct in aggregate, this does not transform otherwise proper conduct into anticompetitive conduct. Here, "[b]ecause each individual action alleged by [Plaintiffs] does not rise to anticompetitive conduct . . . their collective sum likewise does not." *See Dreamstime.com*, 54 F.4th at 1142; *see also Masimo Corp. v. Tyco Health Care Grp., L.P.*, No. CV 02-4770 MRP, 2004 WL 5907538, at *5 (C.D. Cal. June 10, 2004) (opining that *City of Anaheim's* "overall combined effect" analysis "does not allow for clearly legal acts to be thrown into the mix to bolster a plaintiff's antitrust case").[6]

### b. Attempted Monopolization

Plaintiffs' attempted monopolization claim is predicated on the same alleged anticompetitive conduct as their monopolization claim, and thus fails for the same reasons. *See LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) (explaining that attempted monopolization requires pleading the same elements as a monopolization claim).[7]

---

[6] Since Plaintiffs have not plausibly alleged anticompetitive conduct, the Court does not reach the argument that Plaintiffs have not established an antitrust injury. If the parties want the Court to consider an argument, it should not be made only in a footnote. However, the Court notes that charging Plaintiffs supracompetitive prices is one of the "types of injuries that commonly satisfy the antitrust standing requirement." *Free FreeHand Corp.*, 852 F. Supp. 2d at 1185.

[7] The Court declines to reach the argument that Plaintiffs have not adequately alleged the "intent" element of attempted monopolization at this time. *See* Dkt. No. 27 at 17–18.

12

1  Because Plaintiffs have failed to plausibly plead monopolization or attempted
2  monopolization, the Court **DISMISSES** Plaintiffs' Section 2 claim with leave to amend.

3  **III.   MOTION TO STAY**

4  Defendant seeks to stay discovery until thirty days after it files an answer. *See* Dkt. No. 51
5  at 2. The Federal Rules of Civil Procedure do not provide for an automatic stay of discovery
6  simply because a potentially dispositive motion is pending. Nevertheless, a "district court has
7  wide discretion in controlling discovery." *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir.
8  1988). And under Federal Rule of Civil Procedure 26(c), "[t]he court may, for good cause, issue
9  an order to protect a party or person from annoyance, embarrassment, oppression, or undue burden
10 or expense[.]" Courts in this district often apply a two-prong test to determine whether a stay of
11 discovery is appropriate. *See In re Nexus 6p Prod. Liab. Litig.*, No. 17-CV-02185-BLF, 2017 WL
12 3581188, at *1 (N.D. Cal. Aug. 18, 2017) (collecting cases). First, the moving party must
13 demonstrate that the pending motion is "potentially dispositive of the entire case, or at least
14 dispositive on the issue at which discovery is directed." *Id.* Second, "the court must determine
15 whether the pending motion can be decided absent discovery." *Id.*

16 Having found the underlying motion to dismiss warrants dismissal of the complaint in its
17 entirety, the Court finds that there is good cause under Rule 26(c) to temporarily stay discovery.
18 The Court understands that Defendant could and likely should have sought a stay sooner. *See* Dkt.
19 No. 56 at 1. However, given the outcome of the motion to dismiss, the most prudent course now
20 is to wait until it is clear if any claims will proceed based on Plaintiffs' amendments. *See Reveal*
21 *Chat Holdco, LLC v. Facebook, Inc.*, No. 20-CV-00363-BLF, 2020 WL 2843369, at *4 (N.D. Cal.
22 Apr. 10, 2020) ("Indeed, as the Supreme Court has recognized, staying discovery may be
23 particularly appropriate in antitrust cases, where discovery tends to be broad, time-consuming and
24 expensive.") (citing *Twombly*, 550 U.S. at 558). In this case, the Court believes "[i]t is sounder
25 practice to determine whether there is any reasonable likelihood that plaintiffs can construct a
26 claim before forcing the parties to undergo the expense of discovery." *Rutman Wine Co. v. E. & J.*
27 *Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987).

28 The Court accordingly **STAYS** discovery until otherwise ordered.

### IV. CONCLUSION

The Court **GRANTS** the motion to dismiss and dismisses the complaint with leave to amend. Dkt. No. 27. Plaintiffs may file an amended complaint within 28 days of this order. The Court also **GRANTS** the motion to stay discovery. Dkt. No. 51. Discovery is stayed until otherwise ordered.

**IT IS SO ORDERED.**

Dated: 3/8/2023

HAYWOOD S. GILLIAM, JR.
United States District Judge