**BATHAEE DUNNE LLP**
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (*pro hac vice*)
awolinsky@bathaeedunne.com
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

**KOREIN TILLERY P.C.**
Christopher M. Burke (CA 214799)
cburke@koreintillery.com
Walter W. Noss (CA 277580)
wnoss@koreintillery.com
Yifan (Kate) Lv (CA 302704)
klv@koreintillery.com
707 Broadway, Suite 1410
San Diego, CA 92101
Tel. (619) 625-5621

Carol L. O'Keefe (*pro hac vice* forthcoming)
cokeefe@koreintillery.com
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Tel.: (314) 241-4844

*Attorneys for Plaintiffs*

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| TODD CROWDER, KEVIN SCHULTE, and GARRICK VANCE, on behalf of themselves and all others similarly situated,<br><br>    Plaintiffs,<br><br>    v.<br><br>LINKEDIN CORPORATION,<br><br>    Defendant. | Case No. 4:22-cv-00237-HSG<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

PARTIES ...................................................................................................................... 5

I.      PLAINTIFFS ..................................................................................................... 5

II.     DEFENDANT ..................................................................................................... 6

JURISDICTION AND VENUE .................................................................................... 8

DIVISIONAL ASSIGNMENT ..................................................................................... 9

I.      LINKEDIN: THE BEGINNING OF A WINNER-TAKE-ALL BUSINESS .............. 9

        A.      SocialNet: A Social Network Before Its Time ................................. 9

        B.      PayPal and the Power of Network Effects ..................................... 10

        C.      "Blitzscaling": Hoffman's Insight from PayPal ........................... 12

III.    THE RISE OF LINKEDIN: A SPRINT TO DOMINANCE .............................. 14

        A.      The Founding of LinkedIn ............................................................ 14

        B.      LinkedIn Begins Monetizing Its Network of Users ........................ 16

IV.     LINKEDIN IS ACQUIRED BY MICROSOFT WITH AN EYE TOWARD AI-DRIVEN
        MONETIZATION ............................................................................................ 19

V.      LINKEDIN'S DATA AND AI JUGGERNAUT .............................................. 21

        A.      LinkedIn's Extraction of Structured User Data to Train Machine Learning Models ....... 21

        B.      LinkedIn's Data Centralization and Distribution Infrastructure ..................... 25

        C.      LinkedIn's Social, Telemetry, and Inferred Data ........................... 28

        D.      LinkedIn's Acquisition of Drawbridge ........................................ 30

VI.     THE LINKEDIN API .................................................................................... 32

        A.      LinkedIn's REST and JSON API System .................................... 32

        B.      LinkedIn Privatizes its APIs in 2015 .......................................... 34

VII.    THE DATA, MACHINE LEARNING, AND INFERENCE BARRIER TO ENTRY ....... 36

        A.      Data Aggregation, Centralization, and Infrastructure Effects ......................... 36

        B.      The Effects of LinkedIn's Machine Learning Systems ..................... 39

        C.      The Effects of Inference ............................................................. 42

VIII.   LINKEDIN ANTICOMPETITIVELY MAINTAINS ITS MONOPOLY ................. 43

        A.      LinkedIn Leverages Its Private APIs to Obtain Anticompetitive Agreements that
                Prevent Entry and Competition, and that Strengthen the DMIBE .................. 44

                1.      LinkedIn Leverages Its Private APIs to Prevent Entry and Strengthen the
                        DMIBE .................................................................... 45

i

2. LinkedIn's Private API Agreements Fail the Rule of Reason .................. 48

B. LinkedIn Anticompetitively Integrates with Microsoft Azure ......................... 54

1. LinkedIn's Integration Strengthens the DMIBE, Increases Rivals' Costs of Entry, and Ties Up Scarce Computing Resources, Including Resources Needed for AI and Machine Learning at Scale.......................... 55

2. Other than Its Anticompetitive Effect, LinkedIn's Integration with Azure Makes No Economic or Technical Sense ................................. 57

IX. THE RELEVANT MARKETS............................................................................. 63

A. The Professional Social Networking Market ............................................... 63

1. The Professional Social Networking Market Is a Distinct Submarket ..... 65

2. LinkedIn Possesses Monopoly and Market Power in the Professional Social Networking Market ................................................. 74

3. Relevant Geographic Market ............................................................. 76

4. Barriers to Entry ............................................................................... 77

X. HARM TO COMPETITION ............................................................................. 78

CLASS ACTION ALLEGATIONS ................................................................................ 80

CLAIMS FOR RELIEF ................................................................................................ 83

PRAYER FOR RELIEF ................................................................................................ 87

JURY DEMAND .......................................................................................................... 88

**INTRODUCTION**

2  1.    LinkedIn is a monopolist in the Professional Social Networking Market. It sells a premium

3  subscription product, LinkedIn Premium, with its cheapest plan costing approximately $30 per month—

4  and to date, no firm has successfully entered the market to check LinkedIn's subscription prices or to

5  compete with the company for market share. LinkedIn's dominance remains unrivaled, allowing it free

6  rein to continue charging monopoly rents for its subscription products.

7  2.    This dominance is protected by a powerful barrier to entry that arises from the combination

8  of user data, artificial intelligence ("AI") and machine learning hardware, software, and infrastructure,

9  and an unprecedentedly massive trove of inferred data about users and businesses that LinkedIn generates

10  using its AI and machine learning systems. This Data, Machine Learning, and Inference Barrier to Entry

11  ("DMIBE") creates powerful network effects and feedback loops that protect LinkedIn's business from

12  competition. LinkedIn knows this; in fact, its founder, Reid Hoffman, openly "Blitzscaled" LinkedIn's

13  business to obtain the protection of this powerful barrier to entry.

14  3.    LinkedIn's dominance depends on maintaining the strength of the DMIBE, and its ability

15  to charge supracompetitive prices depends on the DMIBE's continued existence. Absent the DMIBE,

16  competitors would enter LinkedIn's market and erode its profits and market share with price competition.

17  This is why LinkedIn has devoted itself to strengthening the DMIBE and preventing entry by any

18  competitors—at any cost, even if it means losing money or hurting its products and customers.

19  4.    This lawsuit arises from an anticompetitive course of conduct by LinkedIn that was

20  intended to, and successfully has, helped LinkedIn maintain its monopoly. Since January 2018, LinkedIn

21  has engaged in two categories of exclusionary acts that have served its monopoly maintenance scheme,

22  including by strengthening the DMIBE and by directly preventing competitive entry through agreements.

23  LinkedIn's exclusionary acts each individually harm (and have harmed) competition in the United States

24  Professional Social Networking Market, helping to maintain LinkedIn's monopoly and maintaining and

25  fortifying the DMIBE protecting it. Moreover, taken together, LinkedIn's exclusionary acts reinforce

26  (and have reinforced) each other, resulting in unmistakable harm to competition by virtue of LinkedIn's

27  anticompetitive monopoly maintenance.

28

5.      ***First***, LinkedIn selectively offers private access to its users' data as a lever to extract agreements not to compete from third parties that pose a threat to the DMIBE or that are relatively well-positioned to enter LinkedIn's Professional Social Networking Market (or to provide data to those who would). Specifically, LinkedIn offers access to what it calls "Private" Application Programming Interfaces ("APIs") to select third parties. Through LinkedIn's Private APIs, its hand-selected third parties enjoy the ability to pull private LinkedIn user data from LinkedIn's servers at will. But in exchange, LinkedIn requires these companies—which it calls Private API "Partners"—to enter into special agreements that prevent the Partners from competing with LinkedIn.

6.      LinkedIn strategically chooses as its Private API Partners third parties uniquely positioned to collect troves of pertinent social data for themselves—for example, e-mail providers such as Yahoo!, Apple, Evernote, and Samsung, who obtain their users' entire network of professional social connections and interactions as part of their products; social media aggregators such as Hootsuite, Annalect, Ogilvy, and Sprinklr, who process posts across various social media channels before and after they are posted; and talent and lead managers that maintain databases of professional connections, including resumes, hiring statistics, and recruiting information. These handpicked Partners are precisely the entities who could, through their own stores of relevant social data, potentially traverse the DMIBE and enter the Professional Social Networking Market at scale—or who could sell or otherwise provide their data to another actual or potential LinkedIn rival. Yet LinkedIn removes them—and their respective troves of professional social data—one by one from the competitive landscape through restrictive Private API agreements.

7.      LinkedIn's Private API agreements are specifically designed for this anticompetitive purpose, as the agreements make no economic or rational sense other than for their anticompetitive effect—preventing entry in the Professional Social Networking Market and fortifying the DMIBE protecting LinkedIn's monopoly in that market. Absent these agreements' restrictions on competition, it would make no sense for LinkedIn to provide its most precious resource—its private user data—to third parties, let alone a hand-selected subset of third parties comprising LinkedIn's most significant potential rivals. Indeed, with the exception of companies that have been offered these purpose-built Private API

agreements, LinkedIn has prevented developers from accessing private user data through APIs since 2015.

8. LinkedIn's Private APIs also affirmatively damage the value of the subscription products LinkedIn sells, as LinkedIn provides selected third parties the ability to pull private user data from its servers without any direct monitoring of how the data is maintained or aggregated. It is precisely this conduct that led to one of the largest data breaches in history, exposing data from more than 500 million LinkedIn users to hackers. When asked, the attackers made no mystery about the source of the data: LinkedIn APIs.

9. Put simply, LinkedIn's API agreements by their terms prevent competition; the counterparties to these agreements are selected by LinkedIn by their potential for entry or to erode the DMIBE; and the substance of the agreements makes no economic sense but for their anticompetitive effect, as they make LinkedIn's products, including its Premium product, more dangerous and less valuable.

10. *Second*, LinkedIn in 2019 began anticompetitively integrating its AI and machine learning systems and infrastructure with its parent Microsoft's cloud computing business, Azure. For years, LinkedIn had maintained its own massive array of powerful computer hardware, including the specialized Graphical Processing Units ("GPUs") needed for AI and machine learning applications. This hardware, coupled with LinkedIn's massive software infrastructure, gave rise to the powerful DMIBE protecting LinkedIn's monopoly. Indeed, to successfully compete with LinkedIn in the Professional Social Networking Market, a rival would have to enter at massive scale, either building its own data centers and server farms, or paying demand-based sums for access to cloud-based resources on Microsoft's Azure, Amazon Web Services, or Google Cloud.

11. To seal off a possible path of entry—the use of cloud-based computing resources to implement and train AI and machine learning systems sufficient to create a trove of inferential user data— LinkedIn integrated with one of the only sources of cloud-based computing at that scale, its parent company Microsoft's Azure platform.

12.     LinkedIn's transition to Azure not only scuttled the massive investment it had for years made in its own data centers, but also required LinkedIn to redesign large swaths of its software infrastructure to deploy on a distributed, cloud-based infrastructure. Moving to Azure, however, did serve one purpose for LinkedIn: it tied up a significant source of available cloud-based computing that could be used for specialized AI and machine-learning applications, and thereby made entry by a would-be Professional Social Networking rival materially harder.

13.     Indeed, because Azure and other cloud compute pricing is based directly on real-time demand (as the supply of hardware needed to train AI is scarce), including real-time spot-pricing, LinkedIn's Azure integration massively drove up costs across all cloud-based platforms, particularly Azure.

14.     The net effect was that the already expensive cost of entering the Professional Social Networking Market at scale became entirely cost-prohibitive for companies other than those that could afford to build—or that already had—their own large-scale, specialized hardware infrastructure, essentially shutting down the only viable path for most companies to enter and compete with LinkedIn using AI and machine learning at scale.

15.     The LinkedIn-Azure integration was and remains unmistakably anticompetitive, as it made no economic sense but for its anticompetitive effect. Most notably, LinkedIn's transition to the cloud significantly increased its **own** cloud computing costs. In fact, to facilitate the transition, LinkedIn's parent company, Microsoft, provides LinkedIn with Azure pricing **below its costs**, as the hardware resources LinkedIn uses cost almost twice as much on Azure as they would if maintained as part of LinkedIn's own dedicated data centers.

16.     Moreover, LinkedIn's Azure transition required the redesign of LinkedIn's massive software infrastructure, which was designed for dedicated LinkedIn systems, not for distributed cloud-based resources. LinkedIn's software infrastructure is expensive, time consuming, and dangerous to rewrite, but LinkedIn has had to do so in order to implement its Azure transition.

17.     Finally, LinkedIn's transition to the public cloud puts user data at risk, exposing troves at data that had long been exclusively on LinkedIn-controlled hardware to the public-facing Internet. It is

well known that cloud-based systems are less secure from cyberattacks. Indeed, other companies that have transitioned private data to the public cloud have experienced data breaches of unprecedented scale, including by insiders at the cloud computing companies.

18. None of this makes any economic sense but for the anticompetitive effect of tying up scarce cloud computing resources that could be used to train the sort of AI and machine learning models needed to enter LinkedIn's market at scale. LinkedIn's determination to foreclose competition from this route is so strong that it and its parent company Microsoft are willing to operate LinkedIn's hardware systems at a significant loss.

19. The Azure integration is independently anticompetitive, as it directly maintains LinkedIn's monopoly by preventing entry at scale, including by reinforcing and strengthening the DMIBE, but together with LinkedIn's anticompetitive Private API agreements, the integration ensures that no competitive threat can emerge to challenge LinkedIn's unrivaled dominance in the Professional Social Network Market.

20. LinkedIn's unlawful monopolization of the United States Professional Social Networking Market has allowed LinkedIn to charge supracompetitive subscription prices for its LinkedIn Premium product. Plaintiffs are LinkedIn Premium subscribers who paid these supracompetitive prices. They—individually and on behalf of a class of LinkedIn Premium subscribers who have been overcharged since 2018—seek treble damages, as well as injunctive relief to stop LinkedIn from continuing to violate Section 2 of the Sherman Act.

## PARTIES

### I.  PLAINTIFFS

21. Plaintiff Todd Crowder is a resident of Georgia. Plaintiff Crowder has been a LinkedIn user since 2019 and has been paying for LinkedIn Premium Career in September 2019 and from March 2021 to present. Plaintiff Crowder has personally spent more than $500 on LinkedIn subscription fees from 2018 to present. His current subscription rate for the LinkedIn Premium Career product is $29.99 per month.

22.     Plaintiff Kevin Schulte is a resident of Arizona. Plaintiff Schulte has been a LinkedIn user since at least January 2020 and has been paying for LinkedIn Premium Career from at least the period of March to December 2020. Plaintiff Schulte has spent more than $700 on LinkedIn subscription fees from 2018 to present.

23.     Plaintiff Garrick Vance is a resident of Texas. Plaintiff Vance has been a LinkedIn user since at least 2013 and has been paying for LinkedIn Premium Career from at least 2010 to present. Plaintiff has spent more than $1,000 on LinkedIn subscription fees from 2018 to present.

24.     Plaintiffs do not pay subscription fees for any other social networking product.

25.     Plaintiffs use LinkedIn on either or both the mobile app and through a web browser to network with other professionals and to keep current about developments in their professional social networks.

26.     Plaintiffs' premium subscriptions allow them to (among other things) view who has viewed their profiles, send inMail messages, receive "job insights," and view "salary insights."

27.     Plaintiffs paid prices for these services that were higher than they would have been absent LinkedIn's anticompetitive conduct and unlawfully acquired and/or maintained monopoly.

28.     LinkedIn caused Plaintiffs to pay supracompetitive prices for LinkedIn services as a result of the market power LinkedIn obtained and/or maintained as a result of the anticompetitive scheme described in this Complaint.

## II.     DEFENDANT

29.     Defendant LinkedIn Corporation is a Sunnyvale, California-based corporation incorporated under the laws of Delaware.

30.     LinkedIn is a social network focusing on professional connections. It has over 750 million members worldwide, including members from every Fortune 500 company.

31.     LinkedIn has over ten thousand employees in offices around the world. LinkedIn's headquarters is located at 1000 W. Maude Avenue, Sunnyvale, CA 94085.

32.     LinkedIn is a wholly owned subsidiary of Microsoft Corp. Microsoft integrates LinkedIn's products with other products offered by the company. As Microsoft explained in its 2021 10-K, filed with the United States Securities and Exchange Commission:

> Our growth depends on securely delivering continuous innovation and advancing our leading productivity and collaboration tools and services, including Office, Dynamics, and LinkedIn. . . . Microsoft Relationship Sales solution brings together LinkedIn Sales Navigator and Dynamics to transform business to business sales through social selling. Dynamics 365 for Talent with LinkedIn Recruiter and Learning gives human resource professionals a complete solution to compete for talent. . . .

33.     Microsoft also operates LinkedIn as a separate professional social network, for which it charges subscription fees. Microsoft describes its LinkedIn business as follows:

**LinkedIn**

> LinkedIn connects the world's professionals to make them more productive and successful and transforms the way companies hire, market, sell, and learn. Our vision is to create economic opportunity for every member of the global workforce through the ongoing development of the world's first Economic Graph, a digital representation of the global economy. In addition to LinkedIn's free services, LinkedIn offers monetized solutions: Talent Solutions, Marketing Solutions, Premium Subscriptions, Sales Solutions, and Learning Solutions. Talent Solutions provide insights for workforce planning and tools to hire, nurture, and develop talent. Marketing Solutions help companies reach, engage, and convert their audiences at scale. Premium Subscriptions enable professionals to manage their professional identity, grow their network, and connect with talent through additional services like premium search. Sales Solutions help companies strengthen customer relationships, empower teams with digital selling tools, and acquire new opportunities. Finally, Learning Solutions, including Glint, help businesses close critical skills gaps in times where companies are having to do more with existing talent. LinkedIn has over 750 million members and has offices around the globe. Growth will depend on our ability to increase the number of LinkedIn members and our ability to continue offering services that provide value for our members and increase their engagement. LinkedIn revenue is mainly affected by demand from enterprises and professional organizations for subscriptions to Talent Solutions, Learning Solutions, Sales Solutions, and Premium Subscriptions offerings, as well as member engagement and the quality of the sponsored content delivered to those members to drive Marketing Solutions.

7

34.     Year over year, LinkedIn continued to grow in 2021, with revenues increasing 27%, by about $2.2 billion, from 2020. Based on these figures, LinkedIn's annual revenues were approximately $10.3 billion in FY 2021, up from approximately $8.1 billion in FY 2020.

35.     LinkedIn makes extensive—and increasing—use of Microsoft's cloud services, including Azure's highest-end and most expensive on-demand hardware and services, including GPU arrays and machine learning/artificial intelligence services.

## JURISDICTION AND VENUE

36.     This action arises under Section 2 of the Sherman Antitrust Act (15 U.S.C. § 2) and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15, 26). Plaintiffs and the putative class seek to recover treble damages, interest, costs of suit, equitable relief, and reasonable attorneys' fees for their damages resulting from LinkedIn's monopolization and attempted monopolization of the Professional Social Networking market as described in this Complaint. Plaintiffs and the putative class seek declaratory and injunctive relief to remedy ongoing harm to Plaintiffs and class members due to LinkedIn's anticompetitive conduct described in this Complaint, including LinkedIn's ongoing fortification of the DMIBE through integration with Azure.

37.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1332(d)(2) (class action diversity jurisdiction), and 1337(a) (antitrust); and under 15 U.S.C. § 15 (antitrust).

38.     Venue is proper in this district under 15 U.S.C. § 15(a) (Clayton Act), 15 U.S.C. § 22 (nationwide venue for antitrust matters), and 28 U.S.C. § 1391(b) (general venue provision). LinkedIn transacts business within (and indeed, is headquartered in) this judicial district, and transacts its affairs and carries out interstate trade and commerce in substantial part in Santa Clara County, within this judicial district. Additionally, a substantial part of the events giving rise to the claims in this action—including acts and/or omissions constituting material parts of the anticompetitive scheme alleged in this Complaint—occurred in this judicial district.

39.     The Court has personal jurisdiction over LinkedIn as it is subject to general jurisdiction in the State of California, where it maintains its headquarters and principal place of business. The scheme,

conspiracy, and monopolization (and attempted monopolization) alleged in this Complaint were targeted at individuals throughout the United States and caused injury to persons in the United States, including in this judicial district.

40. Additionally, jurisdiction and venue are proper in this Court because LinkedIn's user agreement provides:

> The laws of the State of California, U.S.A., excluding its conflict of law rules, shall exclusively govern any dispute relating to this Contract and/or the Services. You and LinkedIn both agree that all claims and disputes can be litigated only in the federal or state courts in Santa Clara County, California, USA, and you and LinkedIn each agree to personal jurisdiction in those courts.

41. In addition to federal question subject-matter jurisdiction, this Court has subject-matter jurisdiction over this matter pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because this is a class action, including claims asserted on behalf of a nationwide class, filed under Rule 23 of the Federal Rules of Civil Procedure; there are likely to be hundreds of thousands if not millions of putative class members; and the amount in controversy exceeds the jurisdictional amount of $5 million.

42. Moreover, there is minimal diversity present as to the class members and Defendant LinkedIn.

## DIVISIONAL ASSIGNMENT

43. Pursuant to the January 14, 2022 Order Reassigning Case, this action was reassigned to a Judge in the Oakland Division of this District.

## FACTS

### I. LINKEDIN: THE BEGINNING OF A WINNER-TAKE-ALL BUSINESS

#### A. SocialNet: A Social Network Before Its Time

44. LinkedIn was founded by Reid Hoffman—but it was not Hoffman's first attempt at a startup (even a social media one). Hoffman's first Internet startup was SocialNet.com. Launched in 1997, it included features such as online dating and a system to match users with similar interests.

45. Hoffman's early foundations and goals for LinkedIn began there—in 1997, with SocialNet.

46.     The focus of SocialNet was so-called "real identity." The website included professional networking, sports interests, dating, and other interest matching—all built on a user's actual (offline) identity.

47.     As Hoffman explained in a 2016 interview:

> The theory behind SocialNet was that the web wasn't just a place where traditional publishers could distribute content more efficiently, or where readers would just have more opportunities to comment on stories that professional writers had written. The web was a place where millions and millions of people would create their own media identities, share information about themselves, and look for opportunities to connect with each other in ways that could truly enhance their lives. SocialNet also started with a particular set of key relationships in human life: dating, work, social, and living (roommates).

48.     Hoffman's close friend from Stanford, Peter Thiel, called SocialNet "literally an idea before its time. It was a social network 7 or 8 years before that became a trend."

49.     Despite being ahead of its time, SocialNet ultimately resulted in what Silicon Valley investors refer to as a "push"—a return of capital to investors.

50.     The germ of the idea, however, would linger in Hoffman's head for years to come.

**B.      PayPal and the Power of Network Effects**

51.     While Hoffman was at SocialNet, Thiel tapped Hoffman to join the board of directors at a new company called PayPal.

52.     PayPal sought to create a new kind of payment system—one that allowed one user to send another money over the Internet. After the failure of SocialNet, Hoffman dedicated his efforts fully to PayPal.

53.     The PayPal business model was one that depended on generating a critical mass of users, which would in turn increase the value of the payment network. The more users PayPal acquired, the more valuable the payment network became, which in turn attracted more users.

54.     The focus on achieving that critical mass, however, was extremely costly for the young startup—exponentially so. At the turn of the millennium, as the dot-com bubble began to wobble, PayPal was running low on cash, despite significant venture funding.

55.     In September of 2000, Peter Thiel, Max Levchin, and Hoffman retreated from PayPal's offices to Hoffman's grandparents' cabin to solve the serious cash burn problem at PayPal. As Hoffman explained in a 2014 podcast:

> We said ok, we have one shot to try to fix PayPal. At the time, August of 2000, PayPal had burned $12,000,000 in one month, not a dime of revenue, and the cost line was exponentiating. . . .

56.     As Hoffman posed the problem, the product was "free credit card processing, with exponentiating transaction volume." This ensured that PayPal lost money with every transaction, and that the company's losses would grow exponentially.

57.     The key insight Hoffman and others reached was that the rapid and exponential losses were justified only if PayPal could scale rapidly enough to build a powerful feedback loop based on network effects.

58.     Reaching a tipping point or critical mass meant potentially capturing the entire market. As Hoffman told Business Insider:

> At PayPal, we had a window of opportunity—to scale up a new digital payments system on a global level before huge companies with far more resources and experience in the payments industry truly understand what was possible. So we learned to move boldly, decisively, and fast. At PayPal, we helped pioneer the idea that growth is the foundation for an internet company. ***The faster we got to scale, the stronger we created network effects***, the more enduring business that we created.

(emphasis added).

59.     Hoffman realized that many of the problems PayPal faced could be solved with sufficient scale. For example, when PayPal faced a large amount of fraudulent transactions in 2001, Hoffman and others at PayPal began leveraging the network itself to determine whether transactions were fraudulent. That is, the network itself allowed PayPal to derive "identity" and "reputation," which in turn allowed PayPal to attack the fraud problem it faced. As Hoffman explained in a June 2016 interview:

> And that was a key personal lesson to learn: a network of identities, communications, and transactions can be a platform for a number of applications. In PayPal, we had payment but also identity and anti-fraud. When you build a platform that creates all kinds of relationships and enables a huge number of interactions of one kind or another, the data that

First Amended Class Action Complaint – Case No. 4:22-cv-00237-HSG

it generates ends up creating all kinds of strategic advantages. You see that in many of our post-PayPal businesses . . . .

60.     Hoffman realized that networks, particularly networks that generate user-to-user interactions, generate valuable data that create "strategic advantages" for the overall business. He had learned that network effects, if exploited, can lead to data-driven multipliers for a business. This would guide the rest of Hoffman's career.

61.     Thiel described PayPal's strategy as achieving escape velocity in order to avoid the perils of competition. In a conversation between Thiel and Hoffman published by the Harvard Business Review, Thiel explained:

> We needed to achieve escape velocity, we needed to grow so quickly that it would discourage anybody from even trying to compete with us. On the one hand, you have to race really hard to scale fast, but then the benefit if you do it is that you're sort of achieving escape velocity from the black hole that is hypercompetition.

62.     To achieve that escape velocity, Hoffman, Thiel and others at PayPal devised a plan that would virally grow the network: they would directly pay users to refer the service to others. As Hoffman recounted:

> Well one of the specific inventions that the PayPal team did to scale was to say that, all these other Internet services are paying for advertising. What we're going to do is much much better, we're just going to give the money directly to our customers because we have a money transmission business anyway. So giving essentially money for them to transmit. So if someone brings in a new person, they got 10 bucks, and the person she brings in gets 10 bucks. This was actually one of the innovations that was a cheaper form of customer acquisition than the current highly competed form of advertising.

63.     The gambit worked. PayPal rapidly expanded to 200 million user accounts worldwide.

64.     PayPal completed its initial public offering in 2002, which was valued at $1.2 billion. Shortly after the IPO completed, on October 3, 2002, eBay acquired PayPal for $1.5 billion.

**C.      "Blitzscaling": Hoffman's Insight from PayPal**

65.     In 2002, at age 35, Hoffman had exited his first successful startup.

66.     PayPal made Hoffman a wealthy man, but it also had taught him an important lesson: rapid scaling matters. And, in network-effect markets, scaling can matter more than efficiency.

67.     Hoffman would later call this insight and approach "Blitzscaling." In network-driven markets, the first to reach critical mass achieves lock-in effects and competitive advantages, thus justifying aggressive risks to obtain scale.

68.     In a book bearing the same title, Hoffman described the process:

> For successful blitzscaling, the competitive advantage comes from the growth factors built into the business model, such as network effects, whereby the first company to achieve critical scale triggers a feedback loop that allows it to dominate a winner-take-all or winner-take-most market and achieve a lasting first-scaler advantage.

69.     Hoffman understood that the value of getting there first in network-effect markets justified the downside of taking aggressive risks with incomplete information about a business's viability. Hoffman contrasted such risk with conventional business risks taken by other founders, such as Walt Disney:

> Blitzscaling goes beyond just a strategy of aggressive growth because it involves doing things that don't make sense according to traditional business thinking, such as prioritizing speed over efficiency despite an uncertain environment. At the same time, blitzscaling also goes beyond just risk taking. It may be risky to bet the company, as Walt Disney did when he borrowed against his own life insurance to build Disneyland, but it's not Blitzscaling. Blitzscaling would have involved inefficiencies like paying construction crews to work twenty-four hours a day in order to get Disneyland open a few months earlier, or reducing ticket prices 90 percent to get to one million visitors faster—knowing that those one million visitors were networked to ten million more.

70.     Being the first to achieve the critical mass of users or network elements required to trigger powerful feedback loops was paramount to Hoffman.

71.     However, because network effects are built on feedback loops, they actually place *downward* pressure on a company's growth until it reaches a certain a certain scale, which Hoffman calls a "tipping point." As Hoffman explains:

> A key element of leveraging network effects is the aggressive pursuit of network growth and adoption. Because the impact of network effects

increases in a superlinear fashion, at lower levels of scale, network effects actually exert downward pressure on user adoption. . . .

With network effects businesses, you can't start small and hope to grow slowly; until your product is widely adopted in a particular market, it offers little value to potential users. Economists would say that the business has to get past the "tipping point" where the demand curve intersects with the supply curve.

72.     Hoffman explained that achieving those reinforcing network effects—reaching the tipping point—may mean "losing money in the short term," which may "allow you to make money in the long term, once you're past the tipping point."

73.     Having successfully exited PayPal, Hoffman turned to his next venture. Hoffman wanted to again tackle the social network concept he first sought to implement with SocialNet. This time, Hoffman would do so with a deep understanding of network-based markets.

74.     He would scale fast at any cost.

## III.     THE RISE OF LINKEDIN: A SPRINT TO DOMINANCE

### A.     The Founding of LinkedIn

75.     In December 2002, Hoffman founded a new social network that was to be focused on professional identity: LinkedIn.

76.     Hoffman understood from the beginning that this idea would require hyperaggressive scaling—the sort of rapid "blitzscaling" he had learned about at PayPal. As Hoffman later reflected about LinkedIn:

The long-term value of LinkedIn was always intended to come from network effects. As a professional social network, LinkedIn leveraged both direct and two-sided network effects, as well as becoming a standard format for presenting one's professional identity. The direct network effects come from the fact that each additional user makes the network slightly more valuable to all other LinkedIn users. The two-sided network effects occur because more users attract more corporate employers, while more employers increase the value of LinkedIn as a passive job-hunting tool. Finally, by becoming an integral part of most people's professional online identities, LinkedIn has become a standard that has largely replaced the traditional resume. Just one of these network effects would probably be enough to create first-scaler advantage; ***all three working together built a massive strategic moat that protected the LinkedIn business from any***

> **new entrants**, and even from attempts by consumer networks like
> Facebook to take away the professional market.

(emphasis added).

77.     Hoffman understood that his new social network was targeting employers, employees, and job hunting. To keep others out of the market, he would have to launch the company and immediately scale it as fast as possible. Capturing the winner-take-all market meant sealing off the captured market from competition, including from general purpose social networks.

78.     Hoffman initially bankrolled the new venture himself and started the company out of his living room. The company's start came in the aftermath of the dot-com bubble, which Hoffman referred to as the "dot-com winter."

79.     After months of development, LinkedIn launched on May 5, 2003. The interactive web application was a no-frills website, with few pictures, advertisements, or images.



80.     Hoffman immediately targeted a goal of obtaining 1 million LinkedIn users. Hoffman pursued that goal single-mindedly, refusing to refine the business model. He had learned his lesson from PayPal—and from SocialNet.

81.     In its first week online, LinkedIn captured 2,500 users, which grew to 6,000 after the first month. Within six months, LinkedIn had reached 37,000 users. Its growth was exponential—by design and dogged, single-minded pursuit.

82.     By the middle of 2005, LinkedIn had reached 1.7 million users, and by August 2005, the service had 3.3 million users. Hoffman had not only met but exceeded his singular goal to achieve 1 million users.

83.     LinkedIn did so in part through aggressive and unwanted tactics. Most notably, LinkedIn mined users' address books and sent users' contacts repeated e-mails asking them to join LinkedIn—sometimes without clear notice to the users it was doing so.

84.     Hoffman shrugged off the tactic in an October 2015 Article in the New Yorker:

> Almost from the beginning, LinkedIn offered members the opportunity to upload their entire e-mail contact list, which generates large numbers of automatic invitation. Hoffman is aware that some people find this annoying, but that is a problem only if it impedes growth. As he puts it, "People may say, 'I'm getting all these fucking invitations,' but you don't tune it too high or too low."

85.     LinkedIn was sued for the tactic by a class of users and ultimately settled the suit.

86.     The spam invitations were a means to an end—rapid scaling. For Hoffman, it was worth it, even if it invaded user privacy.

87.     Hoffman knew from his time at PayPal: if he captured enough market share to trigger powerful network effects, he would take the entire market.

**B.      LinkedIn Begins Monetizing Its Network of Users**

88.     That year, LinkedIn began monetizing its new social network. Hoffman turned his focus to generating revenue. LinkedIn began with paid job postings, then added subscriptions, and ultimately advertising. He recounted the shift in a June 2009 CNN Money interview:

> We launched three revenue streams in 2005. The first was job listings. The second we figured would help us get to profitability fast. We launched subscriptions, which was enhanced communications and search capability. People need to talk to people they don't already know in order to get the job done. That's the plural majority of our business today.

89.     LinkedIn's new subscription business gave subscribers enhanced access to scour LinkedIn's network of users. A subscriber could perform powerful searches across LinkedIn's network to look for users with particular experience, attributes, or employment history.

90.     LinkedIn's new subscription offering also allowed access to a new communications feature, called InMail. Subscribers could now cold-contact LinkedIn's users simply by paying a subscription fee.

91.     LinkedIn's August 8, 2005, announcement described these new features:

> For recruiters, finding the right candidate can mean tens of thousands of dollars in placement fees. For hedge fund managers or venture capitalists, finding and gathering insights from the right due diligence sources can make or break investment decisions. LinkedIn's new premium service provides more powerful search tools to these professionals, addressing their need to find the right job candidates and experts quickly and efficiently. Users who upgrade to a Business account gain access to more powerful search tools. By upgrading, recruiters and researchers can find job candidates and experts not just from their networks, but also from the complete LinkedIn Network of 3.3 million registered professionals. Many users will now search a space 10 times larger and will be 10 times more likely to find the right person.

92.     LinkedIn's new InMail product sold direct access to anyone in LinkedIn's network. A subscriber could directly contact a company's decision-maker, or even a high-profile CEO. For a price, a message could be sent to anyone with a LinkedIn inbox:

> LinkedIn also now provides a new communication mechanism called InMail™ to Business account holders. While contacting a user through introductions is likely to yield the highest response rate, InMail provides the fastest replies and gives Business account holders the option to send confidential information directly to users, without exposing it to intermediaries providing an introduction. And InMail is the only way to reach LinkedIn users more than three degrees away.

93.     LinkedIn was already considered "uncool" compared to other social networks, but now that it was directly selling access to users' inboxes, it had become the ultimate utilitarian social network— a tool for monetization.

94.     The Wall Street Journal described LinkedIn's divergence from other social networks in April 2016:

> At Social Media High, Facebook is the all-star quarterback, Twitter is the school paper's editor in chief and Snapchat is the mysterious, Harley-riding transfer student. That makes LinkedIn the nerd who skips prom for the mathlympics.
>
> Yet, like in every great John Hughes movie, the underdog actually belongs in the in-crowd.
>
> Admit it. Your most frequent interaction with the world's uncoolest network is deleting those "Join my network" emails. You're not alone: 61% of LinkedIn users visit the site no more than every few weeks, according to Pew Research Center.

95.     As LinkedIn "blitzscaled" users and rushed to monetize them in the first decade of the company's existence, its user experience lagged. By 2016, LinkedIn's web app was a mess, described by the Wall Street Journal as "inexcusably terrible" and "unintuitive." On the plus side, LinkedIn had created a new iOS mobile app, which included a "personalized feed of job advice and industry news."

96.     At the same time, spammy InMail messages continued to be a turnoff for many on the network. As the same Wall Street Journal article recounted:

> Since everyone I accepted could message me, my inbox was full of junk. No, attorney in Indonesia, I don't need representation. Another major reason to be wary? Some of the invites could be from scammers or phishers, aiming to leverage your information.

97.     By April of 2016, Pew Research reported that 18% of LinkedIn members used the service daily. LinkedIn's product had utility, particularly to those seeking to leverage the network's user base for profitable information, but it continued to be viewed as a less-engaging platform than other general purpose social networks, like Facebook. Indeed, Pew research had found that 76% of Facebook's users used its product daily in the same time frame.

98.     LinkedIn had a serious problem to overcome—it needed to engage its users. Without that user engagement, LinkedIn, while useful and monetizable, would lack the critical mass of user data needed to capture the winner-take-all professional market for social networking.

99.     For that, it would turn to Microsoft and cutting-edge, data-hungry artificial intelligence.

## IV. LINKEDIN IS ACQUIRED BY MICROSOFT WITH AN EYE TOWARD AI-DRIVEN MONETIZATION

100.    On June 14, 2016, Microsoft agreed to acquire LinkedIn for $26.2 billion—then the largest acquisition in Microsoft's history. The deal would pay $196 per LinkedIn share, a 50% premium to the social network's closing price the Friday before the announcement.

101.    The business case for the merger, Microsoft CEO Satya Nadella explained, was to marry together Microsoft's office productivity software with a professional network of users. Nadella stated on the day of the merger: "It's really the coming together of the professional cloud and the professional network."

102.    Many in the press saw synergies with Microsoft's software, including Microsoft's Office suite and the LinkedIn network of working professionals. As the Wall Street Journal stated when the merger was announced:

> For instance, connecting Office directly to LinkedIn could help attendees of meetings learn more about one another directly from invitations in their calendars. Sales representatives using Microsoft's Dynamics software for managing customer relationships could pick up useful tidbits of background on potential customers from LinkedIn data.

103.    LinkedIn needed to fix its engagement problem, and Microsoft could do that. As the Wall Street Journal explained:

> To achieve that end, LinkedIn needs members such as Mr. Frank to engage more frequently, updating their job titles, contacts, career achievements and more—data crucial to Microsoft's plans to integrate its expensive acquisition. Microsoft wants to pump that data into artificial-intelligence offerings, business-software services and even its Office productivity tools, such as its Outlook email and calendar programs. Artificial intelligence could help Microsoft's Dynamics business play catch-up to Salesforce.com Inc. To that end, Microsoft is using LinkedIn data to help sales representatives target fertile prospects, critical in the so-called customer-relationship management market that Gartner Inc. estimates hit $39.4 billion last year.

104.    LinkedIn's focus after the merger would be not merely to scale its user base, but to blitzscale users' engagement with and on the platform.

105. The next winner-take-all market was professional data, and rapidly scaling to capture a network-driven market was in LinkedIn's DNA.

106. The acquisition, however, gave regulators pause, particularly in Europe. At the center of their angst over the deal was the marrying of Microsoft's powerful artificial intelligence with LinkedIn's unique collection of data.

107. Europe's competition chief, Margrethe Vestager, had revealed in September of 2016 that she was taking a close look at the value of the information in LinkedIn's hands and how acquisition by Microsoft could tilt the competitive playing field.

108. The press quickly homed in on the threat posed by combining various data streams together—namely, Microsoft's business data with LinkedIn's professional data. Putting together such an unprecedented combination and scale of data could lead to powerful network effects, making the acquisition problematic. As the Financial Times observed in November 2016:

> A further consideration is the network effects that are leading to the creation of increasingly powerful pools of data online. "Data gravity" is a phrase that has been used to describe the tendency for large bodies of data to attract suppliers of services and applications, who are drawn to information that makes their products more useful. That, in turn, adds to the value of amassing more data in a single place.

109. Microsoft's head of cloud and enterprise, Scott Guthrie, confirmed that Microsoft was eyeing the powerful data synergies that would result from the merger. In a November 2016 interview, Salesforce's CEO Marc Benioff recounted a speech given by Guthrie at a recent investment conference:

> [Guthrie] started talking about how he was going to wind the LinkedIn data with their CRM data, with their productivity data, with all the other data streams that Microsoft has—and especially proprietary data streams—to create what he said was essentially a barrier to entry for other players in business productivity, where they have a monopoly or other markets. And that was their vision . . . And that was something where we said, whoa, that sounds like something that's illegal, actually.

110. The FTC did not challenge the acquisition. It was not its practice to consider data aggregation in its merger clearance decisions.

111. At the time of the merger, Deborah Feinstein, the director of the FTC's Bureau of Competition, was reported as stating that the FTC had never challenged a merger on the basis of competitive practices over user data, and that if it started to challenge mergers on that basis, it could end up blocking a lot of future deals.

## V. LINKEDIN'S DATA AND AI JUGGERNAUT

112. With the Microsoft acquisition, LinkedIn began focusing on increasing user engagement. Increasing that engagement meant collecting more data, which LinkedIn could then monetize through its products, including, as explained in Section VI of this Complaint, through its third-party developer platform.

113. LinkedIn would be different in Microsoft's hands. It would leverage artificial intelligence ("AI") and machine learning to achieve a new scope and depth from the network effects LinkedIn had long aggressively pursued. LinkedIn's new strategy was to use machine-learning inference to create an impenetrable barrier to entry, then aggressively monetize data and inferences on an unprecedented scale, creating a powerful feedback loop that protected LinkedIn's business from competition.

114. And the scheme has worked. LinkedIn's aggressive, AI-focused strategy and actions since its acquisition by Microsoft have resulted in a professional data aggregation, standardization, and processing apparatus that is unprecedented in size, scope, and one-way scalability. No ostensible peer comes close to LinkedIn's massive undertaking on this score. In fact, LinkedIn invented many of the tools widely used to create real-time data streams, to aggregate and standardize data, and to feed and update machine-learning algorithms.

115. This data infrastructure serves as the backbone for the powerful barrier to entry protecting LinkedIn's monopoly in the Professional Social Networking Market.

### A. LinkedIn's Extraction of Structured User Data to Train Machine Learning Models

116. On October 6, 2016, LinkedIn Engineering posted a blog post titled, "Building The LinkedIn Knowledge Graph." The post explained the ubiquity of LinkedIn's machine-learning systems across its products and network:

At LinkedIn, we use machine learning technology widely to optimize our products: for instance, ranking search results, advertisements, and updates in the news feed, or recommending people, jobs, articles, and learning opportunities to members. An important component of this technology stack is a knowledge graph that provides input signals to machine learning models and data insight pipelines to power LinkedIn products.

117.    The blog post described LinkedIn's "knowledge graph" as data arising from interrelationships between various "entities" on the LinkedIn network:

LinkedIn's knowledge graph is a large knowledge base built upon "entities" on LinkedIn, such as members, jobs, titles, skills, companies, geographical locations, schools, etc. These entities and the relationships among them form the ontology of the professional world and are used by LinkedIn to enhance its recommender systems, search, monetization and consumer products, and business and consumer analytics.

118.    LinkedIn's challenge was not only collecting this data, but cleaning it. LinkedIn employed complex systems to, among other things, standardize data, feed it into its machine-learning algorithms, generate inferential data, and make recommendations.

119.    Unlike data that comes from websites, LinkedIn's data is generated from its users, meaning that its data is far less noisy than information extracted from the Internet.

120.    For example, Google's extraction of data as it crawls websites is far from a standardized process. Indeed, much of Google's work goes into parsing unstructured data and imposing order on it. LinkedIn could impose that order directly from its structured user interactions.

121.    As LinkedIn's engineering team explained in 2016:

Creating a large knowledge base is a big challenge. Websites like Wikipedia and Freebase primarily rely on contributions from human volunteers. Other related work, such as Google's knowledge Vault and Microsoft's Satori, focuses on automatically extracting facts from the internet for constructing knowledge bases. Different from these efforts, we derive LinkedIn's knowledge graph primarily from a large amount of user-generated content from members, recruiters, advertisers, and company administrators, and supplement it with data extracted from the internet, which is noisy and can have duplicates. The knowledge graph needs to scale as new members register, new jobs are posted, new companies, skills, and titles appear in member profiles and job descriptions, etc.

122.     LinkedIn solved its data problem through data standardization, a process that uses machine learning to structure data absorbed from LinkedIn's network in a way that facilitates training of machine learning models:

> To solve the challenges we face when building the LinkedIn knowledge graph, we apply machine learning techniques, which is essentially a process of data standardization on user-generated content and external data sources, in which machine learning is applied to entity taxonomy construction, entity relationship inference, data representation for downstream data consumers, insight extraction from graph, and interactive data acquisition from users to validate our inference and collect training data.

123.     As LinkedIn explained, a central goal of its data extraction process is to generate "training data" for its machine learning algorithms. From there, LinkedIn can draw inferences about users, about their relationships, and most importantly, about the prospective monetization of their data.

124.     Once LinkedIn data has been extracted, updated in real time, and standardized, it can be used "downstream" by consumers of that data—machine-learning algorithms:

**Data representation**

> Entity taxonomies and entity relationships collectively make up the standardized version of LinkedIn data in a graph structure. Equipped with this, all downstream products can speak the same language at the data level. Application teams obtain the raw knowledge graph through a set of APIs that output the entity identifiers by taking either text or other entity identifiers as the input. Various classifiers results are represented in various structured formats, and served through Java libraries, REST APIs, Kafka (a high-throughput distributed messaging system) stream events, and HDFS files consistently with data version control. These data delivery mechanisms on the raw knowledge graph are useful for displaying, indexing, and filtering entitles in products.

125.     In other words, LinkedIn standardizes the data it extracts, then centralizes it in a format that can be consumed for various purposes across many machine-learning models.

126.    LinkedIn also "vectorizes" its data. This allows quantitative measurements between entities on LinkedIn's network—for example, the geometric distances between entities in a vector space. LinkedIn's 2016 blog post presents an example:



127.    In the example, various entities, which could be people or concepts or technologies or products, are vectorized, and their distance from each other then becomes measurable. As LinkedIn's Engineering team explained:

> In this example, the model has a single objective, which is to predict a member's title latent vector based on simple arithmetic operations on the member's skill latent vectors. It is particularly useful to infer the entity relationship from member to title. By optimizing the model for multiple objectives simultaneously, we can then learn latent representations more generically. Representing heterogenous entities as vectors in the same latent space provides a concise way of using the knowledge graph as a data source for which we can extract various kinds of features to feed relevance models. This is particularly useful to relevance models, as it significantly reduces the feature engineering work on the knowledge graph.

128.    LinkedIn, in other words, extracts properties of various entities on its network, turns them into numbers, then assembles those numbers into vectors—a mathematical representation of a point in some $n$-dimensional space, where $n$ represents the number of parameters or pieces of data being modeled.

Once that standardization occurs, virtually anything on LinkedIn's network can be represented and the association between and among entities quantitatively measured.

129.     Data standardization and vectorization allow more sophisticated machine-learning models to be constructed—that is, models that simultaneously account for multiple relationships and attributes among entities.

130.     For example, as LinkedIn's engineers explained in a 2018 academic paper about LinkedIn's recruiter search product:

> Unlike traditional search and recommendation systems which solely focus on estimating how relevant an item is for a given query, the talent search domain requires mutual interest between the recruiter and the candidate in the context of the job opportunity. In other words, we simultaneously require that a candidate shown must be relevant to the recruiter's query, and that the candidate contacted by the recruiter must also show interest in the job opportunity. Therefore, we define a new action event, *inMail Accept*, which occurs when a candidate replies to an InMail from a recruiter with a positive response. Indeed, the key business metric in the Recruiter product is based on inMail Accepts and hence we use the fraction of top *k* ranked candidates that received and accepted an inMail (viewed as *precision@k²*) as the main evaluation measure for our experiments.

131.     The standardization and vectorization of LinkedIn's massive collection of user data is the precursor input to many of the most sophisticated machine-learning algorithms used by LinkedIn and across many of its data-monetizing products.

**B.     LinkedIn's Data Centralization and Distribution Infrastructure**

132.     When LinkedIn standardizes or vectorizes the data it collects, it necessarily imposes structure on the data. And to allow multiple machine-learning models to consume that data, LinkedIn centralizes the data it gathers and structures.

133.     LinkedIn uses software, sometimes open-source software modified by LinkedIn, to create "streams of data" that can be consumed by various machine-learning algorithms. In other words, LinkedIn manages a "data pipeline."

134. LinkedIn, for example, uses software called Kafka, which was built by LinkedIn and donated to the Apache Foundation. Kafka is a distributed platform that allows data to stream to various consumers of data, such as machine-learning models associated with various LinkedIn products.



135. LinkedIn's tooling, including Kafka, sits at the center of its data collection, ingestion, and distribution infrastructure.

136. Kafka allows the distribution of the data through "streams," and an additional piece of software called Gobblin allows for the integration and unification of data from various sources. As a software engineering website explained LinkedIn's "Data Infrastructure" in 2020:

> Complementing Kafka is a tool called Gobblin, a distributed data integration framework. Gobblin is used to ease and unify the integration of data between different sources and sinks, providing scalability, fault tolerance and quality assurance in one tool. Developed initially to serve as an "uber-ingestion framework" for Hadoop at LinkedIn, Gobblin was open-sourced and donated to Apache where it has taken on new integrations and a diverse community of committers.

137. LinkedIn also creates and maintains data centralization and standardization infrastructure so that it can feed various machine-learning models throughout its organization. One such tool is called Pro-ML:

First Amended Class Action Complaint – Case No. 4:22-cv-00237-HSG

LinkedIn has many teams for each ML application, from Feeds to Communities. Each of these areas poses unique challenges in defining the right objectives, applying the correct modeling technique, and successfully serving complex models with low latency at scale. Each model must be tightly integrated within the serving stack specific to its problem space. At the same time, there must be a single unified framework that provides a battery of tools to solve the myriad challenges that come with dealing with complex models that operate on a very large set of data.

LinkedIn's solution is Pro-ML.

The goal of Pro-ML is to double the effectiveness of machine learning engineers while simultaneously opening the tools for AI and modeling to engineers from across the LinkedIn stack.

138.    As part of this tool, LinkedIn relies on a "feature marketplace" and natural-language-processing-based standardization of data, which captures user intent and interests. From that centralized data, machine-learning models can be trained and refined.



139.    In other words, LinkedIn creates a centralized and standardized pool of data that machine-learning models can rely on downstream.

140.    Because LinkedIn relies on these machine learning models to drive engagement and to monetize its network, the centralization and standardization of data is a feature, not a bug. Indeed, it is the sort of thing LinkedIn engineers describe as technical accomplishments in blog posts and in academic papers.

141. LinkedIn also created and maintains a software tool called Brooklin, which, in the words of LinkedIn engineers, allows for "continuous data movement between various sources and destinations."

142. In the aggregate, these tools allow real-time ingestion of data from users on LinkedIn, whether on their cell phones or on their computers, and then the movement of structured data to various machine-learning models throughout LinkedIn's systems.



143. LinkedIn engineers described such an architecture at the 2017 Kafka Summit in New York City.

144. This massive effort is directed at structuring, centralizing, and moving user data. It is how LinkedIn created and maintains a powerful barrier to entry protecting its business, and it is also how LinkedIn is able to efficiently monetize its structured user data through various channels.

**C.    LinkedIn's Social, Telemetry, and Inferred Data**

145. LinkedIn is able to ingest a massive amount of information from a variety of sources. LinkedIn ingests, for example, data from user interactions. As explained in a web article about LinkedIn's data infrastructure:

> The first source is transactional data from the users: every action taken by a user in the form of status updates to post "likes" and job views must be stored. The second source is telemetry data, which comes from monitoring

applications to gain insight into how the different components of the platform are performing. The third source, one without an upper bound according to Surlaker, is derived data, generated by developers for numerous purposes such as data sets to be used for analysis and building machine learning models.

146.     In other words, LinkedIn is able to extract data from users as they interact with each other. It is also able to view what users do on the platform—referred to as "telemetry." Finally, LinkedIn then creates derived data, including data inferred, structured, or vectorized from the user data it collects.

147.     One example of telemetry data is perhaps from LinkedIn's mobile library called Hakawai. After LinkedIn was caught repeatedly reading from "clipboards" on users' iPhones, LinkedIn's Erran Berger explained that it was likely code embedded in its own code base that was similar to Hakawai. That code repeatedly read from iPhone clipboards, likely as part of a broader system designed for telemetry extraction while on LinkedIn's mobile app.

148.     LinkedIn takes all of this data, structures it, centralizes it, then trains machine learning and AI models that allow it to make inferences about its users—or even about organizations or groups of users.

149.     LinkedIn, for example, infers common salary data for cohorts of users. LinkedIn described its Salary product in a March 22, 2020 blog post:

> LinkedIn Salary uses salary data submitted by LinkedIn members to compute user salary insights (in aggregate) for a given job title, company, and region. We share salary insights with members only once we collect a minimum amount of data so that we protect the privacy of our members who have provided their salary data, and so that salary insights are less likely to be skewed. When we don't have member-submitted data, salary insights are inferred using data between similar companies, job titles, location, and other job attributes.

150.     Put simply, LinkedIn determines salary data across common users and organizations, and when it does not have direct salary data, it uses various factors to infer it.

151.     As part of this process, LinkedIn will even infer relationships among a "cohort" of users:

> **Important:** The Accuracy of LinkedIn salary information depends on the availability of data for combinations of specific job titles, regions, and companies. To avoid providing inaccurate estimates inferring from invalid cohorts where the company may not have a presence, we ensure that we

have at least five LinkedIn members with their LinkedIn profile matching the inferred cohort. Some estimates will be more accurate due to greater data availability. Others may be invalid due to outdated profile information where members forget to update their profile information after changing jobs.

152.     LinkedIn infers other user attributes, such as age or gender, from other information available, such as pronouns used by a recommender or the year a user graduated from school.

153.     And, when a LinkedIn user is on the web and LinkedIn does not have cookie information, LinkedIn may even "infer the association between the member and the device" being used.

154.     Inferred data, such as salary data, requires machine-learning algorithms that train on the underlying data and make predictions or inferences based on that data. This ensures that no single data point is dispositive. An entire vector of data can be used all at once to make a prediction about a user, organization, or group of users.

## D.     LinkedIn's Acquisition of Drawbridge

155.     LinkedIn also uses data it collects to determine the "identity" of a user. Specifically, LinkedIn collects data that it uses to evaluate whether a mobile user, for example, is one of the users on its network—or, more generally, to inferentially determine a particular user's identity.

156.     This data-based user-identification process is probabilistic and built on machine-learning models. As LinkedIn explained on its website in 2020:

> Consumer online activity today is fragmented across different devices and platforms. Members' exposure to marketing on one device often results in engagement (such as a visit to the advertiser page and/or purchase of their product) on a different device.
>
> For members who have not logged in to LinkedIn, the LinkedIn cookie is absent, so identification is not possible. For members who are not logged in to LinkedIn and are outside the Designated Countries and Brazil, we infer the association between the member and the device.
>
> The probabilistic identity graph technology forms likely pairs/associations of IDs (such as Google Ad ID on Android or IDFA on iOS, cookies on browsers) to the same device and devices to the same user. More importantly, this is done such that we don't have in this system an understanding of which specific user (as identified by their member information) is involved.

157.     For example, per its website, LinkedIn collects at least the following data for identity inferences:

- Cookies on a mobile or desktop browser, Google Ad ID on Android or IDFA on iOS

- Operating system, device make and model (User Agent)

- IP address

- Time of access (Time Stamp)

- Page URL or application name, as applicable

158.     LinkedIn explains that the above "data [is] used to infer identity" as follows: The probabilistic identity graph technology forms likely pairs/associations of IDs (such as Google Ad ID on Android or IDFA on iOS, cookies on browsers) to the same device and devices to the same user. More importantly, this is done such that we don't have in this system an understanding of which specific user (as identified by their member information) is involved.

159.     Identity is vital to LinkedIn's data monetization efforts. In fact, the network itself is built around the central building block of accurate, distinguishable user identity, particularly professional identity—which can be associated with characteristics and actions and monetized for value many times over to purchasers/"partners" across the Internet (and indeed, offline). One of LinkedIn's most important business priorities is therefore to collect and aggregate detailed information associated with particular user identities. From there, LinkedIn can make powerful inferences not only about that user, but about her connections.

160.     In 2019, LinkedIn acquired an important piece of technology that allowed it to better identify users through machine learning. That is, on May 28, 2019, LinkedIn quietly announced the acquisition of a company called Drawbridge.

161.     Drawbridge's business centered around identifying users across various devices. Drawbridge's technology could identify users across various devices with surgical precision: it claimed 97.3% accuracy in identifying users across devices and systems.

162.     Drawbridge had stored these identities as part of its Connected Consumer Graph, which included more than one billion consumers across five billion digital touchpoints.

163.    CNBC identified Drawbridge as one of its top "disrupters":

> This San Mateo, California-based company has built a technology platform that allows companies to identify the multiple devices (phone, laptop, tablet) that are most likely being used by the same person. This enables brands to better target their ads and messaging. So for instance, if a company is using Drawbridge's technology, the activity you're (anonymously) engaged in on your desktop or laptop could influence the ads you see pushed out to you on your smartphone. If you then make a purchase on your laptop, Drawbridge can tell the advertiser which ad prompted you to do so.

164.    LinkedIn acquired Drawbridge to get at this powerful technology. LinkedIn did not disclose the price of its acquisition in May, and many speculated an 8-figure or lower price. The next month, however, it was revealed that LinkedIn paid $300 million for the company. LinkedIn's VP of marketing solutions commented after the acquisition, "Over a period of some years, it will pay for itself."

165.    Not long after the Drawbridge acquisition, LinkedIn shuttered the company as a separate concern. Its tech and founders were quietly folded into LinkedIn, and a lengthy discussion of LinkedIn's "Probabilistic Identity Inferences" suddenly appeared on LinkedIn's "Marketing Solutions Help" website.

## VI.    THE LINKEDIN API

### A.    LinkedIn's REST and JSON API System

166.    LinkedIn's social network is designed to provide information to web and other software clients in response to requests made to its servers. These requests are made through standardized interfaces—portals purpose-built to respond to queries with defined structures, which include specified information.

167.    These interfaces are called Application Programming Interfaces ("APIs"). LinkedIn's APIs allow developers to make requests to LinkedIn and to receive substantive responses to their requests.

168.    For example, an API request may ask for profile information about a particular LinkedIn user. Such a request would provide LinkedIn's servers with a particular category (or categories) of profile information, along with an identifier associated with the user, and the server would respond by providing the requested information to the application or system that issued the request.

169. LinkedIn's APIs use the same technology underlying the World Wide Web. That is, requests are made to a public-facing web server, and the responses are provided in structured form.

170. This sort of web-based interface allows for a stateless series of requests, meaning that queries and responses are generally made without a prior series of prefatory requests or communications. Stateless requests are made to LinkedIn's APIs, and responses are provided in Java Script Object Notation ("JSON") format.

171. JSON responses allow for data to retain a predefined structure that can be easily parsed after it is received. For example, the query below shows a field name, followed by a field value. The open and closing curly braces create a tree-like substructure to the data, such that fields and sub-fields can be returned.

```json
{
    "firstName":{
        "localized":{
            "en_US":"Bob"
        },
        "preferredLocale":{
            "country":"US",
            "language":"en"
        }
    },
    "localizedFirstName": "Bob",
    "headline":{
        "localized":{
            "en_US":"API Enthusiast at LinkedIn"
        },
        "preferredLocale":{
            "country":"US",
            "language":"en"
        }
    },
    "localizedHeadline": "API Enthusiast at LinkedIn",
    "vanityName": "bsmith",
    "id":"yrZCpj2Z12",
    "lastName":{
        "localized":{
            "en_US":"Smith"
        },
        "preferredLocale":{
            "country":"US",
            "language":"en"
        }
    },
    "localizedLastName": "Smith",
    "profilePicture": {
        "displayImage": "urn:li:digitalmediaAsset:C4D00AAAbBCDEFGhiJ"
    }
}
```

First Amended Class Action Complaint – Case No. 4:22-cv-00237-HSG

172.     Through standardized responses that preserve structure, a developer querying LinkedIn's API can obtain detailed information about a user, about user's interconnections, and even about network of users.

### B.     LinkedIn Privatizes its APIs in 2015

173.     LinkedIn initially announced its APIs in 2010 as a means for developers to build apps that could interact with LinkedIn's network of professionals. As LinkedIn explained, the APIs allowed developers to build applications based on "professional reputation and relationships."

174.     Within six months of launch, LinkedIn's APIs allowed developers to query full profile information about users, as well as information about a given user's connections. As LinkedIn's Lucian Beebe explained in a June 25, 2010 blog post, titled "Greater Access and More Profile Data for Developers":

> In the past, we've returned two versions of profiles:
>
> - For your users who grant you access, you get the fully detailed profile
> - For everyone else, we return the current job information only
>
> Effective now, you will get the full profile details for users who grant you access (no change there) and also for those users's *[sic]* connections as well. This matches the site more closely and lets you present deeper insights to your users.

175.     The profile information returned by the APIs included several fields. These fields were highly detailed. According to 2010 documentation for the LinkedIn APIs, the fields included:

- A member's name
- A unique identifier for the member's user account
- The degree of distance between members (*e.g.*, 1st, 2nd, or 3rd degree connections).
- The honors and association a member has.
- Educational information, including the institutions where the user obtained his education, the month-year information for each institution, and the fields of study.
- A collection of current former employment positions the member had.
- Personal information, such as birthdate, phone number, and address.

- Information about the user's instant message, twitter, and other accounts.
- Recommendation information, including identifiers for recommendations and recommendation types.

176. On February 12, 2015, LinkedIn shut off general developer access to its APIs, particularly as to profile fields for its users.

177. Instead, LinkedIn mandated that access to profile information would require an application to register with LinkedIn and obtain permission from LinkedIn to use a particular field of information.

178. LinkedIn described permissioned developers as "Partners" and required them to enter into separate Private API Agreements (described below) as a condition for access.

179. The announcement came in the form of a blog post by LinkedIn's Adam Trachtenberg, titled "Changes to our Developer Program":

> Starting on May 12, 2015, we will be limiting the open APIs to only support the following uses:
>
> - Allowing members to represent their professional identity via their LinkedIn profile using our Profile API
> - Enabling members to post certification directly to their LinkedIn profile with our Add to Profile tools.
> - Enabling members to share professional content to their LinkedIn network from across the Web leveraging our Share API.
> - Enabling companies to share professional content to LinkedIn with our Company API.
>
> All other APIs will require developers to become a member of one of our partnership programs. For more information about these programs and to apply, go here. A more technical breakdown of exactly what's changing at the API level can be found in our transition guide and our updated API Terms of Use. We encourage all developers to review both documents to ensure their applications are supported and to ensure a smooth transition.

180. As explained below (Section VIII.A, *infra*), LinkedIn, having privatized its APIs that provide LinkedIn user data to third parties, leveraged those Private APIs to prevent entry by potential competitors who threatened the DMIBE. It did so through anticompetitive agreements with hand-selected "partners," requiring that each partner agree not to compete with LinkedIn in exchange for access to

LinkedIn user data through LinkedIn's Private APIs. Providing private access to this data to outside parties was dangerous, as it increased the risk that user data would be compromised while outside of LinkedIn's control. It also defied economic sense to hand over LinkedIn's valuable user data to third parties, but for the accompanying anticompetitive concessions that prevented entry, competition, and/or the erosion of the DMIBE.

## VII. THE DATA, MACHINE LEARNING, AND INFERENCE BARRIER TO ENTRY

181. LinkedIn's rapid acquisition of users from its inception until its purchase by Microsoft in 2016 created powerful network effects. LinkedIn has also rapidly escalated warp and woof of its machine learning and data pipeline infrastructure,

182. LinkedIn's data centralization, machine learning models, and resulting trove of inferred data, creates a powerful barrier to entry—a moat around its business. These three things together reinforce each other, creating a combination of machine learning systems, user data, and inferred data that a new entrant could not possibly obtain without itself reaching a critical mass of user data, a data pipeline and infrastructure to support machine-learning models, and a comparable trove of inferred data.

183. Without these three components, a new entrant could not viably compete with LinkedIn. This allows LinkedIn to charge supracompetitive prices for subscriptions.

184. Put simply, this Data, Machine Learning, and Inference Barrier to Entry ("DMIBE") allows LinkedIn to extract monopoly rents in the form of subscriptions to its social network.

### A. Data Aggregation, Centralization, and Infrastructure Effects

185. LinkedIn's centralization and standardization of data is the first synergistic component of its DMIBE.

186. No single piece of data in isolation is likely as important for inference as an entire set of information considered together. A person's height may be a loose heuristic for the ability to play basketball, but it is unlikely enough information to infer whether the person is a professional basketball player, or how the person spends their time, or whether they are even interested in basketball.

187. When many points of data, however, are combined, a model can predict the outcomes of more complex systems. For example, adding annual income and age to height would likely improve the

ability to predict if someone is in fact a professional basketball player. The more information available—particularly predictive information—the more accurate inference can be.

188.    Modern machine-learning models can consume many data points about a user, interaction, or object at once. They can then make accurate inferences based on that information.

189.    To use many of these machine-learning algorithms, however, the input data must be standardized and often converted into a vector. That is, information about a user must somehow be quantified or tokenized, then mapped to a common space of data so that various data points can be mathematically compared.

190.    Once data is standardized, a machine-learning model can be "trained" from that data. That is, unlike a traditional computer program, which executes pre-written instructions by a "programmer," machine-learning models are often trained directly from data.

191.    Large training sets allow for more robust training. Datasets that are too small may not be sufficiently predictive—they may result in "underfitted" machine learning models.

192.    Thus, for example, a model that predicts whether someone is a professional basketball player solely based on height will be missing information necessary to make accurate predictions. It will be a blunt instrument that is wrong in most cases.

193.    Machine learning trained on data sets that are very large may cause overfitting—meaning that the machine learning model essentially memorizes the data instead of learning from it. Those data sets need careful training, and most importantly, they need careful cleaning and standardization.

194.    Because machine learning models require computationally expensive "training" based on structured data, they can be onerous to create and test. Each machine learning model may need its own unique set of standardized data. A particular machine learning model may rely only on a subset of useful or predictive data. Moreover, different machine learning models may be designed to tolerate different levels of error.

195.    For example, a machine learning model designed to carefully control a pacemaker has little room for error, whereas, a machine learning model meant to predict a person's favorite color for a

user interface can be far from pinpoint accurate and yet still be good enough and indeed relatively valuable for its intended use.

196. LinkedIn tackles this problem by centralizing its data upstream. The data it acquires is fed into its data pipeline (described earlier in this Complaint), standardized, and then aggregated in a centralized place. The data can then be sub-setted and consumed by "downstream" machine learning algorithms.

197. This centralization has a powerful effect. It allows LinkedIn to rapidly develop, train, and update machine-learning algorithms without having to create separate data stores for each machine learning system.

198. A new entrant is unlikely to have such a data pipeline and infrastructure. The new entrant would not merely have to obtain user data—a critical mass of it—that can rival LinkedIn in quality, quantity, and predictive value; the entrant would then have to structure the data in a way that permits (and indeed, facilitates) its transmission to and consumption by machine-learning models.

199. Although other firms, such as Google and Facebook, maintain robust and highly sophisticated data centralization and transfer pipelines, none of them have an infrastructure and pipeline centered upon the acquisition, cleaning, structuring, centralization, and machine learning analysis of professional user data that is comparable to what LinkedIn harvests and stores from its users.

200. In other words, it is not merely sufficient to have a data infrastructure or data pipeline. Nor is it sufficient to have a trove of professional user data. To replicate the data aggregation and centralization aspect of LinkedIn's DMIBE, a new entrant or competitor would have to develop data infrastructure around a particular trove of data—in the case of LinkedIn, professional social data. Anything less would die (and, in practice, has died) on the vine due to the powerful network effects—supercharged by a massive machine learning head start that continues to grow unchecked—that fortify LinkedIn's competitive dominance.

201. To date, there are no competing firms that rival LinkedIn in this regard. Firms that maintain troves of professional social data lack the infrastructure to update that data in real time. For example, a competitor that maintains a robust list of user work history, will not have an infrastructure

that automatically updates changes in employee status in real time. Nor do any firms have a means of centralizing and standardizing such data for immediate incorporation into downstream machine learning models.

## B.     The Effects of LinkedIn's Machine Learning Systems

202.    LinkedIn maintains sophisticated machine learning systems that are capable of inferring massive amounts of information from the user data LinkedIn harvests from its professional social network.

203.    For example, LinkedIn can make inferences about a user or organization's salary information. It can make inferences about connections among users, including the degree of familiarity between them. It can draw inferences about whether a particular user would be a match to work at an organization. It can predict whether an InMail message targeted through its network will garner a response. What LinkedIn can predict based on the data it harvests from its PSN is too vast to enumerate.

204.    The result of this inferential data is a powerful augmenting effect on LinkedIn's data-based competitive moat against potential PSN rivals. LinkedIn not only has access to real-time, actionable user data, it has access to a massive (and continuously growing) trove of inferences about users, about networks of users, and about the organizations they belong to.

205.    Thus, even if a competitor or new entrant were to obtain the raw user information collected from LinkedIn's network users—for example, e-mail address, phone number, app telemetry data, or work history—it would not be enough to overcome LinkedIn's DMIBE. LinkedIn has already derived (and continuously derives) massive amounts of *more-actionable* information from that data using inferences from its machine learning models.

206.    LinkedIn's machine learning models take vast amounts of aggregated information to train and test. A new entrant or competitor would have to build, train, and test machine learning models capable of inferring the same types and quantities of real-time, actionable information LinkedIn infers about its users in order to compete with LinkedIn head-on. And scope and quantity of inferential data is only one component: quality and accuracy of inferential data—which LinkedIn has a years-long head start on

through continuous training and re-training of its models—is another feature a potential PSN competitor would need to demonstrate quickly and at scale in order to effectively compete with LinkedIn.

207. The information that LinkedIn infers from its machine learning models allows LinkedIn to target content, predict user behavior, and even precisely target users for subscriptions, all in real-time, at scale, with continuous improvement through feedback loops and ever-growing raw and inferential data.

208. Without LinkedIn's inferred data, a competitor or new entrant cannot rival the value—including real-time, actionable quality—of user data LinkedIn can offer to third-parties, making LinkedIn the only viable, centralized repository of actionable professional user information.

209. To train machine learning models that can generate a rival trove of inferred data, a competitor or new entrant would have to enter at scale, with sufficient breadth, sophistication, and quality of professional data (and of tools and infrastructure to seamlessly and continuously intake, clean, aggregate, and assemble such data) and with purpose-trained machine learning models capable of immediately generating inferred data of scope and quality sufficient to erode the DMIBE.

210. Although a core set of inferred data about a professional user could potentially be derived by a rival given enough data and machine learning technology, LinkedIn, as explained below, has taken pains to prevent anyone from securing even a toehold in that direction—including by aggressively preventing anyone from obtaining and storing even public data from LinkedIn's network.

211. To train machine learning models, including cutting edge deep neural networks, LinkedIn must use arrays of processing units designed to handle vectors of numbers. More generally, a processor that trains machine learning models will have to handle multi-dimensional information, or tensors, in order to successfully make inferences from the data.

212. Conventional central processing units in computer systems are not up to the task. Those processors do not often have the ability to handle vectors or tensor of data. Moreover, they are not designed to move massive amounts of tensor or vector information in and out of computer memory with enough speed such that a processing bottleneck does not emerge.

213. For this sort of computation, machine-learning systems rely heavily on graphics processing units ("GPUs"). Originally designed to process computer graphics, including in 3D video

games, GPUs are uniquely suited to processing vectors or tensors of information at once. They are also designed to move data in and out of memory at significantly faster speeds than most general purpose CPUs.

214. In addition, some machine learning systems use specially designed processing units, called tensor processing units ("TPUs") to handle machine learning training and inference.

215. A new PSN entrant wishing to challenge's LinkedIn's dominance would therefore not only need to obtain the data (quantity and type) required to train machine learning models, it would need voluminous (and continuous) access to expensive arrays of GPUs or TPUs to train those models. LinkedIn, by contrast, has spent the past several years using powerful GPUs/TPUs to train and re-train its machine models—and to produce inferential professional data at scale, continuously growing and fortifying the DMIBE through a (not-so-)virtuous circle.

216. In addition, LinkedIn's machine learning advantage is reinforced by its workforce of data scientists and machine learning engineers. In fact, LinkedIn was one of the first companies to assemble a data science team. Its data science teams, which first appeared publicly in 2014, are focused on developing new machine learning models and deriving valuable inferences from LinkedIn's user data.

217. Beginning in 2014 and 2015, LinkedIn subdivided its data science teams to pair them with LinkedIn's analytics personnel. As an October 31, 2014, Venture Beat article recounted at the beginning of this corporate shift:

> The company's data scientists—numbering close to 150 now—had the option to go with one group or the other. But for the most part, their day-to-day work consists of the same type of tasks.

> If anything, the reorg pairs up the analytics people, who focus on paid products like recruiting tools, with data scientists, who look into ways people use LinkedIn's free "consumer" service for connecting with others. As for the product data scientists, working with the engineering staff reduces the potential for redundancy.

218. Since then, LinkedIn has not only further developed its data science know-how and talent, it has expanded its AI and machine learning engineering team. LinkedIn has also formalized the internal process it uses to explore data and develop new machine learning models.

219.     Beginning in August 2017, LinkedIn began its new initiative called "Productive Machine Learning," also referred to as "Pro-ML." The initiative was designed to break down silos among LinkedIn's machine learning teams.

220.     The Pro-ML initiative standardized the way LinkedIn's machine learning teams developed new models. Under Pro-ML, the process begins with "exploring and authorizing" machine learning model prototypes; then trains the models on real-time or live data; then deploys the model, including by running the models through REST API-based services. LinkedIn tests its machine-learning systems through this standardized process.

221.     Notably, LinkedIn's engineering team draws on a centralized repository of user data, called the "feature marketplace," where "ML engineers" can "search for features based on various facets including the type of feature (numerical or categorical), statistical summary, and current usage in the overall ecosystem."

222.     LinkedIn not only maintains a critical mass of machine learning models, necessary GPU and TPU hardware, and engineering / data science talent; the company has developed a standardized system of developing new machine learning models.

223.     In other words, to replicate (or overcome) the powerful effects LinkedIn's machine learning advantage, a new entrant or competitor would have to develop not just a talent pool of engineers and scientists, but an organizational structure that can rapidly generate, test, and deploy new machine learning models at scale.

### C.     The Effects of Inference

224.     LinkedIn leverages the data it collects from its users to generate additional information about the user. This is data that is inferred using machine learning and AI algorithms.

225.     Because inferred data about the user can only be obtained by a company that has access to the primary data collected from users *and* to machine-learning algorithms trained to make particular inferences, a new entrant or competitor faces a powerful barrier to entry.

226.     To generate sufficient inferred data to overcome LinkedIn's DMIBE, an entrant or competitor would have to obtain a critical mass of user data, infrastructure to standardize and prepare

data for use with machine learning algorithms, and then train (and continuously re-train) machine learning algorithms to generate massive amounts of inferred data.

227.    Generating inferred data is not enough. Inferred data is actionable data, meaning it must be put to use. It can be used to make predictions about, for example, whether a user will respond to an InMail message, whether a user will click on advertising, whether a user's content will propagate through the social network, or whether the user is a valuable lead for marketers.

228.    A rival would not only have to generate inferred data comparable to the trove of data LinkedIn possesses, but it would also have to monetize that inferred data to compete with LinkedIn. LinkedIn enjoys existing monetization channels for data, including "partner" deals for data access, subscriptions for data access, and user-targeted advertising.

229.    Inferred data is closely coupled with the underlying data used to generate it. Thus, inferred data from other social networks would not be as valuable. Data inferred from a non-professional social network, for example, would have little predictive value as to whether a user is a good business-to-business lead on the LinkedIn platform.

230.    Inferred data from other social networks or sources may also be poorly suited to predict behavior on LinkedIn itself, such as the likelihood of response to an InMail message.

231.    Thus, even a rival that could generate inferred data about some portion of LinkedIn's user base could not replicate LinkedIn's actionable trove of inferred data about its professional social network.

## VIII.    LINKEDIN ANTICOMPETITIVELY MAINTAINS ITS MONOPOLY

232.    Since it emerged with a monopoly in the Professional Social Network Market, LinkedIn has engaged in conduct designed to strengthen the DMIBE, prevent entry by actual and potential rivals, and extract supracompetitive subscription prices from users.

233.    Specifically, as explained below, LinkedIn has engaged in a series of exclusionary acts to strengthen the DMIBE and maintain its monopoly. As relevant here,[1] (1) LinkedIn has entered into, and continues to enter into, anticompetitive Private API Agreements requiring that strategically selected

---

[1] LinkedIn also appears to have entered into an anticompetitive market division agreement with Facebook, but the Court has held that monopoly maintenance allegations based on that agreement are time-barred.

Private API Partners not compete with LinkedIn in exchange for access to private LinkedIn user data; and (2) LinkedIn has anticompetitively integrated its AI and machine learning hardware and software with parent company Microsoft's Azure (*i.e.*, at prices below Microsoft's costs and at nearly two times LinkedIn's pre-transition computing costs), tying up and driving up prices for scarce hardware resources required for AI and machine learning, thereby strengthening the DMIBE and preventing and/or impeding entry at scale by a rival through the public cloud.

### A. LinkedIn Leverages Its Private APIs to Obtain Anticompetitive Agreements that Prevent Entry and Competition, and that Strengthen the DMIBE

234.    LinkedIn provides a select group of "partners" access to private, non-public LinkedIn user data through its Private APIs. As part of LinkedIn's private API access agreements with partners (referred to collectively as the "Private API Agreements" here), LinkedIn requires each partner to agree not to compete with LinkedIn.

235.    LinkedIn selects API partners based on their ability to collect user data that could potentially weaken or threaten the DMIBE protecting LinkedIn's monopoly. LinkedIn's Private API agreements are designed to prevent entry by such rivals into the Professional Social Networking Market. The Private API Agreements also directly strengthen the DMIBE, which depends on LinkedIn's control over a critical mass of user data, machine learning and AI infrastructure, and inferred data.

236.    As explained below, the Private API Agreements are not economically rational or efficient, and make no sense but for their anticompetitive effect, a hallmark of anticompetitive and exclusionary conduct.

237.    These Private API Agreements are anticompetitive means of preventing entry by actual and/or potential rivals, as the pro-competitive benefits of these agreements (if any, given the affirmative damage the agreements impose on LinkedIn's products and customers) are substantially outweighed by their anticompetitive effects—namely, that they foreclose entry by a competitor that could traverse or weaken the DMIBE, and ultimately, could provide a price and market share check on LinkedIn's subscription products.

### 1. LinkedIn Leverages Its Private APIs to Prevent Entry and Strengthen the DMIBE

238.    LinkedIn maintains separate API agreements with firms that pose a threat to the DMIBE, including because they are situated to obtain user data as part of their business. It uses these Private API Agreements to foreclose entry by actual or potential rivals.

239.    As LinkedIn's website makes clear, its private APIs are available only after executing a Private API Agreement, which are separate from the LinkedIn terms and conditions governing its public APIs.[2]

240.    The Private APIs require that selected API Partners agree not to compete with LinkedIn, including by creating a rival product. Upon agreement, a LinkedIn partner obtains access to programmatic permissions to access private LinkedIn user data.

241.    One such permissioned API is called "w_compliance." To obtain access to this and other permissioned APIs, LinkedIn requires partners to agree not to compete with LinkedIn. As explained by developer Colin Wren in a September 14, 2019 blog post:

> LinkedIn has a number of APIs, there's the Profile-API for getting users profiles and there's the Profile-Edit-API which can be used to send a patch of the user's profile to update the content.
>
> In order to use the Profile-Edit-API you need to have the w_compliance permission associated with your app.
>
> The w_compliance permission is gained via LinkedIn's partner program where an app that ***promises not to compete with LinkedIn*** or abuse the API can gain access to more data.

(emphasis added).

242.    Although LinkedIn purports to allow applications for its partner program, it provides access to the Private APIs only to hand-selected Partners. LinkedIn no longer provides a public means of applying for access to most private APIs, including those require the w_compliance permission. LinkedIn selects these partners based on whether they are positioned to traverse or weaken the DMIBE.

---

[2] LinkedIn sometimes refers its public APIs as the "self-serve APIs." These publicly available APIs are governed by LinkedIn's API Terms of Use. The Private APIs at issue in this case are different and are governed by Private API Agreements with specific, LinkedIn-selected parties.

243.    For example, LinkedIn provides private user data pursuant to a Private API Agreement to HootSuite, a product that allows users to manage posts across various social networking channels, including LinkedIn. Because Hootsuite receives its users' social media posts before they are relayed to social media networks, such as LinkedIn and Facebook, it collects a massive trove of user data as part of its core business. Hootsuite also collects detailed analytics about the posts, including about their reach and the engagement of other users with the posts routed through them.

244.    As Hootsuite explains on its website in a post entitled, "LinkedIn and Hootsuite: a Quick Start Guide":

> Adding LinkedIn to your Hootsuite dashboard gives you a smarter way to manage your presence on the world's largest professional social networking site.
>
> You can easily schedule and share content, target a specific audience, monitor activity on your Company Page, and engage with your followers— all on one platform.

245.    The result is that Hootsuite collects a mass of professional user data, as well as social data from LinkedIn posts, which it could in turn use to create or support a rival product. LinkedIn prevents Hootsuite from doing so by providing it Private API access in exchange for an agreement not to enter the market with a competing product.

246.    In addition to Hootsuite, LinkedIn maintains Private API Agreements with companies such as Amobee, Annalect, Ogilvy, and Sprinklr. LinkedIn provides these Private API Partners with access to user and post engagement data on LinkedIn. As explained in an August 13, 2019 post on MSPoweruser.com:

> LinkedIn today announced Audience Engagement, a new category of the LinkedIn Partner Program. As part of this program, select partners will have access to LinkedIn Audience Engagement API that will allow markets with new insights to discover new audiences, serve engaging content and give insights into how competitors are engaging customers. Amobee, Annalect, Hootsuite, Ogilvy, and Sprinklr are the five launch partners for LinkedIn Audience Engagement API.

247.    All of these companies are positioned to collect user data as part of their business. Left unchecked, they could potentially erode the DMIBE. For example, as Annalect explains on its website, it uses the LinkedIn APIs as part of its media analytics product:

> Annalect has recently launched a new product, Professional Audiences, leveraging LinkedIn data to give marketers a better understanding of the content consumed by business audiences using data related to industry, company size, location and title.

248.    By collecting user response and analytics relating to professional social medial posts, including business-to-business focused posts, these and other similar Partners amass their own trove of professional social data, which they could in turn leverage to create or support a product that could rival LinkedIn or diminish the strength of its DMIBE. LinkedIn extinguishes the threat by extracting an anticompetitive concession from these Private API Partners—one that prevents them, by agreement, from competing with LinkedIn.

249.    LinkedIn selects other Private API Partners for the same reason. For example, LinkedIn maintains API Agreements with companies such as Marketo, Eloqua, LiveRamp, and Acxiom, which provide contact management platforms.

250.    LinkedIn discloses the identity some of the other Private API Partners on its website, and all of them are uniquely positioned to amass significant amounts of professional social data from users:

> Through our partnerships and developer program, we enable certain affiliates, partners, customers, and other permitted developers to display to their users information from the profiles of members they meet, write to or about, manage or consider for talent or other opportunities, take social actions (e.g., follow their company), etc. Some examples include Outlook and Yahoo Mail, Calendar or Contacts, Apple and Samsung native mail, contacts and calendar phone apps, Cortana, Evernote, social media aggregators (e.g., tools for company brand administrators to consolidate interactions with followers across social media), talent and lead managers.

251.    These Private API Partners are selected by LinkedIn for their position at the threshold of entry to the Professional Social Networking Market. That is, these Private API Partners all collect extensive user data as part of their core businesses, providing them with a readymade trove of user data that could be leveraged to enter the Professional Social Networking Market at scale—or to sell data to a

potential entrant or LinkedIn competitor. Indeed, e-mail providers such as Yahoo!, Apple, Evernote, and Samsung, obtain their users' entire network of professional social connections and interactions as part of their products; social media aggregators process posts across various social media channels before and after they are posted; and talent and lead managers maintain databases of professional connections, including resumes, hiring statistics, and recruiting information.

252. LinkedIn's Private API Agreements are used to capture potential entrants to the Professional Social Networking Market by requiring them to enter into agreements not to compete with LinkedIn. Moreover, because these Private API Partners intertwine their products with LinkedIn's Private APIs, they become interdependent and unlikely to break off to compete with LinkedIn in the Professional Social Networking Market. LinkedIn Private API Partners are also restrained from providing their trove of data to other potential or actual LinkedIn rivals, as they will not risk their continued access to LinkedIn's Private APIs. This further widens the DMIBE moat that protects LinkedIn's Professional Social Networking Market monopoly.

### 2. LinkedIn's Private API Agreements Fail the Rule of Reason

253. LinkedIn's Private API Agreements, which require Private API Partners to agree not to compete with LinkedIn in exchange for specialized access to private LinkedIn user data, are anticompetitive, as they impede and prevent entry into the Professional Social Networking Market and strengthen the DMIBE.

254. There are no procompetitive reasons for these agreements that could conceivably justify, let alone outweigh the anticompetitive effect of, the Private API Agreements, particularly as to fact that these agreements greatly contribute to maintaining LinkedIn's monopoly in the Professional Social Networking Market.

255. To begin with, it makes no rational economic sense for LinkedIn to provide one of its most precious resources—the private user data under its control and dominion—to third parties, particularly potential Professional Social Networking entrants, rivals, or competitors, absent the anticompetitive agreement with these parties not to compete with LinkedIn.

256.     Indeed, as explained below, LinkedIn's monopoly is protected by powerful network effects and feedback loops that arise from LinkedIn's critical mass of user data; its machine learning and AI systems and infrastructure; and the inferences it makes about users from that technology and data.

257.     Providing LinkedIn's private user data to third parties, particularly those that themselves collect large amounts of professional social data, makes no economic sense but for the anticompetitive agreement not to compete with LinkedIn that LinkedIn embeds into each such exchange.

258.     As explained in this subsection, LinkedIn acts against its own economic interest in order to obtain this anticompetitive concession from its strategically selected Private API Partners. In other words, the Private API Agreements make no rational sense but for the anticompetitive effect they have on the DMIBE and the Professional Social Networking Market.

259.     In fact, the Private API Agreements pose a significant security risk to LinkedIn's users and make LinkedIn's subscription products less valuable. LinkedIn's Premium subscribers do not benefit from having their data accessed and used in undisclosed ways, under undisclosed terms and security conditions, by third parties. Indeed, LinkedIn's Premium product does not appear to derive any of its value to subscribers from Private API "partner" access to and use of these subscribers' data.

260.     LinkedIn's Private API Agreements create public-facing, permissioned endpoints that permit external access to LinkedIn's massive trove of user data, in which data has been carefully structured, cleaned, and centralized for programmatic use and consumption.

261.     LinkedIn's structuring and centralization of vast quantities of user data for consumption and analysis by machine learning/AI tools and other systems creates a substantial security and data privacy risk. Specifically, if LinkedIn's systems were to be compromised, a malicious actor could access massive amounts of structured data stored centrally.

262.     LinkedIn's Private API Agreements greatly exacerbate this already substantial security and data privacy risk, because they create and promulgate a public-facing means (indeed, an entire set of them, including test interfaces and other easy-to-overlook public-facing endpoints) for third-party systems outside of LinkedIn's internal ecosystem/network to query and use LinkedIn's structured data.

263.    Even carefully permissioned APIs may be potentially compromised from outside of LinkedIn's systems; but maintaining a broad set of public-facing but secretive endpoints that permit (and indeed, are designed to facilitate) third-party access to centralized, cleaned, structured data of LinkedIn users is a security and data privacy nightmare. And this security and data privacy nightmare has reared its head repeatedly over the past few years, which have seen in substantial exfiltration and perhaps misuse of LinkedIn user data, including the data of Premium subscribers.

264.    As cybersecurity expert David Greer explained in a February 13, 2019, blog post, many of the massive data breaches that have occurred in recent years have been the result of API vulnerabilities:

> You've heard that nation-state hackers stole 145 million consumer records in the 2017 Equifax breach. Did you know that this attack and breaches at Amazon, Facebook, T-Mobile, and the Black Hat security conference all targeted vulnerable APIs?
>
> Thanks to APIs, your consumers, employees, and partners benefit from robust applications with rich features. But cyberthugs profit too, because they can leverage APIs and their flaws to get to your data.

265.    LinkedIn's integration with Azure (described, *infra*) further increases the attack surface from LinkedIn's provision of user data through its Private API "partner" program, as API keys may be stored on Azure cloud-based systems, which if compromised, would provide access to otherwise carefully permissioned API resources.

First Amended Class Action Complaint – Case No. 4:22-cv-00237-HSG

266.    Moreover, LinkedIn's APIs appear to be—at least in part—the purported source of some of the data currently being sold on the dark web. For example, on June 22, 2021, a user of a popular hacker forum advertised data from 700 million LinkedIn users for sale.



267.    The forum user posted a sample of the data that included 1 million LinkedIn users. The trove of information included e-mail addresses, full names, phone numbers, physical addresses, Geolocation records, LinkedIn username and profile URL, personal and professional experience, background, gender, and other social media accounts and user names.

268.    The June 22, 2021, trove of data purportedly covered 92% of LinkedIn users. The data also included other fields, such as "inferred_salary" and "inferred_years_experience."

```
"full_name":"charlie ████","gender":"male",
"linkedin.com/████5",
"linkedin_username":"charlie-████5","linkedin_id":"2████3",
"facebook_url":"facebook.com/v████",
"facebook_username":"v████",
"facebook_id":"1████5",
"work_email":"c████com",
"mobile_phone":"+15████8",
"industry":"biotechnology",
"location_name":"cambridge, massachusetts, united states",
"location_metro":"boston, massachusetts",
"location_geo":"42.37,-71.10","location_last_updated":"2020-12-01",
"linkedin_connections":120,"inferred_salary":"████",
"inferred_years_experience":5,
"summary":"I am a moti████",
"full_name":"mehari ████",
"linkedin_url":"linkedin.com/████",
"linkedin_username":"mehari-1████55",
```

269.    LinkedIn quickly responded to reports of its compromised data with a carefully worded statement that blamed the information's release on data scrapers, and suggested that some of the data may have come from sources other than LinkedIn.

270.    LinkedIn never clearly stated what portion of the data came from itself and its APIs.

271.    But, when cybersecurity journalists interacted with the purveyor of the LinkedIn data, they asked about its source. The seller stated that the data came "from linkedin api" (*sic*).



272.     In any event, whether some, all, or none of the data posted on the dark web in June 2021 ultimately came from LinkedIn APIs is immaterial to the ultimate point: exposing centralized repositories of structured data to public-facing endpoints—even ostensibly permissioned ones—creates a substantial, widely recognized, and frequently exploited security and privacy risk to that data.

273.     In some cases, a degree of data access security/privacy risk may be justifiable as part of a particular product or service—*e.g.,* because the product or service requires third-party data access to function, and only those specific third parties are provided carefully-controlled data access in connection with the product or service.

274.     LinkedIn's Private API Partner program does not fall within the above category of data access. The question is not close, especially in connection with LinkedIn's Premium subscription product. LinkedIn's Private API Agreements are not necessary to LinkedIn's Premium subscription product. LinkedIn user data is not made broadly accessible, such that its availability would promote competition. Instead, LinkedIn provides Private API access—with all the attendant risks and overall impairments to LinkedIn's actual products, including its Premium subscription product, that come from providing private LinkedIn user data to third parties under undisclosed terms, through poorly documented and impossible-to-secure private endpoints—in order to obtain agreements from strategically selected third parties not to compete with LinkedIn. In short, LinkedIn's Private API agreements impair LinkedIn's Premium subscription product to maintain the company's competitive stranglehold on the Professional Social Networking Market.

275.     And the users themselves—even those that pay significant monthly fees to LinkedIn for its Premium product—do not receive any value from LinkedIn or its Private API Partners through LinkedIn's Private API program. To the contrary, the agreements not to compete extracted as part of the Private API Agreements prevent competitive entry, shielding LinkedIn from competition and keeping subscription prices (prices paid by those same Premium subscribers) supracompetitively inflated.

276.     The harm to LinkedIn Premium users from having their data internally centralized, aggregated, structured, and then exposed through public-facing endpoints through LinkedIn's Private API program, and from the inflation of their subscription prices as a result of the anticompetitive clauses

embedded in the Private API agreements, greatly outweighs any procompetitive effects (if any) of providing these users' LinkedIn data to hand-selected third parties. Indeed, LinkedIn's Private API Agreements affirmatively impair and devalue LinkedIn's products, including its Premium subscription product, such that LinkedIn's conduct in connection with its Private API program that makes no economic sense but for the anticompetitive restrictions LinkedIn imposes on hand-selected potential Professional Social Networking rivals (and potential sources of professional social data for Professional Social Networking rivals) through its Private API agreements.

277. Moreover, the externalized risk created by LinkedIn's Private API Agreements is ongoing. For example, if some user data made accessible to a third party through LinkedIn's Private API program were to be compromised (which may already have happened, and indeed likely has, perhaps repeatedly and continuously), there is no clear or disclosed means for LinkedIn—let alone its users (including Premium subscribers), whose data would be the subject of such compromise—to monitor or mitigate such an event. Once a user's private data is pulled from LinkedIn's servers through a Private API endpoint, the user's data is perpetually vulnerable to attack in that third-party's hands.

278. Put simply, LinkedIn's Private API agreements are not procompetitive. Rather, they affirmatively damage and devalue LinkedIn's products, including its Premium subscription product. In fact, LinkedIn's Private API agreements make no economic sense but for their anticompetitive effect, which is to seal off entry at scale in the LinkedIn-dominated Professional Social Networking Market by any entity potentially well-suited to do so.

## B. LinkedIn Anticompetitively Integrates with Microsoft Azure

279. Although LinkedIn had for years amassed and maintained the critical hardware required for its machine learning and AI systems, in July 2019, it announced it would replace much of that infrastructure with computing resources from its parent company Microsoft's public cloud service, Azure.

280. The integration with Azure tied up scarce GPU and computing resources, which a potential entrant that could not afford to build its own hardware server and data centers would need in order to traverse the DMIBE and enter the Professional Social Networking Market at scale. Indeed, by tying up

scarce GPU and computing resources, LinkedIn drove up the costs for a would-be entrant using the public cloud.

281.    Other than this anticompetitive effect, LinkedIn's abrupt transition to Azure made no economic or technical sense. Operating LinkedIn on the public cloud costs nearly twice as much as LinkedIn's existing computing systems; requires its parent company to operate the required Azure resources at below their costs; requires LinkedIn to redesign its software infrastructure for a distributed cloud-based system—a costly endeavor riddled with risks to LinkedIn's users' data and LinkedIn's operations; and exposes LinkedIn user data to the open Internet, compounding and exacerbating the already significant risks from data aggregation and centralization.

282.    LinkedIn's transition to its corporate parent's cloud was by itself anticompetitive and lacked any legitimate economic or technical justification. But it also acted as an accelerant for LinkedIn's other actions to anticompetitively maintain its monopoly in Professional Social Networking, most critically its anticompetitive Private API agreements. Indeed, working in conjunction with anticompetitive agreements with API Partners not to compete with LinkedIn, the integration protected LinkedIn's flank by massively increasing the cost of entry for a Professional Social Networking rival that would need to use public-cloud-based systems for the AI and machine learning resources necessary to traverse LinkedIn's DMIBE and enter the Professional Social Networking Market.

    1.    **LinkedIn's Integration Strengthens the DMIBE, Increases Rivals' Costs of Entry, and Ties Up Scarce Computing Resources, Including Resources Needed for AI and Machine Learning at Scale**

283.    Before 2019, LinkedIn maintained its own data and server centers, and LinkedIn's massive AI and machine learning software infrastructure was designed specifically for its custom hardware systems.

284.    Training AI and machine learning systems requires specialized GPUs capable of performing repeated vector operations—mathematical operations performed on large arrays of data at the same time. Prior to 2019, LinkedIn had for years purchased the hardware required for its AI and machine

learning systems—not only the hardware required to train deep neural networks, but also the hardware needed to make real-time inferences based on data.

285.    This hardware used for AI and machine learning applications is scarce. Indeed, for years GPUs were in short supply, particularly those powerful enough to handle LinkedIn's sophisticated machine learning and AI systems. Before 2019, LinkedIn had already obtained a critical mass of this hardware and had adapted its software stack to move massive amounts of structured user data—updated in real time—to systems designed to train and update AI and machine learning systems.

286.    On July 23, 2019, however, LinkedIn announced that it was abandoning its own hardware systems in favor of migrating to parent company Microsoft's public cloud: Azure.

287.    As explained below, the move made no economic or technical sense. Azure's public cloud was nearly twice as expensive, exposed user data to the Internet, and required a rewrite and redesign of critical software infrastructure that LinkedIn had developed for its own data and server centers.

288.    The value of the integration to LinkedIn, however, was its effect on LinkedIn's monopoly and on the DMIBE protecting it.

289.    To begin with, LinkedIn's integration with Azure tied up Azure's GPU and other AI-related computing capacity. Indeed, Azure accounts for more than 20% of the overall cloud computing capacity available worldwide. When considering the GPUs required for AI applications, including Azure's NVIDIA A100 GPU capacity, the integration's tie-up of resources was even more significant.

290.    Because GPUs and other AI-related hardware is scarce, pricing at Azure, and at rival cloud computing platforms such as Amazon Web Services and Google Cloud, is determined largely by demand. Indeed, all three platforms provide spot pricing based directly on real-time demand for computing.

291.    LinkedIn's integration increased the demand for scarce computing resources significantly, directly constraining the supply of hardware needed for an actual or potential entrant to compete with LinkedIn in the Professional Social Networking Market.

292.    Indeed, a potential entrant would have to traverse LinkedIn's DMIBE to provide a competing product. One way it could do so would be by creating its own computing hardware and data centers—at great cost—essentially entering at a scale rivaling LinkedIn's massive operations.

293.    The other way would be to use a public cloud product, such as Azure or Amazon Web Services, to centralize data, train AI models, and infer data about users. For years, the massive cost of entry at scale, namely the cost of building data and server centers, prevented any upstart from entering and competing with LinkedIn in the Professional Social Networking Market.

294.    As the public cloud became a viable alternative means of potentially traversing or weakening the DMIBE, LinkedIn acted quickly to drive up the costs of entry through that channel. That is, by leveraging its parent company Microsoft's Azure public cloud system for its computing, LinkedIn drove up the costs of entering the Professional Social Networking Market through the public cloud channel, including by tying up scarce resources and increasing prices across all cloud systems.

295.    As explained below, LinkedIn's parent company, Microsoft, provided LinkedIn with Azure computing resources at prices well **below cost**—certainly, below the prices Microsoft would have otherwise offered to the public for those cloud computing resources.

296.    The net effect of the integration was to strengthen the DMIBE by reducing the amount of public cloud capacity available for AI and machine learning applications, and increasing the costs of rivals who would use the public cloud as a route to traverse the DMIBE and enter the Professional Social Networking, including by inflating the relevant cloud compute prices. LinkedIn and Microsoft were willing to abrogate profit-maximizing behavior to accomplish this, going so far as to provide LinkedIn with Azure-based resources at below-market and below-cost pricing.

### 2.    Other than Its Anticompetitive Effect, LinkedIn's Integration with Azure Makes No Economic or Technical Sense

297.    Apart from the anticompetitive effect of the integration described above, LinkedIn's integration with Azure makes no technological or economic sense. The transition to the public cloud costs nearly twice as much for ongoing operation of LinkedIn's systems and relies on a massive discount from the retail price of the computing power LinkedIn consumes from Azure. The transition also required the massive redesign of LinkedIn's sprawling data infrastructure, including its finely tuned Kafka and Spark systems. Moreover, LinkedIn's transition to the public cloud made user data far more vulnerable to cyberattacks and data breaches.

298. ***Transitioning LinkedIn's On-Premises Systems to the Azure Public Cloud Makes No Financial or Economic Sense.*** The costs of operating LinkedIn's systems, including its AI training and inference systems, on the Azure public cloud make no financial sense at Azure's retail price of computing power.

299. Generally, the price of public cloud computing time on services such as Azure, Amazon Web Services, and Google Cloud, including storage and bandwidth, is significantly higher than the cost of the same resources if operated as part of privately operated computing cluster. Across various sizes of server, aggregate cost estimates, including estimates by OpenMetal, are stark:

| Deployment Size / Bandwidth | Public Cloud | Private Cloud | Increased Cost |
|---|---|---|---|
| Small 100 VMs, 10TB | $ 3,889 | $ 1,810 | 2.14x |
| Medium 500 VMs, 50 TB | $15,756 | $7,100 | 2.22x |
| Large 1000 VMs, 150 TB | $31,641 | $13,740 | 2.3x |
| XL 2000 VMs, 300 TB | $57,658 | $33,182 | 1.74x |

300. Across various sizes, bandwidth, and storage specifications, cloud-based computing resources are nearly twice as expensive as operating comparable private systems, which LinkedIn had done for years before its transition to the Azure public cloud.

301. What's more, hardware specific to AI training and inference is specialized and even more costly on the public cloud. In particular, AI training, and some large-scale inference applications, require arrays of GPUs. Cloud computing units equipped with GPUs are significantly more expensive than the equivalent hardware would be if operated privately (as LinkedIn did before the Azure transition).

302. The above prices are thus likely even lower than the costs of integration for LinkedIn, as LinkedIn would require a significant amount of GPU power, operated close to capacity. At LinkedIn's scale, public cloud-based GPU-equipped systems become extremely costly.

303.    LinkedIn operates approximately 250,000 servers, many at high utilization, on-premises. A transition at that scale to the Azure public cloud makes no financial sense and would at least nearly double LinkedIn's costs of server operations.

304.    To maintain cost-neutrality, Microsoft would have to provide its subsidiary, LinkedIn, a massive discount from its retail price to eliminate the more than 2x average increase in cost. Even assuming the lower increased cost associated with large deployment sizes on the public cloud, the approximately 1.74x increase in cost to migrate LinkedIn to Azure (or another public cloud) would imply a discount far below retail prices by Microsoft to maintain cost neutrality for LinkedIn's transition.

305.    Although Microsoft does not provide separate gross margins and operating costs for its Azure business, Azure rival Amazon Web Services recorded an operating margin of 26% in 2022. Google Cloud operates its public cloud system at a loss, reporting an operating margin of -10%.

306.    According to the press, Google estimated, based on a leaked internal Microsoft document, that Microsoft's Azure margins were in line with its own. As reported by CNBC in December 21, 2022:

> Google has for years been playing catch-up in the cloud infrastructure market, where it's seen in the industry as a distant third in the U.S., behind Amazon and Microsoft. The challenge for investors is that the three companies don't report cloud infrastructure metrics in a way that makes them easily comparable.
>
> However, an internal estimate assembled by Google employees, based on a leaked Microsoft document and some extrapolation of other market statistics, suggests Google believes it's closer to second place than analysts think.
>
> Google's document estimates that Microsoft generated under $29 billion in Azure consumption revenue in the latest fiscal year, which ended June 30, reflecting the value of cloud infrastructure services used by clients. That's several billion dollars less than what Wall Street Analysts had forecast. Bank of America was the most bullish, predicting Azure would pull in $37.5 billion in fiscal 2022. Cowen predicted revenue of $33.9 billion and UBS said $32.3 billion.
>
> The document from Google has Azure ending the 2022 fiscal year with an operating loss of almost $3 billion, down from a loss of more than $5 billion the prior year. It claims that Azure's sales and marketing costs approached $10 billion, accounting for 34% of consumption revenue. Microsoft said sales and marketing costs for the whole company equaled 11% of revenue over the same period.

307. Put simply, Microsoft's Azure likely makes a small margin, if a profit at all, even at its retail prices. Thus, any discount by Microsoft to LinkedIn that would make the transition to the public cloud even cost neutral for LinkedIn would require providing Azure's products at well below cost.

308. ***Costly and Time-Consuming Redesign of LinkedIn's Infrastructure and Systems***. LinkedIn's integration with Microsoft's Azure was a radical departure from LinkedIn's carefully built, existing infrastructure, which was focused on maintaining clusters of servers "on premises," meaning in facilities owned/leased and operated by LinkedIn.

309. LinkedIn's AI, machine learning, and data infrastructure was designed from the ground up to operate on LinkedIn's server architecture. LinkedIn relies heavily on Apache Spark, an engine for executing data engineering, data science, and machine learning on single-node machines or clusters. According to LinkedIn engineer, Min Shen, Spark is the "primary compute engine at LinkedIn."

310. LinkedIn operates more than 10,000 nodes across its production clusters, and Spark jobs account for more than 70% of its cluster computing resources.

311. LinkedIn would have to re-engineer its Spark nodes to operate on the public cloud, including the data shuffling system custom developed by LinkedIn to ensure that representative amounts of data reside on each Spark node. As Shen explained in a October 21, 2020 post, LinkedIn would have to adapt its shuffling mechanism—which keeps its Spark-based system efficient at its massive scale—to operate on the public cloud, which would require distribution of Spark nodes across "disaggregated clusters" of servers.

312. LinkedIn's graph database and data streaming system, Kafka, described above, would also have to be adapted to a massive public-cloud deployment. LinkedIn would have to transition massive amounts of data flowing through Kafka, a data pipeline designed to update LinkedIn's AI and machine learning models in real time, to specially contained systems on Azure. A migration of such massive scale would create months of mission-critical work, with high risks of downtime, data loss, and disruption to the LinkedIn product.

313.    LinkedIn would also have to scuttle much of its custom event monitoring systems, instead adopting proprietary Azure signals instead, meaning LinkedIn's internal fault tolerance systems would have to undergo redesign.

314.    LinkedIn's Samza stream-processing system, which was built on top of Kafka, would also have to undergo reconfiguration, and potentially even redesign. LinkedIn's Hadoop YARN cluster would also require significant adaptation and reconfiguration.

315.    All of this added massive complexity to LinkedIn's existing systems and products. The transition to Azure would likely be error prone, cause downtime and loss of data, and would cost significant engineering time across LinkedIn's various teams.

316.    ***Increased Vulnerability to Cyberattacks and Data Breaches.*** The transition of highly sensitive user data, including inferred user data, to the public cloud, would make a massive trove of such data available to the open Internet for the first time—sitting in a shared public cloud facility.

317.    Other companies operating at fractions of LinkedIn's scale that have transitioned to the public cloud have met with disastrous results—namely, decreased cybersecurity and massive data breaches.

318.    One notable example is Capital One, which migrated all its private, on-premises systems to the Amazon Web Services public cloud. Capital One suffered an unprecedented data breach in July of 2019 due, in part, to a misconfiguration of its access settings. The attacker was a former Amazon Web Services employee that had scanned the public cloud system for vulnerable systems with misconfigurations.

319.    The migration to the public cloud by Capital One resulted in a staggering breach of 100 million people's personal data. Capital One settled a lawsuit for the breach for $190 million and suffered significant loss of goodwill because of the attack.

320.    Security practitioners have identified significant risks from migrating scaled operations, particularly those with sensitive user data, to a public cloud. For example, Timothy Morrow of Carnegie Mellon University's Software Engineering Institute, identified the following risks in a March 2018 blog post: reduced visibility and control by product consumers; Internet-accessible management APIs can be

compromised; separation among multiple tenants on shared machines may fail; data deletion may be incomplete across diffuse storage devices; credentials can be stolen; increased complexity, which strains IT staff; and abuse by insiders, including unauthorized access.

321.    As cybersecurity research company Check Point explains, the mere fact that public cloud systems are exposed to the public Internet increases the likelihood of cyberattack:

> Cybercrime is a business, and cybercriminals select their targets based upon the expected profitability of their attacks. Cloud-based infrastructure is directly accessible from the public Internet, is often improperly secured, and contains a great deal of sensitive and valuable data. Additionally, the cloud is used by many different companies, meaning that a successful attack can likely be repeated many times with a high probability of success. As a result, organizations' cloud deployments are a common target of cyberattacks.

322.    LinkedIn opted to expose itself to this risk for the first time as part of its migration to Azure. Not only was its private, on-premises based cluster of computers inherently more secure, LinkedIn had spent years securing them. It was willing to throw out all of that work as part of the Azure migration and risk direct exposure to systematized attacks on public cloud systems—inexplicable conduct but for the anticompetitive effect of the transition.

*       *       *

323.    LinkedIn's migration to the Azure cloud increased operational costs by almost a factor of two; it required an overhaul of LinkedIn's custom-built software and infrastructure; and it exposed LinkedIn to an entirely new set of cybersecurity risks. None of this made its product better—to the contrary, it made LinkedIn's systems and products, including its Premium product, more dangerous, complex, and expensive.

324.    The only benefit to the Azure migration was the anticompetitive effect of driving up the cost of entry in the Professional Social Networking Market and cutting off the most viable path to entry by a rival in that market: computing time and GPU resources available on the public cloud.

325.    The Azure integration's sole purpose and effect was anticompetitive: to strengthen the barrier to entry protecting LinkedIn's Professional Social Networking monopoly.

## IX.    THE RELEVANT MARKETS

326.    LinkedIn dominates a market of its own creation—the Professional Social Networking Market. This market is a sub-market of the Social Networking Market and, unlike the general Social Networking Market, includes a subscription-based product for which individual end users will pay money—which LinkedIn offers as LinkedIn Premium.

### A.    The Professional Social Networking Market

327.    LinkedIn is a social network, but a specific kind of social network. It is not a place where people come principally to share pictures of their children, to organize dinners, to set up dates, to send personal messages, or to share videos of their vacations. Indeed, when LinkedIn users occasionally do engage in these sorts of activities, the LinkedIn community (and indeed, sometimes LinkedIn itself) will self-moderate or otherwise discipline a user for posting things that are "out of place" on LinkedIn.[3]

328.    Moreover, LinkedIn's Professional community policies expressly warn: "Do not use LinkedIn to pursue romantic connections, ask for romantic dates, or provide sexual commentary on someone's appearance."[4] LinkedIn's specific mandate for its own social network is clear: Be professional.



**Linked in** Professional community policies

## Be professional

We require content to be professionally relevant and on topic, such as sharing and gaining expertise; hiring and getting hired; teaching and acquiring new skills; and engaging in actions that allow you and others to be more productive and successful.

---

[3] Thus, for example, the Internet, and indeed LinkedIn itself, is replete with what is essentially a meme (whole-heartedly supported by LinkedIn itself): "LinkedIn is not a dating site." As one February 21, 2020 post put it (reposting a popular article that has been around since at least 2014): "LinkedIn still creates discussion: recruiters love it, some people don't see the point of using it, but there is always a lot of talk about and on it. However, you feel about the site, there is one thing that most people agree on: LinkedIn is not a dating site."

[4] https://www.linkedin.com/legal/professional-community-policies (accessed Dec. 8, 2021).

329.    LinkedIn "require[s] content to be professionally relevant and on topic," and further promulgates "Publishing Platform Guidelines" that explain:

> LinkedIn's Publishing Platform is an ideal forum to develop and strengthen your **professional identity** by sharing your knowledge and expertise **in your job**. It will be **tied to your professional profile**.

(Emphases added.)

330.    By consumer self-selection and community policing and by LinkedIn's own careful marketing, curation, and moderation, LinkedIn is where users display their professional persona and share strictly professional content related to their careers and work.

331.    LinkedIn's professional social network is regarded as a person's virtual CV or resume on the Internet. A LinkedIn profile contains a user's job history, skills, professional connections, professional posts, and recommendations from current and former colleagues.

332.    LinkedIn's social network is intended to be, and principally is, used exclusively for business or career related communications and connections. Content is required to be professional and job-related, and all postings, even if ostensibly more wide-ranging, are squarely and solely tied to a user's professional profile.

333.    Even the degree and type of familiarity associated with online connection works uniquely on LinkedIn among social networks, reflecting the unique role and scope of a professional social networking product. Thus, the term "connect with me on LinkedIn" has a well-understood meaning in online (and indeed, offline) discourse, and is meant to represent the possibility of a professional connection, rather than a romantic or personal one, as in a traditional social network like Facebook. For example, when a person with both LinkedIn and Facebook profiles meets a new coworker or someone at a professional conference, that person may seek to connect with that coworker/conference attendee on LinkedIn (where they will learn about each other's professional background and goals, and may discuss professional issues), but not on Facebook (where both persons' respective wedding pictures, birthday greetings, concert reviews, and strong views on the Third Amendment may be posted and highlighted).

### 1. The Professional Social Networking Market Is a Distinct Submarket

334. The Professional Social Networking market is a distinct submarket, with its own pricing, functionality, and principal product. Several relevant factors confirm this:

335. ***Industry or public recognition of the submarket as a separate economic entity***. LinkedIn itself recognizes that its social network is distinct from other social networks. Indeed, in its 2015 Form 10-K, LinkedIn described itself as a "professional network" or an "online professional network."

336. LinkedIn explained that it faced competition from other online professional networks or from social networks that "are developing or could develop solutions that compete" with LinkedIn's. In other words, other general social networks do not naturally compete with LinkedIn if they do not develop competitive products targeting online professional networking.

337. As Linkedin further explained in its 2015 10-K:

> Additionally, we face competition from a number of companies outside the United States that provide online professional networking solutions. We also compete against smaller companies that focus on groups of professionals within a specific industry or vertical.

338. That is, LinkedIn regards itself as providing social networking that targets professional networking and professionally directed activities. It regards itself as competitive in respect to its social network only with companies that either provide professional social networking services or that could provide such services if they developed additional products.

339. When LinkedIn went public in January 2011, it filed a Form S-1. There, it also emphasized that it generates its revenue from professionally oriented social networking:

> We generate revenue from enterprise and professional organizations by selling our hiring solutions and marketing solutions offline through our field sales organization or online on our website. We also generate revenue from members, acting as individuals or on behalf of their enterprise or professional organizations, who subscribe to our premium services.

340. Third parties routinely distinguish LinkedIn as a distinct form of social network product that is directed exclusively towards professional networking. For example, the website How Stuff Works cogently explains the difference between LinkedIn's Professional Social Network and other social networks:

LinkedIn is different than other social networking sites in that it's designed solely for the purpose of professional networking. As we said earlier, a LinkedIn profile page is essentially an online resumé. You can't post photos (other than your profile photo). You can't host a blog. You can't embed your favorite YouTube videos or playfully "poke" your friends. You can't personalize the colors or layout of your profile page or search for "single females, age 25-30" in your area. . . .

We also mentioned that a connection on LinkedIn implies more than a casual acquaintance. LinkedIn recommends that all connections be viewed as potential professional or personal references. You should feel confident that all of your connections would give you a positive recommendation to a future employer or a kind of introduction to other members of their network. Also, once someone becomes your connection, they'll have access to all of your other connections. You don't want to connect with anyone who will embarrass or misrepresent you with your other connections.

341. Even as LinkedIn has offered more robust content publishing options over time, its singular, distinct mission and product—a *professional* social network, and nothing else—has remained the centralizing organizing feature of LinkedIn's social network, and LinkedIn itself has carefully sought to police and distinguish this mission, including through express guidelines to that effect:



**Linked in** Professional community policies

## Be professional

We require content to be professionally relevant and on topic, such as sharing and gaining expertise; hiring and getting hired; teaching and acquiring new skills; and engaging in actions that allow you and others to be more productive and successful.

342. A New York Times article entitled *Why Aren't We Talking About LinkedIn* further explains the difference between LinkedIn's Professional Social Network and other Social Networks:

LinkedIn was never meant to "connect the world," at least not without a caveat and a reason: it was built to connect "the world's professionals," and specifically "to make them more productive and successful." Any debate about "free speech" on LinkedIn has to square with the fact that it's a place where you have to pay to message people with whom you aren't already

connected. If Facebook or Instagram sent a notification every time you looked at another user's profile, it would be a scandal; on LinkedIn, it's a core feature of the platform. On other social media platforms, users might be careful in case employers see evidence of their lives outside of work. The identities performed on LinkedIn are contrived with employers in mind.

343.    In other words, LinkedIn's Professional Social Network is composed of contrived profiles designed to make business connections; to impress others; and to find or change jobs. Posts on LinkedIn are of a different sort from those on general social networks, and they are regarded as such by the public and the industry. Again, LinkedIn requires as much, in express "Publishing Platform Guidelines":

LinkedIn's Publishing Platform is an ideal forum to develop and strengthen your professional identity by sharing your knowledge and expertise in your job. It will be tied to your professional profile.

344.    LinkedIn's unique role—and the unique characteristics of a Professional Social Network, as distinct from a general one—can also be seen in how LinkedIn has been regarded and described by potential rivals or competitors, including the most natural potential entrant in the Professional Social Networking market: Facebook.

345.    For many years, Facebook gathered professional information from its users, and prior to 2015, internally considered LinkedIn to be potentially competitive, including through the potential development of a Facebook-branded Professional Social Networking product. However, six years later, Facebook no longer considers LinkedIn's social network to be potentially competitive with any of Facebook's products, and Facebook has declined to launch a professional social network to rival LinkedIn.

346.    As NBC News reported as part of its publication of internal Facebook documents, prior to 2015, Facebook tried to block LinkedIn from obtaining access to Facebook users' data, and asked LinkedIn to refrain from accessing Facebook's APIs until the companies could reach a data reciprocity deal. Although the outcome of those negotiations cannot be known without discovery, Facebook never entered the Professional Social Networking market after those negotiations—and has not done so to this day. In fact, Facebook has recently launched other professionally-directed products, including Workplace by Facebook (a Slack competitor) and yet studiously avoided launching a professional social network.

347.    And even though Facebook now maintains multiple general social networks (Facebook and Instagram), ubiquitous messaging products (Messenger and WhatsApp), and its own office communications suite (Workplace), when Facebook CEO Mark Zuckerberg was testifying at the U.S. Senate in May 2018, he said: "I don't consider LinkedIn to be one of our direct competitors." In short, although Facebook is the most natural potential entrant into the Professional Social Networking market, it has not done so, and distinguishes its general social networks (and other products) from LinkedIn's professional social network.

348.    LinkedIn's founder Reid Hoffman likewise has not regarded the leading general social network, Facebook, to be a direct LinkedIn competitor.

349.    LinkedIn's paid subscription product is considered distinct from other social networking products. For example, while LinkedIn allows paid subscribers to view information about users that viewed their profile, other social networks do not offer such functionality.

350.    More significantly, general social networks such as Facebook and Twitter are not viewed by LinkedIn users, and particularly LinkedIn Premium subscribers, as comparable products to LinkedIn's professional social network, particularly for business networking and professional communications.

351.    ***The product's peculiar characteristics and uses***. Unlike LinkedIn's social network, general social networks like Facebook are not generally viewed or targeted for obtaining professional access to decisionmakers at companies and business enterprises. By contrast, LinkedIn serves as a point of connection among business professionals, in which individuals in their uniquely professional roles and identities can communicate, can connect, can market themselves, and can be marketed to in a way analogous to real-world office visits and communications—distinct from a visit or call to a person's home or in public, as in the analog of a Facebook or Twitter post or communication.

352.    A LinkedIn Premium subscription is not interchangeable with user accounts on other social networks like Twitter or Facebook. Professionally-oriented posts and communications, tied to one's professional identity, would not and do not propagate through those general social networks (which are designed around and littered with personal content, including family photos, personal events, political and social commentary, birthdays, and other non-professional content, all tied to a general, personal

identity) in a similar manner, with similar effectiveness, or with materially similar goals and results, as they do on LinkedIn's social network.

353. The machine-learning algorithms powering general purpose social networks are not specifically tuned toward maximizing business networking connections and opportunities.

354. Twitter and Facebook's content service systems, which decide what to show users, are not specially tuned towards providing users information relevant to their business interests and distinct professional identity.

355. General social networks do not have the ability to facilitate cold messaging in an avowedly professional context with a person in their distinctly professional identity, such as with LinkedIn's InMail product.

356. LinkedIn's machine-learning algorithms are specially tuned towards professional information and inferences particularly relevant for recruiting and job hunting, whereas general social networks are not so tuned.

357. General social networks do not have comparable products to LinkedIn's "Sales Navigator," which is available by subscription only.

358. Most general social networks do not allow users to determine who has viewed their profile or their content—let alone in the context and with information specifically directed toward both the poster and the viewer's professional identities. LinkedIn provides that functionality as part of its paid subscription products.

359. There are no competing paid subscription products on any general social network that provide the same—or even arguably competitively similar—premium professional services and functionalities available through LinkedIn Premium, including InMail, Sales Navigator, granular professional search, and professionally-oriented user viewing information.

360. ***LinkedIn's premium product features are only available on LinkedIn.*** No other social network provides comparable subscription products to LinkedIn. LinkedIn has several subscription products ranging from $29.99/month to $99.95/month. Each plan provides some degree of access to InMail Credits, Profile Viewer information, and LinkedIn Learning (a library of online courses).

361.    LinkedIn's Premium Career plan starts at $29.99 a month, and includes 3 InMail message credits; allows the subscriber to compare themselves to other job candidates applying for the same job; and includes interview and recruitment resources.

362.    LinkedIn's Premium Business plan starts at $47.99 a month, and includes 15 InMail message credits; insights and information regarding company pages; and the ability to view an unlimited number of people when browsing through the LinkedIn site.

363.    LinkedIn's Sales Navigator product starts at $64.99 a month and provides tools to generate sales and build sales leads. It includes 20 InMail message credits. It provides features that allow insights on potential accounts and leads on LinkedIn. And it allows the creation of lists via an on-site lead builder.

364.    LinkedIn's Recruiter Lite product is the highest-end tier for individual subscriptions and starts at $99.95. It provides for 30 InMail message credits. It allows for advanced unlimited searches with filters designed for recruiting. It integrates hiring and candidate tracking functionality. And it also provides recommendations for potential candidates.

365.    The functionality offered by these LinkedIn premium subscription products is not available on any other social network. Indeed, no major general social network provides cold-introduction functionality such as InMail. None of the general social networks provide recruiting tools. The leading general social networks do not publicly offer paid functionality that allows a user to determine who, by specific professional identity, has viewed their (or their company's) page.

366.    None of the leading general social networks provide a paid ability to traverse the network looking for users by granular professional characteristics such as work experience, business connections, and qualifications for particular jobs.

367.    There is no cross-elasticity of demand between LinkedIn's premium products and an account on other general social networks like Twitter and Facebook. This is because none of the general social networks offer the same (or even competitively similar) professional functionality provided through LinkedIn subscription products.

368.    Moreover, none of the general social networks provide the same context, degree, and overall type and level of access to business decisionmakers accessible through premium subscription features on LinkedIn's massive, professionally-focused network of business professionals.

369.    **_Unique production facilities._** LinkedIn's subscription products and user products are powered by LinkedIn's unique network of business connections and the LinkedIn social network's explicit, avowed professional focus—with no other focus permitted by LinkedIn's own express rules and guidelines. No other social network contains, promotes, and surfaces exclusively business-related connections, communications, and content among individuals in their professional (rather than personal or other type of) identity and capacity.

370.    LinkedIn's machine-learning algorithms require specific professionally-focused data derived from LinkedIn's user network. LinkedIn produces inferred professional data from its professional social network. LinkedIn's recommendations of professional content, individuals, jobs, and organizations rely on and feed back into these particularized machine-learning and AI algorithms.

371.    Other social networks do not possess the real-time information about business and professional interactions that LinkedIn possesses. For example, while other social networks may possess job posting information, LinkedIn produces machine-learning based inferences that match individuals with jobs and other professionals based on their business-related interactions, education, job history, and skillset. General social networks do not have access to comparable data, particularly data that is updated in real time.

372.    **_Distinct customers._** LinkedIn's subscription customers are business professionals that seek to find, connect with, and communicate with other professionals and with business decisionmakers in an avowed, bilaterally understood professional context. This exclusively professional context, and these avowedly, definitionally professional connections and communications, are unavailable from general social networks, which do not offer actually or even potentially competitive alternatives to business professionals who are willing to pay for the unique professional social networking tools and services that LinkedIn offers through its Premium subscriptions.

373. Indeed, a profile on a general social network like Facebook may include content and connections that may be inappropriate or far too informal for business contacts, and the overall context does not permit the sorts of professionally-oriented, bilaterally understood searches, connections, and communications that are by specific design and cultivation definitionally and ubiquitously present on LinkedIn's social network, especially through its paid products like InMail and advanced professional search.

374. LinkedIn premium subscription purchasers are unable to buy comparable products from other general social networks, so their purchases are entirely distinct from those made on general social networks.

375. A LinkedIn premium subscriber cannot obtain any of the additional services, such as InMail, profile viewer information, or granularly targeted professional search, from other social networks. No comparable products are offered by these general social networks, such as Facebook or Twitter.

376. ***Distinct prices and sensitivity to price changes.*** LinkedIn charges premium subscription prices that range from $29.99 to $99.95. No general social networks provide comparable subscription products that enhance a user's ability to access information about others on the social network. Facebook and Twitter, for example, do not offer products that allow paid-for access to professional messaging with business decisionmakers in their professional capacity; to information about a user's profile views; or to powerful, granular professional search; nor do general social networks provide the ability to traverse professional user profiles using attenuated second- and third-order connections.

377. LinkedIn's users are also far more valuable, on a per-user basis, than users on general social networks. As LinkedIn states on its website, 4 out of 5 LinkedIn members "drive business decisions." LinkedIn's members have "2x the buying power of average web audiences," and LinkedIn provides the "#1 platform for B2B lead generation, rated by marketers." LinkedIn's customer and user bases are thus distinct and distinguishable from other general social network customer and user bases.

378. Moreover, teenagers, retirees, and other non-career-oriented individuals represent a small minority of LinkedIn users, and even smaller minority of active LinkedIn users, and a vanishingly small

minority of LinkedIn Premium subscribers—whereas these individuals make up significant portions of the user bases of leading general social networks, including Facebook, Twitter, Instagram, and TikTok.

379.    LinkedIn also experiences price stability that is unheard of in any similarly structured market. It has largely maintained its prices with no competitive check from 2015 until the present.

380.    Moreover, through the addition of new subscription offerings, LinkedIn has essentially raised all-in prices without any competitive check.

381.    ***Specialized vendors.*** LinkedIn has spawned an industry of specialists that help users with their LinkedIn profiles; with lead generation and sales on LinkedIn; and with maintaining an enterprise or organizational presence on LinkedIn's professional social network.

382.    There are, for example, third-party LinkedIn consultants that optimize LinkedIn profiles, including profile photos, headlines, summaries, and content curation.

383.    Online professional freelancing sites include posts for jobs such as "LinkedIn Specialists" who focus on LinkedIn content creation, profile optimization, and LinkedIn sales strategy optimization.

384.    Moreover, marketers use LinkedIn at significant rates. Indeed, more than half of U.S. marketers will use LinkedIn in 2021, and the share of marketers using LinkedIn has risen steadily since 2017.



385.    These marketers are specialized vendors that have developed and targeted LinkedIn's professional social network as a unique and distinct marketing channel. Their purpose is to target the unique user base and context offered by LinkedIn's one-of-a-kind professional social network.

### 2.    LinkedIn Possesses Monopoly and Market Power in the Professional Social Networking Market

386.    LinkedIn possesses a monopoly and market power in the Professional Social Networking Market.

387.    LinkedIn is the only major Professional Social Network in the United States. Sites like Indeed, New Work SE, ZipRecruiter, glassdoor, SimplyHired, and Snagajob are job boards, not professional social networks. They do not provide comparable user-oriented features. None of them offer subscription-based professional social networking.

388.    Social networks such as Facebook, Twitter, and YouTube provide the ability to post content, interact with friends or connections, and message other users on the social network. But none of those social networks provide business or professionally oriented connections, access to an exclusively professional network, or subscription-based products directed toward professional features.

389.    Moreover, messaging functionality on other social networks do not include the ability to buy messages providing cold introductions to other users on the network in an avowedly professional context, such as with LinkedIn's InMail product.

390.    LinkedIn dwarfs other professional social networks. For example, the professional social network Xing, although oriented towards professionals and business connections, has approximately 15 million users worldwide compared to LinkedIn's 690 million users, and has approximately 20 million monthly visits compared to LinkedIn's over 980 million visits. Xing competes mostly in Europe, and generated a paltry (lined up next to LinkedIn's FY 2021 revenue of $10.3 billion) € 15.4 million Euros in 2019. Xing's user share and revenue share of the Professional Social Networking Market is at most approximately 1-2%.

391.    AngelList, although popular among younger users and startup companies, is also significantly smaller than LinkedIn and provides far more limited functionality. It mostly serves to

connect job seekers, with approximately 548,000 job seekers and 16,000 companies interacting on its Platform. AngelList's subscription product starts at approximately $250 per user per month and is focused almost entirely on searching job candidates and resumes. It is not a substitute for LinkedIn's professional social network, and does not offer a meaningful substitute to LinkedIn's principal Premium subscription products. AngelList accordingly does not possess a meaningful share of the Professional Social Networking market, and does not offer products/services with cross-elasticity of demand with LinkedIn's Premium subscription products.

392.    Professional social network Viadeo also has a very small share of the Professional Social Networking Market. Viadeo has only 720,000 recruiter users and 6.4 million professionals on its network. Although Viadeo sells a premium subscription-based product in the market, the company generates only $26.5 million in annual revenue, and has been in decline since at least 2017. Viadeo also does not maintain a significant share of the United States-based geographic market, as it is used mostly in France.

393.    Other rivals in the Professional Social Networking market are even narrower in their product offerings. For example, professional social network Lets Lunch is focused on connecting professionals during their lunch hours. It too accounts for a tiny share of the overall Professional Social Networking market, with only 2,000 companies and a *de minimis* number of users in comparison to LinkedIn's 690 million (worldwide)/174 million (U.S.) user base.

394.    When all rival professional social networks are accounted for, LinkedIn possesses between 97% and 99% of the share of users and user engagement, and between 95 and 99% of the revenue share of the subscription and user-oriented products sold in the entire Professional Social Networking market.

395.    LinkedIn's massive market share allows it to essentially set the prices of its subscription products with little or no competitive check, as LinkedIn Premium users faced with price increases could not obtain the same product features elsewhere.

396.    Even job search functionality available on other sites would not provide the same functionality as job search functionality on LinkedIn, because no other professional social network has the same size and depth of LinkedIn's network of professionals and companies. Moreover, no other

competitor has the access to LinkedIn's professionally-oriented trove of data, nor its sophisticated—and professional data-trained and targeted—machine-learning systems and inferential data.

397. LinkedIn is therefore able to make a small but significant non-transitory increase in prices for its LinkedIn Premium subscription products without facing any competitive check.

398. Indeed, LinkedIn is able to charge significant, and all-in increasing, user-facing prices for several of its most popular and integral professional social networking services (*e.g.*, In Mail, profile view information, and advanced professional search), while other social networks like Facebook are able to provide only free products without sacrificing the size of their networks.

399. LinkedIn is also able to increase prices for certain functionality, such as for unlimited searching of its network or for additional InMail messages per month. None of LinkedIn's tiered offerings have led to any entry by a competitor, nor has there been any price pressure on LinkedIn from other firms, rivals, or competitors.

### 3. Relevant Geographic Market

400. The relevant geographic market for the Professional Social Networking market is the United States.

401. First, job-seekers in the United States rarely seek work outside of the United States. Although there are exceptions, LinkedIn users who buy subscription services generally interact with other U.S. professionals and with U.S.-based companies or with companies or organizations with major U.S. presences.

402. Second, language differences also limit the interaction across LinkedIn's professional social network. LinkedIn users, for example, who communicate with Arabic or Chinese character sets will interact far less frequently with U.S. members who communicate in English and with English character sets.

403. The United States is also LinkedIn's largest market, with 174 million users—a large share of all professionals in the United States.

404. In the alternative, even if the Professional Social Networking market is viewed worldwide, LinkedIn is available in more than 200 countries and includes 163 million users in Europe (including the UK), 196 million in Asia Pacific and 107 million in Latin America.



Source: LinkedIn

405. Even on a worldwide basis, LinkedIn is the largest professional social network by a wide margin, with more than 90-95% of the worldwide share in users, user engagement, and subscription product revenue. There are no rivals with a meaningful share of the market or with any ability to check LinkedIn's pricing, monopoly, and market power.

### 4.   Barriers to Entry

406. The Professional Social Networking market is protected by several significant barriers to entry.

407. As described above, the Professional Social Networking market is subject to powerful network effects. The more professional users use the network, the more valuable the network becomes, which in turn, attracts more users.

408. This feedback loop results in tipping-point effects, meaning that a firm competing in the market cannot build a competitive product without first obtaining a critical mass of users. Once a critical

mass of users is obtained, the firm obtaining that critical mass experiences a surge in additional users, as the network itself becomes more valuable.

409.    A similar feedback loop exists with respect to user data. Because a Professional Social Network obtains profits by deploying machine learning algorithms and AI to target content and to search through the network of users, a critical mass of data is required. Without a critical mass and quality of data, a competitor in the market could not accurately train machine learning models, impairing its ability to monetize its network or to serve content to it is users, thus diminishing the value of the network.

410.    Likewise, a significant barrier to entry arises from the computational hardware and software infrastructure required to process large amounts of data, particularly in real time. User data, once collected, must be fed back into existing machine-learning algorithms and models. For the data to be most actionable, particularly for content targeting, that data must be incorporated into the trained machine-learning algorithms.

411.    These effects together are referred to as the Data, Machine Learning, and Inference Barrier to Entry (described, *supra*). The DMIBE protects LinkedIn's business. To overcome it, a new entrant must replicate LinkedIn's massive data trove, its data processing and machine-learning infrastructure, obtain comparable inferred data, and must have access to scalable computing power, including GPUs, capable of generating inferred data.

## X.    HARM TO COMPETITION

412.    LinkedIn's conduct, taken together or individually, harms competition in several ways.

413.    The alleged conduct includes (a) the integration of LinkedIn's hardware and software machine learning and AI systems with Microsoft's Azure cloud systems and GPU arrays and (b) anticompetitive Private API Agreements with strategically selected API Partners, requiring them to agree not to compete with LinkedIn in exchange for Private API access.

414.    LinkedIn's conduct may include other overt acts, including anticompetitive data sharing agreements and potentially overt acts enforcing LinkedIn's market division agreement with Facebook after January 13, 2018. Discovery is required to know the details of such agreements, including agreements with "partners" for access to LinkedIn user data.

415.     Taken together, LinkedIn's conduct strengthens and has strengthened the DMIBE, preventing any significant competitor from entering the Professional Social Networking Market. LinkedIn seals off competitors from the market by reinforcing the DMIBE.

416.     The conduct also reduces and has reduced consumer choice. Because the strengthening of the DMIBE prevents entry by any rival Professional Social Network, consumers have only one choice for Professional Social Networking and will pay inflated subscription prices for access to services provided only by LinkedIn.

417.     LinkedIn's Private API agreements directly prevent entry in the Professional Social Networking Market by would-be rivals, and further bolster the DMIBE protecting LinkedIn's monopoly in that market by preventing these same would-be rivals from selling or otherwise providing relevant social data to a different would-be entrant.

418.     LinkedIn's anticompetitive integration with Azure impedes entry in the Professional Social Networking Market by making it harder for a rival or would-be rival to enter the market at scale by tying up and increasing the cost of scarce specialized cloud computing resources.

419.     Absent LinkedIn's anticompetitive conduct, entry would be possible and LinkedIn would have to compete with other entrants and companies providing the same or similar services. In all likelihood, LinkedIn would not be able to charge similar subscription fees in a competitive world. Indeed, general social networks do not charge comparable subscription fees (if any at all) and monetize user engagement mostly through advertising revenue. LinkedIn's ability to charge a large subscription fee thus stems from the DMIBE and the anticompetitive conduct that reinforces and strengthens it.

420.     Plaintiffs and the Class are harmed—and will continue to be harmed—by LinkedIn's anticompetitive conduct.

421.     Plaintiffs and the Class have been overcharged for subscriptions by LinkedIn as a result of its anticompetitive conduct, including the strengthening of the DMIBE and preclusion of entry by a rival that could serve as a price check.

**CLASS ACTION ALLEGATIONS**

422.     The class's claims all derive directly from a course of conduct by LinkedIn. LinkedIn has engaged in uniform and standardized conduct toward the class. It did not materially differentiate in its actions or inactions toward members of the class. The objective facts on these subjects are all the same for all class members. Within each Claim for Relief asserted by the class, the same legal standards govern. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed class pursuant to Federal Rule of Civil Procedure 23.

423.     This action may be brought and properly maintained as a class action because resolution of the questions it presents is one of a common or general interest, and of many persons, and also because the parties are numerous, and it is impracticable to bring them all before the court. Plaintiffs may sue for the benefit of all as representative parties pursuant to Federal Rule of Civil Procedure 23.

**The Class**

424.     Plaintiffs bring this action and seek to certify and maintain it as a class action under Federal Rule of Civil Procedure 23 on behalf of themselves and a class defined as follows:

> All persons, business associations, entities, and corporations who purchased LinkedIn Premium services or otherwise paid LinkedIn for any upgraded account features from the period beginning January 13, 2018, to the present (the "Class Period").

425.     Excluded from the nationwide class is LinkedIn, its employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates; and the judicial officers and their immediate family members and associated court staff assigned to this case.

**Numerosity and Ascertainability**

426.     The members of the class are so numerous that a joinder of all members would be impracticable. Indeed, there are millions of LinkedIn users that pay anticompetitively inflated subscription fees.

427.     The class is ascertainable. The class definition identifies groups of unnamed plaintiffs by describing a set of common characteristics sufficient to allow a member of that group to self-identify as

having a right to recover based on the description. Other than by direct notice, alternatively proper and sufficient notice of this action may be provided to the class members through notice disseminated by electronic means, through broadcast media, and published in newspapers or other publications. Moreover, LinkedIn is in possession of all user contact information, including e-mail addresses.

**Predominance of Common Issues**

428. A well-defined community of interest in questions of law or fact involving and affecting all members of the class exist, and common questions of law or fact are substantially similar and predominate over questions that may affect only individual class members. This action is amenable to a class-wide calculation of damages, or the establishment of fair and equitable formulae for determining and allocating damages, through expert testimony applicable to anyone in the class.

429. The most significant questions of law and fact that will decide the litigation are questions common to the class, or to definable categories or subclass thereof, and can be answered by the trier of fact in a consistent manner such that all those similarly situated are similarly treated in the litigation. The questions of law and fact common to the Plaintiffs and class members, include, among others, the following:

a. Whether LinkedIn unlawfully monopolized the market for Professional Social Networking;

b. Whether LinkedIn unlawfully attempted to monopolize the market for Professional Social Networking;

c. Whether LinkedIn has market power in the market for Professional Social Networking;

d. Whether LinkedIn's conduct, including its integration with Azure, and its Private API Agreements, are anticompetitive;

e. Whether LinkedIn's anticompetitive conduct lacks any procompetitive benefits and/or whether the anticompetitive effects outweigh the procompetitive benefits of the conduct;

f. Whether the members of the Class are entitled to trebled damages, attorneys' fees, costs, and other monetary relief under the antitrust laws;

g. Whether the members of the Class are entitled to injunctive relief;

h. Whether LinkedIn should be enjoined from its integration with Microsoft's Azure public cloud;

i. Whether LinkedIn has unlawfully and anticompetitively reinforced and strengthened the DMIBE through its conduct.

## Typicality

430. Plaintiffs' claims are typical of the members of the class. The evidence and the legal theories regarding LinkedIn's alleged wrongful conduct are substantially the same for Plaintiffs and all of the class members.

## Adequate Representation

431. Plaintiffs will fairly and adequately protect the interests of the class members. Plaintiffs have retained competent counsel experienced in antitrust and class action litigation to ensure such protection. Plaintiffs and their counsel intend to prosecute this action vigorously and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Class.

## Superiority

432. This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because LinkedIn has acted and refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

433. This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and fact regarding Defendant's conduct and responsibility predominate over any question affecting only individual Class members.

434. Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction

of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

435. The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenge of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

436. Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide, and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any class into subclasses.

## REALLEGATION AND INCORPORATION BY REFERENCE

437. Plaintiffs reallege and incorporate by reference all the preceding paragraphs and allegations of this Complaint, as though fully set forth in each of the following Claims for Relief asserted on behalf of the class.

## CLAIMS FOR RELIEF

### COUNT ONE:
### (on behalf of Plaintiffs and the Class)
### Monopolization of the Professional Social Networking Market in Violation of 15 U.S.C. § 2

438. Plaintiffs bring this count against LinkedIn on behalf of themselves and the putative class.

439. LinkedIn has willfully acquired and maintained monopoly power in the relevant market for Professional Social Networking.

440. LinkedIn possesses monopoly power in the Professional Social Networking market. LinkedIn has the power to control prices and exclude competition in the Professional Social Networking market.

441. LinkedIn possesses a dominant position in the market for Professional Social Networking, and has enjoyed that position since at least 2015. LinkedIn's share of users in the Professional Social Networking market is between 97 and 99%. LinkedIn possesses between 95 and 99% of the revenue share from subscription and user-oriented products sold in the Professional Social Networking market.

442. LinkedIn has willfully acquired and maintained monopoly power in the Professional Social Networking market by exploiting powerful network effects. The more users that use LinkedIn's network, the more valuable the network becomes. This, in turn, attracts more users.

443. LinkedIn's conduct as alleged in this Complaint, including (a) entering into anticompetitive Private API Agreements with hand-selected third parties that prevent competition with LinkedIn and (b) an anticompetitive integration of LinkedIn with Microsoft's Azure cloud computing platform, has had an anticompetitive effect in the Professional Social Networking market.

444. LinkedIn's anticompetitive conduct as alleged in this Complaint, including (a) entering into anticompetitive Private API Agreements with hand-selected third parties that prevent competition with LinkedIn and (b) an anticompetitive integration of LinkedIn with Microsoft's Azure cloud computing platform, has no legitimate business purpose or procompetitive effect.

445. LinkedIn's anticompetitive conduct as alleged in this Complaint, including (a) entering into anticompetitive Private API Agreements with hand-selected third parties that prevent competition with LinkedIn and (b) an anticompetitive integration of LinkedIn with Microsoft's Azure cloud computing platform, has had a substantial effect on interstate commerce.

446. Plaintiffs and the class members have been and will be injured in their business or property as a result of LinkedIn's anticompetitive conduct alleged in this Complaint, including (a) LinkedIn's entering into anticompetitive Private API Agreements with hand-selected third parties that prevent competition with LinkedIn and (b) LinkedIn's anticompetitive integration of LinkedIn with Microsoft's Azure cloud computing platform, which together helped LinkedIn unlawfully maintain its Professional

Social Networking Market monopoly during the Class Period. For example, Plaintiffs and each class member have paid and/or continue to pay supracompetitive subscription prices for one or more LinkedIn Premium products. These supracompetitive prices were caused by LinkedIn's unlawful anticompetitive conduct as alleged in this Complaint, including (a) LinkedIn's entering into anticompetitive Private API Agreements with hand-selected third parties that prevent competition with LinkedIn and (b) LinkedIn's anticompetitive integration of LinkedIn with Microsoft's Azure cloud computing platform, which together helped LinkedIn unlawfully maintain its Professional Social Networking Market monopoly during the Class Period. Plaintiffs and the class members seek to recover overcharge damages for paying these supracompetitive LinkedIn Premium subscription fee prices to LinkedIn. Plaintiffs and the class members have also suffered and will suffer from reduced consumer choice and other non-overcharge injuries as a result of LinkedIn's monopolization of the Professional Social Networking Market.

447. As a result of LinkedIn's monopolization of the Professional Social Networking market, Plaintiffs and the class members have suffered and will suffer injury of the type the antitrust laws were intended to prevent, including the anticompetitive overcharge and reduced consumer choice described above. Plaintiffs and the class members have been and will be injured by the harm to competition as a result of LinkedIn's monopolization and associated anticompetitive conduct.

448. Plaintiffs and the class members seek monetary damages, including treble damages and applicable attorney's fees and costs, for LinkedIn's unlawful monopolization of the Professional Social Networking Market, as well as appropriate injunctive relief.

**COUNT TWO:**
**(on behalf of Plaintiffs and the Class)**
**Attempted Monopolization of the Professional**
**Social Networking Market in Violation of 15 U.S.C. § 2**

449. Plaintiffs bring this count against LinkedIn on behalf of themselves and the putative class.

450. LinkedIn has engaged in predatory, exclusionary, and anticompetitive conduct, including but not limited to (a) entering into anticompetitive Private API Agreements with hand-selected third parties that prevent competition with LinkedIn and (b) an anticompetitive integration of LinkedIn with Microsoft's Azure cloud computing platform. The purpose of this conduct was and is to eliminate

competitive threats before they became too formidable and to prevent potential rivals from entering the Professional Social Networking Market at scale.

451. This conduct caused LinkedIn to have a dangerous probability of achieving a monopoly in the Professional Social Networking Market.

452. LinkedIn's conduct as alleged in this Complaint, including (a) entering into anticompetitive Private API Agreements with hand-selected third parties that prevent competition with LinkedIn and (b) an anticompetitive integration of LinkedIn with Microsoft's Azure cloud computing platform, has had an anticompetitive effect in the Professional Social Networking Market.

453. LinkedIn's anticompetitive conduct as alleged in this Complaint, including (a) entering into anticompetitive Private API Agreements with hand-selected third parties that prevent competition with LinkedIn and (b) an anticompetitive integration of LinkedIn with Microsoft's Azure cloud computing platform, has no legitimate business purpose or procompetitive effect.

454. LinkedIn's anticompetitive conduct as alleged in this Complaint, including (a) entering into anticompetitive Private API Agreements with hand-selected third parties that prevent competition with LinkedIn and (b) an anticompetitive integration of LinkedIn with Microsoft's Azure cloud computing platform, has had a substantial effect on interstate commerce.

455. Plaintiffs and the class members have been and will be injured in their business or property as a result of LinkedIn's anticompetitive conduct alleged in this Complaint, including (a) LinkedIn's entering into anticompetitive Private API Agreements with hand-selected third parties that prevent competition with LinkedIn and (b) LinkedIn's anticompetitive integration of LinkedIn with Microsoft's Azure cloud computing platform, which together helped LinkedIn unlawfully attempt to monopolize the Professional Social Networking Market during the Class Period. For example, Plaintiffs and each class member have paid and/or continue to pay supracompetitive subscription prices for one or more LinkedIn Premium products. These supracompetitive prices were caused by LinkedIn's unlawful anticompetitive conduct as alleged in this Complaint, including (a) LinkedIn's entering into anticompetitive Private API Agreements with hand-selected third parties that prevent competition with LinkedIn and (b) LinkedIn's anticompetitive integration of LinkedIn with Microsoft's Azure cloud computing platform, which

together helped LinkedIn unlawfully attempt to monopolize the Professional Social Networking Market during the Class Period. Plaintiffs and the class members seek to recover overcharge damages for paying these supracompetitive LinkedIn Premium subscription fee prices to LinkedIn. Plaintiffs and the class members have also suffered and will suffer from reduced consumer choice and other non-overcharge injuries as a result of LinkedIn's attempted monopolization of the Professional Social Networking Market.

456.    As a result of LinkedIn's attempted monopolization of the Professional Social Networking market, Plaintiffs and the class members have suffered and will suffer injury of the type the antitrust laws were intended to prevent, including the anticompetitive overcharge and reduced consumer choice described above. Plaintiffs and the class members have been and will be injured by the harm to competition as a result of LinkedIn's attempted monopolization and associated anticompetitive conduct.

457.    Plaintiffs and the class members seek monetary damages, including treble damages and applicable attorney's fees and costs, for LinkedIn's unlawful attempted monopolization of the Professional Social Networking Market, as well as appropriate injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that judgment be entered against LinkedIn and that the Court grant the following:

A.    Determine that this action may be maintained as a class action pursuant to Rules 23(a), (b)(2), and/or (c)(4) of the Federal Rules of Civil Procedure, and direct that reasonable notice of this action, as provided by Rule 23(c)(2), be given to the Class, and declare Plaintiffs as the representatives of the Class;

B.    Enter a judgment against LinkedIn in favor of Plaintiffs and the Class;

C.    Grant permanent injunctive relief to remedy the ongoing effects of LinkedIn's unlawful and anticompetitive conduct;

D.    Award Plaintiffs and the Class actual and/or trebled damages;

E.    Award Plaintiffs and the Class their costs of suit, including reasonable attorneys' fees as provided by law; and

F.    Award such further and additional relief as the case may require and the Court may deem just and proper under the circumstances.

## JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable as a matter of right.

Dated: April 5, 2023

Respectfully submitted,

*/s/ Brian J. Dunne*
Brian J. Dunne (CA 275689)
bdunne@bathaeedunne.com
Edward M. Grauman (*pro hac vice*)
egrauman@bathaeedunne.com
**BATHAEE DUNNE LLP**
901 South MoPac Expressway
Barton Oaks Plaza I, Suite 300
Austin, TX 78746
Tel.: (213) 462-2772

Christopher M. Burke (CA 214799)
cburke@koreintillery.com
Walter W. Noss (CA 277580)
wnoss@koreintillery.com
Yifan (Kate) Lv (CA 302704)
klv@koreintillery.com
**KOREIN TILLERY P.C.**
707 Broadway, Suite 1410
San Diego, CA 92101
Tel. (619) 625-5621

*/s/ Yavar Bathaee*
Yavar Bathaee (CA 282388)
yavar@bathaeedunne.com
Andrew C. Wolinsky (*pro hac vice*)
awolinsky@bathaeedunne.com
**BATHAEE DUNNE LLP**
445 Park Avenue, 9th Floor
New York, NY 10022
Tel.: (332) 322-8835

Carol L. O'Keefe (*pro hac vice* forthcoming)
cokeefe@koreintillery.com
**KOREIN TILLERY P.C.**
505 North 7th Street, Suite 3600
St. Louis, MO 63101
Tel.: (314) 241-4844

*Attorneys for Plaintiffs and the Proposed Class*