UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

<table>
<tr><td>TODD CROWDER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>LINKEDIN CORPORATION,<br><br>Defendant.</td><td>Case No. 22-cv-00237-HSG<br><br>**ORDER DENYING MOTION TO DISMISS AND GRANTING IN PART AND DENYING IN PART MOTIONS TO SEAL**<br><br>Re: Dkt. Nos. 73, 84, 85, 91</td></tr>
</table>

Before the Court are Defendant's motion to dismiss, the parties' administrative motions to seal, and a non-party's motion to seal. Dkt. Nos. 73, 84, 85, 91. The Court held a hearing on the motion to dismiss. Dkt. No. 77. The Court **DENIES** the motion to dismiss and **GRANTS IN PART AND DENIES IN PART** the motions to seal.

## I.    BACKGROUND

Plaintiffs filed the first amended complaint ("FAC") after the Court granted Defendant's motion to dismiss their initial complaint. *See* Dkt. No. 65.

This is an antitrust proposed class action against LinkedIn, an online social network that focuses on professional connections. *See* FAC ¶¶ 1, 30. Plaintiffs subscribe to LinkedIn Premium Career, which provides paying users with additional features. *Id*. ¶¶ 21–23. Plaintiffs assert that LinkedIn has a monopoly in the professional social networking market, allowing it to overcharge Premium subscribers. *Id*. ¶¶ 20, 421, 446–456. Plaintiffs allege that LinkedIn's monopoly is protected by a powerful barrier to market entry comprising LinkedIn's "data centralization, machine learning models, and resulting trove of inferred data." *Id*. ¶¶ 182. This barrier allegedly prevents would-be rivals from entering the market, because "[w]ithout these three components, a new entrant could not viably compete with LinkedIn." *Id*. ¶ 183. Defendant allegedly strengthens

this barrier and maintains its monopoly through two categories of anticompetitive conduct. *Id*. ¶ 232–33. First, Defendant sells private user data through application programming interfaces ("API") to exclusive third parties called "partners." *Id*. ¶¶ 234–78. Second, Defendant integrated its user data with Microsoft's Azure cloud computing system. *Id*. ¶¶ 279–325. Plaintiffs bring claims under Section 2 of the Sherman Act for monopolization and attempted monopolization. 15 U.S.C. § 2; FAC ¶¶ 438–57.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

If the court concludes that a 12(b)(6) motion should be granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation omitted).

United States District Court
Northern District of California

2

III.   **DISCUSSION**

A.   **Section 2 Liability for Monopolization**

Under Section 2 of the Sherman Act, it is unlawful to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States . . . ." 15 U.S.C. § 2. To establish Section 2 liability, a plaintiff must show: (1) possession of monopoly power in the relevant market; (2) willful acquisition or maintenance of that power; and (3) causal antitrust injury. *Fed. Trade Comm'n v. Qualcomm Inc.*, 969 F.3d 974, 990 (9th Cir. 2020).

i.   **Anticompetitive Conduct**

Defendant argues that Plaintiffs' FAC should be dismissed because they have not adequately alleged that LinkedIn engaged in "anticompetitive" conduct. Anticompetitive conduct is "the use of monopoly power to foreclose competition, to gain a competitive advantage, or to destroy a competitor." *Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1208 (9th Cir. 1997) (quotation omitted). Put another way, anticompetitive conduct is "behavior that tends to impair the opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way." *Cascade Health Sols. v. PeaceHealth*, 515 F.3d 883, 894 (9th Cir. 2008). "[B]ehavior that might otherwise not be of concern to the antitrust laws—or that might even be viewed as procompetitive—can take on exclusionary connotations when practiced by a monopolist." *Image Tech. Servs., Inc.*, 125 F.3d at 1217 (quotation omitted).

a.   **API Agreements**

The first category of alleged anticompetitive conduct is that Defendant provided access to its private user data to "hand-selected partners" only after the partners "promise[d] not to compete with LinkedIn." Opp at 12; FAC ¶¶ 234–52. The FAC describes APIs as interfaces that allow developers to request and receive information from LinkedIn, and as a way "for developers to build apps that could interact with LinkedIn's network of professionals." FAC ¶¶ 166–73. Plaintiffs allege that in 2015, LinkedIn stopped offering general access to its APIs and began requiring developers to apply and register to become API "partners." *Id.* ¶¶ 173–80. Plaintiffs assert that Defendant leveraged those Private APIs to prevent potential competitors from entering the market. *Id.* ¶ 180. According to Plaintiffs, Defendant did this "through anticompetitive

3

United States District Court
Northern District of California

1    agreements with hand-selected 'partners,' requiring that each partner agree not to compete with

2    LinkedIn in exchange for access to LinkedIn user data through LinkedIn's Private APIs."  *Id*.

3           Defendant contends that these allegations are fatally speculative because "Plaintiffs have

4    no plausible factual support for their non-compete arguments."  Mot. at 8.  Defendant argues that

5    Plaintiffs' theory relies solely on "on an irrelevant, unverified, vague, and speculative 2019 blog

6    post."  *Id*.  That blog post states:

> LinkedIn has a number of APIs, there's the Profile-API for getting
> users profiles and there's the Profile-Edit-API which can be used to
> send a patch of the user's profile to update the content. In order to use
> the Profile-Edit-API you need to have the w_compliance permission
> associated with your app. The w_compliance permission is gained via
> LinkedIn's partner program where an app that promises not to
> compete with LinkedIn or abuse the API can gain access to more data.

10   FAC ¶ 241.  Defendant argues that Plaintiffs' reliance solely on this "unverified source" makes

11   their API non-compete claim implausibly pled.  Mot. at 9.

12          The Supreme Court and Ninth Circuit have found competitors' agreements not to compete

13   with one another in a market to be anticompetitive.  *See Otter Tail Power Co. v. U.S.*, 410 U.S.

14   366, 377 (1973) ("Use of monopoly power 'to destroy threatened competition' is a violation of the

15   'attempt to monopolize' clause of [§]2 of the Sherman Act," as are "agreements not to compete,

16   with the aim of preserving or extending a monopoly"); *Optronic Techs., Inc. v. Ningbo Sunny Elec

17   Co.*, 20 F.4th 466, 481 (9th Cir. 2021) (describing agreement between horizontal competitors

18   either not to compete in a market or to divide customers or potential customers between them as

19   "illegal market allocation, which is a *per se* Section 1 violation") (citing *Palmer v. BRG Georgia,

20   Inc.*, 498 U.S. 46, 49 (1990)).  To sustain a Section 2 claim, a plaintiff must also adequately allege

21   that a defendant's conduct harmed competition.  *Dreamstime.com, LLC v. Google LLC*, 54 F.4th

22   1130, 1143 (9th Cir. 2022) (affirming dismissal of Section 2 claim for failure to adequately plead

23   harm to competition); *see also Kentmaster Mfg. Co. v. Jarvis Products Corp.*, 146 F.3d 691, 695

24   (9th Cir. 1998) (finding failure to allege harm to competition to be fatal to Section 2 claims).

25          Plaintiffs have adequately alleged anticompetitive conduct.  The FAC alleges that "[t]he

26   Private APIs require that selected API Partners agree not to compete with LinkedIn, including by

27   creating a rival product. Upon agreement, a LinkedIn partner obtains access to programmatic

28

permissions to access private LinkedIn user data." FAC ¶ 240. Plaintiffs plead that "an app that promises not to compete with LinkedIn . . . can gain access to more data." *Id.* ¶ 241. According to Plaintiffs, Defendant selects API partners that pose a significant threat to its business as a means to foreclose entry by actual or potential rivals. *Id.* ¶ 238. Plaintiffs identify some of Defendant's API partners and allege that these companies, but for signing API agreements, would be well positioned to compete with Defendant. These facts adequately allege that Defendant entered into non-compete agreements which work to "impair the opportunities of rivals and [] do not further competition."[1] *Cascade Health Sols.*, 515 F.3d at 894.

Defendant's fact-based arguments regarding the credibility of the blog post do not change the Court's conclusion that Plaintiffs have adequately alleged anticompetitive conduct. Defendant argues that "(1) a blog post (2) by a non-rival (3) stating that the API agreement he never saw (4) contained an undefined non-compete provision is nothing but unfounded, irrelevant speculation insufficient to support Plaintiffs' API claim." Mot. at 10. But this argument invites the Court to construe the allegations in the complaint in Defendant's favor. Plaintiffs have pled facts supporting a cognizable legal theory: Defendant requires would-be competitors to agree not to compete with it in the professional social networking market, and these potential competitors receive valuable data in exchange for this commitment. Whether this theory bears out factually is for a later stage, but Plaintiffs have adequately alleged it.[2]

---

[1] At the Court's direction, Defendant produced certain private API agreements to Plaintiffs. *See* Dkt. No. 78. In connection with their supplemental briefs, the parties submitted these agreements. *See* Dkt. Nos 85, 86, 88. As explained at the end of this order, the Court finds that the agreements cannot change the outcome of the pending motion to dismiss given the allegations in the FAC. That said, once the Court *can* consider the substance of the agreements, such as on a motion for summary judgment, it seems plain that at least the agreements proffered so far simply do not contain the sort of outright agreement not to compete that is alleged in the FAC. Given this seeming mismatch, the Court will consider whether an early summary judgment motion on this point may be warranted.

[2] According to the FAC, API partners are both Defendant's potential competitors (in that they are primed to enter the professional social networking market) and customers (in that they purchase data from Defendant). As such, there is some ambiguity as to whether the API agreements are vertical or horizontal restraints. *See* Dkt. No. 81 ("Hrg. Tr.") at 27:1–11. But at this stage it is enough that Plaintiffs have alleged that the API partners are viable potential competitors, and Defendant entered into agreements with them for the purpose of restraining competition and enabling Defendant to charge supracompetitive prices. *See Gatan, Inc. v. Nion Co.*, Case No. 15-cv-01862-PJH, 2017 WL 3478837, at *5 (N.D. Cal. Aug. 14, 2017) ("Because Nion was both a

Plaintiffs have also adequately alleged harm to competition.  The harm to competition analysis "need not always be extensive or highly technical." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983  (9th Cir. 2023); *see also Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*, 627 F.2d 919, 924 (9th Cir. 1980) ("There is no special rule requiring more factual specificity in antitrust pleadings.").  Instead, a plaintiff may allege that defendant "increases barriers to entry or reduces consumer choice by excluding would-be competitors that would offer differentiated products." *Epic Games*, 67 F.4th at 983–84.

Here, Plaintiffs allege that absent the non-compete agreements, "competitors would enter LinkedIn's market and erode its profits and market share with price competition."  FAC ¶ 3. According to Plaintiffs, because of the exclusionary APIs, Defendant has no competitors, and premium subscribers "cannot obtain any of the additional services" because "no comparable products" exist.  *Id*. ¶ 375.   Plaintiffs claim that but for the non-compete agreements, there would be greater price competition in the premium product market that Defendant currently monopolizes. The FAC pleads that Defendant "charges premium subscription prices that range from $29.99 to $99.95," and that "[n]o general social networks provide comparable subscription products that enhance a user's ability to access information about others on the social network."  *Id*. ¶ 376. According to Plaintiffs, Defendant enjoys "unheard of" price stability because they have "no competitive check."  *Id*. ¶ 379. Together, these allegations adequately plead harm to competition. [3]

In sum, Plaintiffs have plausibly alleged that Defendant's entry into the API agreements

---

customer and a potential competitor of Gatan, it is not clear at this stage whether the Agreement should be considered a vertical or horizontal restraint.  But the court need not decide whether the rule of reason applies to the Agreement, or weigh its pro- and anti-competitive effects, at the pleading stage. It is enough that Nion plausibly alleges that the Agreement restrains trade, and a potential competitor's promise not to make a competing product limits competition.") (citations omitted).

[3] Defendant also argues that Plaintiffs are asserting an exclusive dealing claim, which necessitates pleading substantial foreclosure.  Reply at 5.  At the hearing, Plaintiffs' counsel directly confirmed that they are not pursuing an exclusive dealing theory.  Hrg. Tr. 18:21-23 (answering "That's absolutely correct, Your Honor" when asked "I assume that your position is that you're not bringing any sort of tying or exclusive-dealing claim here[?]").  Given this concession, the Court agrees that a claim of market foreclosure is not necessary to adequately allege anticompetitive conduct.  *See Bay Area Surgical Management LLC v. Aetna Life Insurance Co.*, 166 F.Supp.3d 988, 997-98 (N.D. Cal. 2015).

1    constitutes anticompetitive conduct and have pled an associated harm to competition.  Plaintiffs

2    thus adequately plead a Section 2 monopolization claim, and Defendant's motion to dismiss this

3    claim is DENIED.[4]

4              **ii.    Attempted Monopolization**

5          Defendant argues that even if Plaintiffs' monopolization claim survives, their attempted

6    monopolization claim should be dismissed because "it does not allege that LinkedIn possessed a

7    'specific intent to control prices or destroy competition.'"  Mot. at 18.  Plaintiffs do not argue that

8    they directly plead specific intent, but instead contend that "[i]ntent can be inferred where, as here,

9    anticompetitive conduct 'form[s] the basis for a substantial claim of restraint of trade' or is

10   'clearly threatening to competition or clearly exclusionary.'"  Opp. at 24.

11         A Section 2 attempted monopolization claim requires proof of three elements: "(1) specific

12   intent to monopolize a relevant market; (2) predatory or anticompetitive conduct; and (3) a

13   dangerous probability of success."  *Optronic Techs.*, 20 F.4th at 481–82.  All three elements may

14   be proved with evidence of either: (1) conduct forming the basis for a substantial claim of restraint

15   of trade, or (2) conduct that is clearly threatening to competition or clearly exclusionary.  *Twin*

16   *City Sportservice, Inc. v. Charles O Finley & Co., Inc.*, 676 F.2d 1291, 1309 (9th Cir. 1982).

17   "[W]hile the three elements are discrete, they are often interdependent; i.e., proof of one of the

18   three elements may provide circumstantial evidence or permissible inferences of the other

19   elements."  *Id*. at 1308.  An attempted monopoly violation can be found based on evidence of

20   conduct alone.  *Id* at 1309.

21         Plaintiffs' attempted monopolization claim is predicated on the same alleged

22

23   _____

24   [4] Given the Court's conclusion that Plaintiffs' API theory adequately alleges anticompetitive
     conduct and harm to competition to support the Section 2 monopolization claim, the Court need
25   not address the alternative Azure integration and "monopoly broth" theories of liability.  *See Aya*
     *HealthCare Servs., Inc. v. AMN Healthcare, Inc.*, No. 17-cv-205-MMA (MDD), 2018 WL
26   3032552 *at 8 & n.7 (S.D. Cal. June 19, 2018) ("In light of the Court's conclusion that Plaintiffs
     have sufficiently alleged antitrust injury, the Court need not address Plaintiffs' third theory of
27   antitrust injury mentioned in Plaintiffs' opposition to the instant motion.").  The Court can address
     what the import of these additional theories might be on summary judgment or at trial.  *See* Opp.
28   at 23 ("Finally, whether the Azure integration can stand alone under Section 2 or not, LinkedIn's
     Azure migration is nevertheless actionable as part of a 'monopoly broth' that includes the private
     API agreements.")

United States District Court
Northern District of California

anticompetitive conduct as their monopolization claim, and is sufficiently pled for the same reasons. *See LiveUniverse, Inc. v. MySpace, Inc.*, 304 F. App'x 554, 557 (9th Cir. 2008) (explaining that attempted monopolization requires pleading the same elements as a monopolization claim).[5] Plaintiffs have adequately pled that Defendant's API agreements excluded would-be competitors from the market. This allegedly allowed Defendant to enjoy "unheard of" levels of pricing with "no competitive check." At this stage, Defendant's alleged exclusion of competitors sufficiently pleads anticompetitive conduct supporting an inference of specific intent to destroy competition. Accordingly, Defendant's motion to dismiss Plaintiffs' attempted monopolization claim is DENIED.

## IV.   JUDICIAL NOTICE

### A.   Legal Standard

In *Khoja v. Orexigen Therapeutics*, the Ninth Circuit addressed the judicial notice rule and incorporation by reference doctrine. *See* 899 F.3d 988 (9th Cir. 2018). Under Federal Rule of Evidence 201, a court may take judicial notice of a fact "not subject to reasonable dispute because it … can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2). Accordingly, a court may take "judicial notice of matters of public record," but "cannot take judicial notice of disputed facts contained in such public records." *Khoja*, 899 F.3d at 999 (citation and quotations omitted). The Ninth Circuit has clarified that if a court takes judicial notice of a document, it must specify what facts it judicially noticed from the document. *Id.* at 999. Further, "[j]ust because the document itself is susceptible to judicial notice does not mean that every assertion of fact within that document is judicially noticeable for its truth." *Id.* As an example, the Ninth Circuit held that for a transcript of a conference call, the court may take judicial notice of the fact that there was a conference call on the specified date, but may not take judicial notice of a fact mentioned in the transcript, because the substance "is subject to varying interpretations, and there is a reasonable dispute as to what the [document] establishes." *Id.* at 999–1000.

---

[5] As an unpublished memorandum disposition, *LiveUniverse* is not precedent, but the Court may consider it for its persuasive value. Fed. R. App. P. 32.1; CTA9 Rule 36-3.

United States District Court
Northern District of California

Separately, the incorporation by reference doctrine is a judicially-created doctrine that allows a court to consider certain documents as though they were part of the complaint itself. *Id*. at 1002. This is to prevent plaintiffs from cherry-picking certain portions of documents that support their claims, while omitting portions that weaken their claims. *Id*. Incorporation by reference is appropriate "if the plaintiff refers extensively to the document or the document forms the basis of plaintiff's claim." *Khoja*, 899 F.3d at 1002. However, "the mere mention of the existence of a document is insufficient to incorporate the contents" of a document. *Id*. at 1002. And while a court "may assume [an incorporated document's] contents are true for purposes of a motion to dismiss … it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint." *Id*.

## B. Defendant's Request

As part of its motion to dismiss, Defendant requests that the court take judicial notice of the following documents:

1. A copy of the API related blog post that Plaintiffs quote in their complaint, at https://medium.com/swlh/the-frustrations-of-dealing-with-the-linkedin-api-747147c95eac, Dkt. No. 73-2, Ex. A.

2. A copy of a publicly accessible website discussing API agreements that Plaintiffs quote in their complaint, Dkt. No. 73-3, Ex. B.

Websites and their contents may be proper subjects for judicial notice. *See Threshold Enterprises Ltd. v. Pressed Juicery, Inc.*, 445 F. Supp. 3d 139, 146 (N.D. Cal. 2020) (collecting cases); *Wible v. Aetna Life Ins. Co.*, 374 F. Supp. 2d 956, 965 (C.D. Cal. 2005) (recognizing that "websites and their contents may be proper subjects for judicial notice" where party "supplied the court with hard copies of the actual web pages of which they sought to have the court take judicial notice").

Further, under the doctrine of incorporation by reference, the Court may consider documents whose contents are alleged in the complaint, provided the complaint "necessarily relies" on the documents, the document's authenticity is uncontested, and the document's relevance is uncontested. *See Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010);

*United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003) ("Even if a document is not attached to a complaint, it may be incorporated by reference into a complaint if the plaintiff refers extensively to the document or the document forms the basis of the plaintiff's claim.").  "The defendant may offer such a document, and the district court may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)."  *Ritchie*, 342 F.3d at 908.

Here, Exhibits A and B are copies of web pages, and Plaintiffs expressly cite to them at length in the FAC.  *See* FAC ¶¶ 241, 246.  In their opposition, Plaintiffs do not object to Defendant's request for judicial notice and rely on the blog post website themselves in that brief. *See* Dkt. No. 74 at 6–7.  Therefore, the Court **GRANTS** Defendant's request for judicial notice of Exhibits A and B.

As discussed above in footnote 1, the parties also submitted the private API agreements that Defendant produced in discovery.  *See* Dkt. Nos 85, 86, 88.  The Court directed counsel to indicate whether they agreed that the Court may take judicial notice of those agreements in deciding the motion to dismiss.  Dkt. No. 92.  Defendant argues that because the API agreements were referenced in the FAC and form the basis of Plaintiffs' claims, they should be considered incorporated by reference.  Dkt. Nos. 85, 93.  Plaintiffs argue that the Court may take judicial notice of only the undisputed facts related to the API agreements (for example, that 18 agreements were submitted and "that they contain the words they contain").  Dkt. No. 94.  Plaintiffs' position is that the Court may not take judicial notice of the agreements to determine what they characterize as disputed facts (such as the overall content and effect of the agreements).  *Id.*

The key question is what use the Court can properly make of these documents at the motion to dismiss stage.  The FAC indisputably refers repeatedly to, and characterizes, "Private API Agreements."  *See, e.g.,* FAC ¶ 234-252.  And the parties agree that the documents they have submitted are at least some of the agreements that are at issue in the case.  *See* Dkt. No. 94 at 2 (Plaintiffs' acknowledgment that "there appears to be no dispute between the parties that the documents attached to Dkt. No. 85 are what they purport to be—eighteen LinkedIn private API agreements with four named counterparties").  So while the FAC does not granularly describe

1    these particular agreements, Plaintiffs agree that "the Court may look at the terms of these

2    documents to evaluate Plaintiffs' claims in adjudicating LinkedIn's motion to dismiss." *Id.*

3          But even assuming the Court finds these documents to be incorporated by reference or

4    judicially noticeable, it agrees with Plaintiffs that it cannot rely on them to contradict the

5    allegations in the FAC.  *See Khoja*, 899 F.3d at 1002 (explaining that "it is improper to assume the

6    truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-

7    pleaded complaint"); *Lee v. City of Los Angeles*, 250 F.3d 668, 689 (9th Cir. 2001) (finding that

8    district court erred in taking judicial notice of disputed matters contained in public documents).  It

9    is undisputed that additional relevant API agreements have not yet been produced (which is

10   understandable given the limited scope of the Court's order directing targeted disclosure of certain

11   agreements).  Dkt. No. 78.  And one of the central issues in dispute in this case is the meaning of

12   the clauses describing the conditions to which API partners agreed in receiving LinkedIn's data.

13   The Court cannot resolve these interpretation disputes in Defendant's favor at this stage.  *See In re*

14   *Juul Labs, Inc., Antitrust Litigation*, 555 F.Supp.3d 932, 968 (N.D. Cal. 2021) (finding segments

15   of alleged agreement incorporated by reference based on repeated citation to them in the

16   complaint, but finding that the court "cannot and do[es] not resolve the parties' disputes over what

17   certain provisions in those documents mean," given that "the parties argue[d] the provisions mean

18   different things on their face or in the context of the other written and unwritten agreements and

19   communications between [them]").  Accordingly, while it acknowledges the existence and content

20   of the agreements, the Court finds that they do not change its analysis above finding that Plaintiffs

21   have adequately pled a Section 2 and attempted monopolization claims sufficient to survive a

22   motion to dismiss.

23   **V.     MOTIONS TO SEAL**

24          **A.     Legal Standard**

25          Courts generally apply a "compelling reasons" standard when considering motions to seal

26   documents related to the merits of a case.  *Pintos v. Pac. Creditors Ass'n*, 605 F.3d 665, 678 (9th

27   Cir. 2010) (quoting *Kamakana v. City & Cty. of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006)).

28   "This standard derives from the common law right 'to inspect and copy public records and

documents, including judicial records and documents.'" *Id.* (quoting *Kamakana*, 447 F.3d at 1178). "[A] strong presumption in favor of access is the starting point." *Kamakana*, 447 F.3d at 1178 (quotations omitted). To overcome this strong presumption, the party seeking to seal a judicial record attached to a dispositive motion must "articulate compelling reasons supported by specific factual findings that outweigh the general history of access and the public policies favoring disclosure, such as the public interest in understanding the judicial process" and "significant public events." *Id.* at 1178–79 (quotations omitted). "In general, 'compelling reasons' sufficient to outweigh the public's interest in disclosure and justify sealing court records exist when such 'court files might have become a vehicle for improper purposes,' such as the use of records to gratify private spite, promote public scandal, circulate libelous statements, or release trade secrets." *Id.* at 1179 (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 598 (1978)). "The mere fact that the production of records may lead to a litigant's embarrassment, incrimination, or exposure to further litigation will not, without more, compel the court to seal its records." *Id.*

The Court must "balance[ ] the competing interests of the public and the party who seeks to keep certain judicial records secret. After considering these interests, if the court decides to seal certain judicial records, it must base its decision on a compelling reason and articulate the factual basis for its ruling, without relying on hypothesis or conjecture." *Id.* Civil Local Rule 79-5 supplements the compelling reasons standard set forth in *Kamakana*: the party seeking to file a document or portions of it under seal must "establish[ ] that the document, or portions thereof, are privileged, protectable as a trade secret or otherwise entitled to protection under the law," and "[t]he request must be narrowly tailored to seek sealing only of sealable material." Civil L.R. 79-5(b).

### B.   Parties' Motions Regarding Sealing

The parties' sealing motions concern the API agreements themselves as well as references to them in some of the briefs. Because the documents attached to the motion to dismiss are more than tangentially related to the merits of the case, the Court applies the compelling reasons standard.

1    "[Defendant] is not itself moving to seal these documents based on LinkedIn's own

2    confidential business information." Dkt. No. 85 at 1.  Instead, Defendant filed its motion "solely

3    to accommodate third parties—the API Partners—with the opportunity to evaluate whether

4    anything in these agreements should remain sealed." *Id.*  Defendant accordingly framed its

5    request as a motion to consider whether these non-parties' material should be sealed.

6        Only non-party Hootsuite, Inc. filed a statement in response to the motion, seeking to

7    maintain under seal portions of the information identified by Defendant. *See* Dkt. No. 91.

8    Hootsuite "only seeks to seal limited portions of these exhibits . . . that relate[] to terms that

9    describe the technology behind Hootsuite's product and its product structure, which could

10   disadvantage it with its competitors." *Id.*  The Court finds this targeted request appropriate and

11   **GRANTS** the motions with respect to Hootsuite's documents and references to them because the

12   proposed redactions seek to seal only sensitive confidential business information. *See Baird v.*

13   *BlackRock Institutional Tr., N.A.*, 403 F.Supp.3d 765, 792 (N.D. Cal. 2019) ("[C]onfidential

14   business information in the form of license agreements, financial terms, details of confidential

15   licensing negotiations, and business strategies satisfies the compelling reasons standard.")

16   (internal quotations omitted).

17       The motions are otherwise **DENIED** with respect to all other third-party agreements given

18   that no party or nonparty has presented a basis for sealing them (or references to them). *See* Civil

19   L.R. 79-5(f).

20   **VI.    CONCLUSION**

21       The Court **DENIES** Defendant's motion to dismiss.  *See* Dkt. No. 73.  Accordingly, the

22   Court also **LIFTS** the discovery stay.  *See* Dkt. No. 64.

23       The Court **GRANTS IN PART and DENIES IN PART** the parties' requests to determine

24   whether another party's material should be sealed.  *See* Dkt. Nos. 84, 85.  Sealing is **GRANTED**

25   as to the materials specified by non-party Hootsuite in Dkt. No. 91-1 and **DENIED** otherwise.

26       The Court **DIRECTS** the parties to file public versions of all documents for which the

27   proposed sealing has been denied within ten days from the date of this order.  Only the specific

28   information related to Hootsuite may be redacted.  Each party is responsible for submitting these

United States District Court
Northern District of California

conforming versions of any document that it originally filed unless the parties mutually agree on a different allocation of this work.

       The Court further **SETS** a telephonic case management conference for April 9, 2024 at 2:00pm.  The Court further **DIRECTS** the parties to submit a joint case management statement by April 2, 2024.  All counsel shall use the following dial-in information to access the call:

       Dial-in: 888-808-6929

       Passcode: 6064255

       For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines.  All attorneys appearing for a telephonic case management conference are required to dial in at least 15 minutes before the hearing to check in with the CRD.  The parties should be prepared to discuss how to move this case forward efficiently.

       **IT IS SO ORDERED.**

Dated:   3/21/2024

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

14