UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD CROWDER, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>LINKEDIN CORPORATION,<br><br>　　　　Defendant. | Case No. 22-cv-00237-HSG<br><br>**ORDER DENYING MOTION FOR PRELIMINARY APPROVAL**<br><br>Re: Dkt. No. 129 |

Before the Court is Plaintiffs' unopposed motion for preliminary approval of class action settlement. *See* Dkt. No. 129. The Court held a hearing on the motion, Dkt. No. 131, and now **DENIES** it.

I.  **BACKGROUND**

　A.  **Factual Allegations**

This is an antitrust proposed class action against Defendant LinkedIn, an online social network that focuses on professional connections. *See* Dkt. No. 65 ("FAC") ¶¶ 1, 30. Plaintiffs subscribe to LinkedIn Premium Career, which provides paying users with additional features. *Id.* ¶¶ 21–23. Plaintiffs assert that LinkedIn has a monopoly in the professional social networking market, allowing it to overcharge Premium subscribers. *Id.* ¶¶ 20, 421, 446, 455. Plaintiffs allege that LinkedIn's monopoly is protected by LinkedIn's "data centralization, machine learning models, and resulting trove of inferred data," without which "a new entrant could not viably compete with LinkedIn." *Id.* ¶¶ 182–83. Defendant allegedly strengthens this barrier to entry and maintains its monopoly through two categories of anticompetitive conduct. *Id.* ¶¶ 232–33. First, and most relevant here, Defendant offers potential rivals access to its private user data through application programming interfaces ("APIs") that are unavailable to others, on the condition that

those rivals don't compete with Defendant. *Id.* ¶¶ 173–80, 233. Second, Defendant integrated its user data with parent company Microsoft's Azure cloud computing system, "tying up and driving up prices for scarce hardware resources." *Id.* ¶¶ 233, 279–325. Plaintiffs seek damages and injunctive relief on behalf of the class under Section 2 of the Sherman Act for monopolization and attempted monopolization. 15 U.S.C. § 2; FAC ¶¶ 438–57. Defendant's second motion to dismiss was denied. Dkt. No. 73 (motion); Dkt. No. 95 (order).

### B. Settlement Agreement

In December 2024, the parties participated in a full-day mediation with mediator Gregory Lindstrom. *See* Dkt. No. 129-2 ("Burke/Bathaee Decl.") ¶ 13. The parties ultimately entered into a settlement agreement. *See* Dkt. No. 129-1 ("Settlement Agreement," or "SA"). The key terms relevant to this order are as follows:

Class Definition: The Settlement Class is defined as "all persons, entities, and corporations in the United States who purchased LinkedIn Premium services online on LinkedIn.com or via a LinkedIn mobile application from the period beginning January 13, 2018, to the present and are current LinkedIn members." SA § 1.33.

Settlement Benefits: "[F]or a period of three (3) years from the Settlement Effective Date, LinkedIn will not include the Non-Use of LinkedIn API Provision in any future API Agreement. To the extent that any current API Agreement contains the Non-Use of LinkedIn API Provision, LinkedIn agrees not to enforce such provisions against the counterparties to those agreements for a minimum of three (3) years from the Effective Date." *Id.* § 2.1. A "Non-Use of LinkedIn API Provision" is "any provision in any API Agreement that expressly restricts a partner from using LinkedIn APIs or associated LinkedIn data or content in an application that competes against LinkedIn's primary lines of business." *Id.* § 1.16.[1]

Release: According to the Settlement Agreement, "the Settlement Class Members" and

---

[1] Defendant previously provided several examples of these provisions to the Court. Dkt. No. 85. At oral argument, the parties represented that there are hundreds of existing, individualized agreements between LinkedIn and its partners. Dkt. No. 134 ("Tr.") 17:18–18:5. But while there is variance between these provisions, they apparently follow a similar framework and pattern. *Id.* 18:16–25.

their related persons shall:

> "be deemed to have, and by operation of the Judgment shall have, fully, finally, and forever released, waived, relinquished and discharged, and shall forever be enjoined from prosecuting, all Settlement Class Released Claims against each Released Defendant Person."

SA §§ 1.30, 1.34, 3.3. Further, "Settlement Class Released Claims" means:

> "any and all claims, counterclaims, demands, actions, potential actions, suits, and causes of action, losses, obligations, damages, matters, and issues of any kind or nature whatsoever, and liabilities of any nature, including without limitation claims for costs, expenses, penalties, and attorney's fees that Settlement Class Members ever had or now have against any of the Released Defendant Persons, . . . on account of or arising out of or resulting from or in any way related to any conduct that was alleged or could have been alleged in the Action based on any or all of the same factual predicates of the Action, including but not limited to LinkedIn's purported monopolization of an alleged professional social networking market."

*Id.* § 1.35.

Incentive Awards: According to the Settlement Agreement, counsel for Bathaee Dunne LLP and Burke LLP ("Co-Lead Counsel") may apply for an incentive award for each of the named Plaintiffs of no more than $5,000. *Id.* §§ 1.5, 7.1.

Attorneys' Fees and Costs: The Settlement Agreement provides that Co-Lead Counsel will apply for an award of up to $4,000,000 in attorneys' fees and $100,000 in costs. *Id.* § 6.1. Defendant will not challenge the application. *Id.* Fees are payable within fifteen business days of the Court's order. *Id.* § 6.2.

Opt-Out Procedure: Class members who do not wish to be bound must opt out in writing within 77 days of the specified notice date. SA § 8.4; Dkt. No. 129-1, Ex. A ¶ 22.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 23(e) provides that "[t]he claims, issues, or defenses of a certified class—or a class proposed to be certified for purposes of settlement—may be settled . . . only with the court's approval." Fed. R. Civ. P. 23(e). "The purpose of Rule 23(e) is to protect the unnamed members of the class from unjust or unfair settlements affecting their rights." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008). Accordingly, before a district court

3

approves a class action settlement, it must conclude that the settlement is "fundamentally fair, adequate and reasonable." *In re Heritage Bond Litig.*, 546 F.3d 667, 674–75 (9th Cir. 2008).

Where the parties reach a class action settlement prior to class certification, district courts apply "a higher standard of fairness and a more probing inquiry than may normally be required under Rule 23(e)." *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012) (quotations omitted). Such settlement agreements "must withstand an even higher level of scrutiny for evidence of collusion or other conflicts of interest than is ordinarily required under Rule 23(e) before securing the court's approval as fair." *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1048–49 (9th Cir. 2019) (quoting *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011)). A more "exacting review is warranted to ensure that class representatives and their counsel do not secure a disproportionate benefit at the expense of the unnamed plaintiffs who class counsel had a duty to represent." *Roes*, 944 F.3d at 1049 (quotations omitted).

Courts may only approve a settlement after considering whether:

> "(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3); and (D) the proposal treats class members equitably relative to each other."

*In re Cal. Pizza Kitchen Data Breach Litig.*, 129 F.4th 667, 674 (9th Cir. 2025) (quoting Fed. R. Civ. P. 23(e)(2)).[2] Courts may preliminarily approve a settlement and notice plan to the class if the proposed settlement: (1) appears to be the product of serious, informed, non-collusive negotiations; (2) does not grant improper preferential treatment to class representatives or other segments of the class; (3) falls within the range of possible approval; and (4) has no obvious deficiencies. *In re Lenovo Adware Litig.*, No. 15-MD-02624-HSG, 2018 WL 6099948, at *7

---

[2] Before 2018, courts applied what were often referred to as the "*Hanlon*" factors, as articulated in *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). "The key *Hanlon* factors are now baked into the text of Rule 23(e), and the remaining ones can still be considered for Rule 23(e)(2) analysis." *In re Cal. Pizza Kitchen*, 129 F. 4th at 674.

4

(N.D. Cal. Nov. 21, 2018) (citation omitted). Courts lack the authority, however, to "delete, modify or substitute certain provisions. The settlement must stand or fall in its entirety." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998) (quotation and citation omitted).

### III.   DISCUSSION

Plaintiffs seek approval of a settlement providing only injunctive relief with unclear value for a limited period of three years. Plaintiffs claim this is virtually all they could have achieved at trial, understating the fact that they have sacrificed the class members' damages claims before even attempting to certify a damages class. In contrast to this limited relief, Plaintiffs' counsel stands to walk away with attorneys' fees of $4,000,000. The parties have not convinced the Court that this is a fair or reasonable settlement agreement, even at the preliminary approval stage.

#### i.   Settlement Within Range of Possible Approval

One factor the Court considers is whether the settlement is within the range of possible approval. To evaluate whether the settlement amount is adequate, "courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer." *Lenovo*, 2018 WL 6099948, at *8 (quotation omitted). Here, this requires the Court to evaluate (1) the value of the offer; and (2) the strength of Plaintiffs' case.[3] "The relief that the settlement is expected to provide to class members is a central concern." *Lou v. Am. Honda Motor Co., Inc.*, No. 16-CV-04384-JST, 2025 WL 1359067, at *5 (N.D. Cal. May 9, 2025) (quotation omitted).

Plaintiffs argue that "the class has obtained essentially all of . . . [the] injunctive relief that they sought," noting that "[t]he Settlement enjoins LinkedIn from enforcing or including these noncompetition covenants in any of its private API agreements for three years from final approval, thus redressing the exclusionary conduct at the heart of the case." Mot. at 22 (quoting *Campbell v. Facebook Inc.*, 2017 WL 3581179, at *4 (N.D. Cal. Aug. 18, 2017), *aff'd*, 951 F.3d 1106 (9th Cir. 2020)).

The Court disagrees that the settlement provides essentially all the relief Plaintiffs sought.

---

[3] The Court's analysis here primarily considers the Rule 23(e)(2) factor that "the relief provided for the class is adequate, taking into account . . . the costs, risks, and delay of trial and appeal." Fed. R. Civ. P 23(e)(2).

1     First, the injunctive relief is limited to a period of three years.  SA § 2.1.  At oral argument,
2     Plaintiffs represented that this was the best deal they could get during arms-length negotiation, and
3     they argued that three years is enough time for market correction and price equilibrium.  Tr. 4:9–
4     24.  But the parties provide no real evidence or explanation supporting the idea that three years is
5     sufficient for existing or future competitors to be able to compete with LinkedIn's existing data
6     collection and machine learning models.  The Court appreciates that the practical realities of
7     negotiation sometimes mean that a plaintiff cannot achieve permanent injunctive relief through a
8     settlement.  That said, three years is a far cry from achieving "essentially all of . . . [the] injunctive
9     relief" sought.  *Campbell*, 2017 WL 3581179, at *4.

10     Second, and relatedly, the Court is not persuaded that the agreed-upon relief addresses
11     class members' alleged harms.  Plaintiffs' theory is that Defendant locked up its biggest
12     competitive threats by "offer[ing] them privileged access to valuable LinkedIn user data,
13     intertwining those products with LinkedIn's private APIs; and in exchange, impos[ing] contractual
14     restrictions on these counterparties' ability to compete in LinkedIn's principal lines of business."
15     Mot. at 22.  Plaintiffs' proposed relief prevents Defendant from enforcing and imposing those
16     contractual restrictions for a period of three years.  SA § 2.1.  But it's not clear why Defendant
17     wouldn't just stop offering its API (and related data) to current and future rivals under the terms of
18     the settlement, since it could no longer enforce these non-use clauses.  This would appear to be a
19     significant offsetting loss to potential competitors, particularly where "a new entrant could not
20     viably compete with LinkedIn" absent "LinkedIn's data centralization, machine learning models,
21     and resulting trove of inferred data," since doing so apparently requires "a critical mass of user
22     data."  FAC ¶¶ 182–83.

23     Plaintiffs don't appear to dispute that this may happen or explain what the impact would be
24     on competition, but they claim the benefit is that existing competitors won't be contractually
25     restricted from competing.  Tr. 7:13–18.  Defendant also represented that it anticipates that it will
26     continue to enter partnerships absent the non-use provisions, and says it already enters into some
27     API agreements without these provisions.  *Id.* 15:12–17, 19:19–22.  But the Court can't tell if that
28     is because some parties contracting for API access are not actually competitors in the space.

1  Regardless, neither response helps explain why the incidence of providing API access would not
2  go down under the settlement agreement and how (or if) that impacts competition, and the Court
3  remains unconvinced of the actual value of this injunctive relief.

4        Plaintiffs claim they will be able to quantify the value of this injunctive relief at final
5  approval by presenting expert testimony from an antitrust economist. Mot. at 23. But that does
6  not help when serious problems are evident on the face of the settlement, and the Court does not
7  have the purported evidence before it. The parties must "provide enough information to allow the
8  district court to carefully evaluate the strength of the claims, the risks of litigating those claims all
9  the way through, and the value of the relief each class member will receive from the settlement."
10 *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1037 (N.D. Cal. 2016).

11       The limited injunctive relief is made more troubling by the fact that Plaintiffs have entirely
12 abandoned their damages claims in the settlement. *Cf. Hilsley v. Gen. Mills, Inc.*, No. 3:18-CV-
13 00395-L-BLM, 2021 WL 2290782, at *4 (S.D. Cal. June 4, 2021) (rejecting preliminary approval
14 where plaintiffs "abandon[ed] the monetary relief requested in the amended complaint").
15 Plaintiffs have consistently alleged that customers already paid supracompetitive prices as a result
16 of LinkedIn's anticompetitive behavior. FAC ¶ 20. Despite this, Plaintiffs' settlement does not
17 include any monetary award and releases damages claims for all settlement class members who do
18 not opt out. *See* Mot. at 18; SA §§ 1.30, 1.34, 3.3.

19       Plaintiffs do not attempt to quantify the monetary relief they could have achieved at trial or
20 compare that expected value to the benefits of the injunctive relief here, making this decision even
21 harder to understand. *Compare In re Google Inc. St. View Elec. Commc'ns Litig.*, 21 F.4th 1102,
22 1117 (9th Cir. 2021) (permitting injunctive relief that "require[d] relatively little of Google," but
23 only because the legal claims "might have been quite difficult to prove and would likely have
24 yielded very little per class member in damages"), *with Hilsley*, 2021 WL 2290782, at *4
25 ("Plaintiffs do not address the aggregate amount of monetary relief they would recover had they
26 prevailed on the merits, raising the question whether the settlement is based on a substantive
27 analysis of Plaintiffs' case."). "When further litigation may result in substantial monetary relief to
28 class members, . . . in order to show that nothing was unfairly bargained away by counsel, it may

1   be necessary for settling parties to show why their non-monetary settlement is at least as good for
2   the class as any monetary figure that would approximate what they could expect from further
3   litigation." *Campbell*, 951 F.3d at 1126; *see also Cunha v. Chico Produce, Inc.*, No. 17-CV-
4   00597-JST, 2019 WL 12875982, at *7 (N.D. Cal. June 25, 2019) (requiring identification of
5   maximum recovery).

6   More generally, Plaintiffs have not clearly explained what about the strength of their case,
7   the risks and costs of trial, or the possible relief at trial justified compromising the monetary relief
8   for zero dollars. Plaintiffs argue that "the substantial risk of proceeding with this litigation"
9   justifies settlement, "particularly when weighted against the robust relief secured for the class."
10  Mot. at 24. They observe that antitrust cases are challenging, litigation will likely last for years,
11  and the issues are highly technical. *Id.* at 24–25. The Court acknowledges that all this is true, and
12  it has previously expressed some skepticism about Plaintiffs' legal theory. Dkt. No. 95 at 5. But
13  Plaintiffs' arguments here are generic, largely restating the elements of an antitrust case and the
14  remaining steps in litigation. *See* Mot. at 24–25. Plaintiffs need not catalogue every strength and
15  weakness, but the lack of any unique discussion makes the zero-dollar value of this settlement
16  hard to compare against the expected recovery at a later stage.

17  Plaintiffs' efforts to compare this settlement to other cases approving injunctive-only relief
18  are unpersuasive. Plaintiffs rely heavily on *Campbell v. Facebook, Inc.*, 951 F.3d 1106 (9th Cir.
19  2020), arguing that "the case for approval here is stronger, as the relief in *Campbell* provided only
20  'modest value'" since it only required a one-year informational disclosure on Facebook's website.
21  Mot. at 24. In *Campbell,* the Ninth Circuit affirmed preliminary approval of an injunctive-only
22  settlement class, noting that "the class did not need to receive much for the settlement to be fair
23  because the class gave up very little." *Id.* at 1123. Critically, "[d]amages claims had already been
24  eliminated from the case" since the plaintiffs had tried and failed to certify a damages class, "so
25  the only forms of potentially available relief . . . were declaratory or injunctive." *Id.* at 1123–24.
26  That is not the case here.

27  In addition, Plaintiffs argue that this settlement is particularly valuable because, like in
28  *Campbell*, it "preserves putative class members' right to bring damages claims by allowing them

8

to opt out." Mot. at 23–24 (discussing *Campbell*, 951 F.3d at 1126). But this comparison is misleading, since *Campbell*'s "class members were [only] required to release their declaratory and injunctive relief claims," even if they didn't opt out. *Id.* at 1114–15, 1126. Here, while class members may be able to opt out, any who fail to do so will waive their damages claims forever. In short, given the current record, the Court is not persuaded that the injunctive relief is any more valuable than that granted in *Campbell*, and the class appears in line to give up substantially more.

Confronted with these distinctions, at oral argument the parties encouraged the Court to consider the Ninth Circuit's non-precedential decision in *Littlejohn v. Copland*, 819 F. App'x 491 (9th Cir. 2020). There, the court affirmed the district court's holding that the particular injunctive relief was not valueless and that the attorneys' fees were fair and reasonable. *Id.* at 494. The Court agrees that some settlements securing injunctive-only relief may be fair and reasonable. But that is not the relevant point. For example, *Littlejohn* considered injunctive relief that more clearly addressed the alleged harm by removing the allegedly misleading reference to "no artificial flavors." *Id.* at 492. Here, as the Court has explained, the connection to Plaintiffs' underlying theory is more tenuous. *Littlejohn* also considered the value of that injunctive relief against attorneys' fees of $272,000. *Id.* Here, the requested fees are almost 15 times that amount.

Because Plaintiffs have not shown that this short-term injunctive relief is adequately valuable to justify sacrificing monetary relief without ever attempting to certify a damages class— including by failing to clearly articulate what the expected recovery could have been—the Court cannot find that this settlement falls in the range of possible approval, and this factor heavily favors denial of preliminary approval. *See Koby v. ARS Nat'l Servs., Inc.*, 846 F.3d 1071, 1079 (9th Cir. 2017) ("As the proponents of the settlement, [the parties] bore the burden of demonstrating that class members would benefit from the settlement's injunctive relief . . . .").

### ii. Arm's Length Negotiation

The Court also considers whether there is evidence of collusion or other conflicts of interest. *See Roes*, 944 F.3d at 1049. The Ninth Circuit has directed district courts to look for "subtle signs of collusion," which include whether counsel will receive a disproportionate distribution of the settlement, whether the parties negotiate a "'clear sailing' arrangement (i.e., an

9

arrangement where defendant will not object to a certain fee request by class counsel)," and whether the parties agree to a reverter that returns unclaimed funds to the defendant. *Id.*[4] Courts must scrutinize instances where "the class receives no monetary distribution but class counsel are amply rewarded." *In re Bluetooth Headset*, 654 F.3d at 947; *Campbell*, 951 F.3d at 1126 ("When further litigation may result in substantial monetary relief to class members, the failure to include meaningful monetary relief in a settlement might be (but is not necessarily) a subtle sign that class counsel bargained away something valuable to benefit themselves."). A clear-sailing provision similarly raises concerns because "[t]here may be some cases in which courts should be concerned that class counsel gave up valuable injunctive relief in exchange for a defendant's promise not to contest class counsel's fee application." *Campbell*, 951 F.3d at 1127.

While the Settlement Agreement does not contain a reverter, it includes both a clear sailing arrangement and a disproportionately high amount of attorneys' fees. Plaintiffs will seek up to $4,000,000 in attorneys' fees and $100,000 in costs, which Defendant will not challenge. SA § 6.1. This agreement is particularly concerning in light of the early stage of the case, which never made it to class certification and never made it past written discovery, Mot. at 11, 20, the limited non-monetary relief, and the absence of any monetary relief. While the Court agrees with Plaintiffs that the presence of these factors does not per se establish collusion, Mot. at 26, it does mean the Court must "examine the negotiation process with even greater scrutiny than is ordinarily demanded." *In re Bluetooth Headset*, 654 F.3d at 949.

The settlement cannot withstand that scrutiny. Plaintiffs argue that "the substantial value of the injunctive relief supports the proposed $4-million fee award." Mot. at 27. They also observe that this award is a lodestar multiplier of approximately 0.69, since their current lodestar "is approximately $5,800,000." *Id.* Plaintiffs again represent that they would introduce an expert to show that the value of the injunctive relief is high enough that the $4,000,000 in fees would come in below the Ninth Circuit's 25% benchmark. Mot. at 27; *see*, *e.g.*, *In re Bluetooth Headset*,

---

[4] The Court's analysis here encompasses the Rule 23(e)(2) factors that "the proposal was negotiated at arm's length" and "the relief provided for the class is adequate, taking into account . . . the terms of any proposed award of attorney's fees, including timing of payment." Fed R. Civ. P. 23(e)(2).

10

654 F.3d at 942 ("[C]ourts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure.").

"[I]n a case where the class primarily receives non-monetary relief, but class counsel obtain millions of dollars, it may be an abuse of discretion not to at least attempt to approximate the value of injunctive relief and use that valuation in an assessment of disproportionality." *Campbell*, 951 F.3d at 1126. Plaintiffs have not provided the Court with their expert report, so its ability to estimate the value of the injunctive relief is limited. But given the limitations of the injunctive relief discussed above, the Court is skeptical that the approximate value of the injunctive relief is greater than—or anywhere close to—$16,000,000. It is admittedly difficult to calculate the value of injunctive relief in settlement circumstances like this, and courts are sometimes permitted to use the lodestar to estimate proportionality where the value of injunctive relief is not "easily quantified." *Id.* Of course, the Court does not currently have the details behind Plaintiffs' calculated lodestar, but it is not convinced that such a high amount is warranted on the current record. *See Briseño v. Henderson*, 998 F.3d 1014, 1026 (9th Cir. 2021) (instructing district courts to carefully scrutinize fee arrangements under *Bluetooth* and noting that "the lodestar amount alone cannot tell us if the requested fees are reasonable").

Plaintiffs also note that additional factors suggest a lack of collusion, such as the involvement of a mediator. Mot. at 28. This may be true, but it does not overcome the significant concerns already discussed by the Court. Plaintiffs also argue that they did not receive the "red-carpet treatment on fees" since they took "a substantial lodestar discount" and arranged "injunctive relief [that] is virtually everything that could have been obtained at trial . . . [while] preserv[ing] putative class members' right to bring damages claims by allowing them to opt out." *Id.* This repeats the same arguments that the Court has already considered. The reality is that Plaintiffs have *not* demonstrated that this is all the relief—injunctive or otherwise—that they realistically could have obtained in settlement or at trial, and the fact that class members can opt

11

out does not change that conclusion.[5]  As a result, the markers of potential collusion and conflicts of interest weigh against preliminary approval.[6]

### iii. Preferential Treatment

The Court next considers whether the Settlement Agreement provides preferential treatment to any Class Member.  The Ninth Circuit has instructed that district courts must be "particularly vigilant" for signs that counsel have allowed the "self-interests" of "certain class members to infect negotiations." *In re Bluetooth Headset*, 654 F.3d at 947.  For that reason, courts in this district have consistently stated that preliminary approval of a class action settlement is inappropriate where the proposed agreement "improperly grant[s] preferential treatment to class representatives." *Lenovo*, 2018 WL 6099948, at *8 (quotations omitted).[7]

Plaintiffs argue that the settlement will grant identical injunctive relief and that the authorized incentive awards of up to $5,000 are presumptively reasonable.  Mot. at 29.  Incentive awards "are intended to compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958–59 (9th Cir. 2009).  Plaintiffs must provide sufficient evidence to allow the Court to evaluate their awards "individually, using 'relevant factors includ[ing] the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, . . . [and] the amount of time and effort the plaintiff expended in pursuing the litigation.'" *Stanton v. Boeing Co.*, 327 F.3d 938, 977 (9th Cir. 2003) (quotation

---

[5] As the Court explained at oral argument, the primary reason injunctive relief settlements typically don't include the right to opt out is because in the normal case, unlike here, injunctive class members are not releasing damages claims.  Tr. 9:14–25.

[6] The Court does not determine at this stage whether there has been actual collusion, but the presence of the clear sailing arrangement and the disproportionately high amount of attorneys' fees "give[] rise to at least a danger of collusion." *Hofmann v. Dutch LLC*, 317 F.R.D. 566, 578 (S.D. Cal. 2016).  In light of "these multiple indicia of possible implicit collusion" and what appears to be unreasonably high attorneys' fees, there is a significant risk that the parties agreed to "lower monetary payments to class members or less injunctive relief for the class than could otherwise have been obtained." *In re Bluetooth Headset*, 654 F.3d at 947 (quotations omitted).

[7] This Court's analysis here encompasses the Rule 23(e)(2) factor that "the proposal treats class members equitably relative to each other."  Fed R. Civ. P. 23(e)(2).

12

omitted). The Court would consider the evidence presented at the final fairness hearing and evaluate the reasonableness of any incentive award request. Nevertheless, because incentive awards are not per se unreasonable, the Court finds that this factor weighs in favor of preliminary approval. *See Rodriguez*, 563 F.3d at 958 (finding that "[i]ncentive awards are fairly typical in class action cases" and "are discretionary" (emphasis omitted)).

### iv. Obvious Deficiencies

The Court also considers whether there are obvious deficiencies in the Settlement Agreement. As discussed, the Court finds several obvious deficiencies here.

*   *   *

Having weighed the relevant factors,[8] the Court finds that the Settlement Agreement is not fair, reasonable, and adequate, and **DENIES** preliminary approval.

## IV. CONCLUSION

The Court **DENIES** the motion for preliminary approval. Dkt. No. 129. The Court further **SETS** a case management conference on January 13, 2026, at 2:00 p.m. to discuss next steps. The hearing will be held by Public Zoom Webinar. All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg. All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities.

**IT IS SO ORDERED.**

Dated: 12/17/2025

HAYWOOD S. GILLIAM, JR.
United States District Judge

---

[8] The Court does not consider the factors articulated in Rule 23(e)(2)(C)(ii) and (iv), which do not apply here. *See* Mot. at 25–26, 29 (stating the same). And while Plaintiffs make other arguments about the adequacy of their representation of the class, Mot. at 21, which the Court has not specifically addressed, those arguments do not overcome the obvious deficiencies.

13